THE FOLLOWING IS THE PDF OF AN OFFICIAL TRANSCRIPT. OFFICIAL TRANSCRIPTS MAY BE FILED IN CM/ECF ONLY BY THE OFFICIAL COURT REPORTER AND WILL BE RESTRICTED IN CM/ECF FOR A PERIOD OF 90 DAYS.  YOU MAY CITE TO A PORTION OF THE ATTACHED TRANSCRIPT BY THE DOCKET ENTRY NUMBER, REFERENCING PAGE AND LINE NUMBER, ONLY AFTER THE COURT REPORTER HAS FILED THE OFFICIAL TRANSCRIPT; HOWEVER, YOU ARE PROHIBITED FROM ATTACHING A FULL OR PARTIAL TRANSCRIPT TO ANY DOCUMENT FILED WITH THE COURT.

United States District Court

1          UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF GEORGIA
2                ATLANTA DIVISION

3
UNITED STATES OF AMERICA,        )
4                                )
           PLAINTIFF,            )
5      V.                         )    DOCKET NUMBER
                                 )    1:19-CR-00297-ELR-JSA
6  TODD CHRISLEY,                 )
   JULIE CHRISLEY, AND            )
7  PETER TARANTINO                )
                                 )    **VOLUME 2**
8          DEFENDANTS.            )
_____)

9
                 Transcript of Jury Trial
10        before the Honorable Eleanor L. Ross
             United States District Judge
11                   May 17, 2022

12
A P P E A R A N C E S:
13

14  FOR THE GOVERNMENT:          THOMAS J. KREPP, ESQ.,
                                 ANNALISE KATHLEEN PETERS, ESQ.
15

   FOR DEFENDANT TODD CHRISLEY:   BRUCE HOWARD MORRIS, ESQ.,
16

   FOR DEFENDANT JULIE CHRISLEY:  STEPHEN MICHAEL FRIEDBERG, ESQ.
17                                CHRISTOPHER S. ANULEWICZ, ESQ.
                                 JONATHAN DELUCA, ESQ.
18

   FOR DEFENDANT PETER TARANTINO: DANIEL PATRICK GRIFFIN, ESQ.
19                                JOHN JAMES VAN WHY, ESQ.

20

21       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
   TRANSCRIPT PRODUCED BY COMPUTER.
22  _____

23
                  Geraldine S. Glover, RPR
24             Federal Official Court Reporter
            75 Ted Turner Drive, SW, Suite 2114
25             Atlanta, Georgia  30303-3309

                 United States District Court

1 <u>Index to Examination</u>

2 <u>WITNESS</u>                                                    <u>PAGE</u>

3 PAUL DESISTO

4     Direct Examination By Ms. Peters                        440

5     Cross-Examination By Mr. Morris                         467

6     Cross-Examination By Mr. Griffin                        475

7 LISA STONE

8     Direct Examination By Mr. Krepp                         477

9     Cross-Examination By Mr. Friedberg                      547

10     Cross-Examination By Mr. Anulewicz                     554

11     Redirect Examination By Mr. Krepp                      566

12     Recross-Examination By Mr. Anulewicz                   570

13 BETTY CARTER

14     Direct Examination By Mr. Krepp                        574

15

16

17 <u>INDEX TO EXHIBITS</u>

18 <u>G O V E R N M E N T'S   E X H I B I T S</u>

19                                         IDENTIFIED      ADMITTED

20 119      E-MAIL                             446           448

21 123      E-MAIL                             451           453

22 124      E-MAIL                             456

23 125      W-9 AND E-MAIL                     458           459

24 130      E-MAIL                             460           460

25 132      E-MAIL                             462           462

United States District Court

1    **INDEX TO EXHIBITS**

2    **G O V E R N M E N T ' S   E X H I B I T S (CONT'D)**

3                                                    IDENTIFIED    ADMITTED

| | | | IDENTIFIED | ADMITTED |
|---|---|---|---|---|
| 4 | 137 | E-MAIL 3/13/17 | 463 | 464 |
| 5 | 102A | 2 PHOTOGRAPHS | 480 | 481 |
| 6 | 103B | SIGNATURE CARD | 482 | 483 |
| 7 | 118 | E-MAIL | 490 | 498 |
| 8 | 103 | SIGNATURE CARD - 6044 ACCOUNT | 502 | 503 |
| 9 | 103A | BUSINESS RESOLUTION - 6044 ACCOUNT | 502 | 503 |
| 10 | | | | |
| | 104 | SIGNATURE CARD - 7889 ACCOUNT | 506 | 507 |
| 11 | | | | |
| | 104A | BUSINESS RESOLUTION - 7889 ACCOUNT | 506 | 507 |
| 12 | | | | |
| 13 | 101 | CASHIER'S CHECKS | 508 | 509 |
| 14 | 105 | MAP OF NASHVILLE, TENNESSEE | 512 | 513 |
| 15 | 197 | SUBPOENA | 514 | 515 |
| 16 | 194 | LETTER | 517 | |
| 17 | 198 | E-MAIL | 521 | 521 |
| 18 | 195 | E-MAIL | 522 | 540 |
| 19 | 100 | SCREEN SHOT PHOTOGRAPHS | 543 | 544 |
| 20 | 60 | IRS GENERAL PUBLICATION | 586 | 589 |
| 21 | 64 | IRS GENERAL PUBLICATION | 586 | 589 |
| 22 | 68 | IRS GENERAL PUBLICATION | 586 | 589 |
| 23 | 69 | IRS GENERAL PUBLICATION | 586 | 589 |
| 24 | 74 | IRS GENERAL PUBLICATION | 586 | 589 |
| 25 | 83 | IRS GENERAL PUBLICATION | 586 | 589 |

United States District Court

1    **INDEX TO EXHIBITS**

2    **G O V E R N M E N T'S   E X H I B I T S (CONT'D)**

3                                          **IDENTIFIED**    **ADMITTED**

| | | IDENTIFIED | ADMITTED |
|---|---|---|---|
| 85 | IRS GENERAL PUBLICATION | 586 | 589 |
| 91 | IRS GENERAL PUBLICATION | 586 | 589 |
| 46-48 | TAX LIENS | 593 | 594 |
| 521 | NOTICE OF FEDERAL TAX LIEN | 597 | 598 |
| 63 | IRS PUBLICATION | 599 | 600 |
| 66 | IRS PUBLICATION | 599 | 600 |
| 76 | IRS PUBLICATION | 599 | 600 |
| 88 | IRS PUBLICATION | 599 | 600 |
| 89 | IRS PUBLICATION | 599 | 600 |
| 90 | IRS PUBLICATION | 599 | 600 |
| 92 | IRS PUBLICATION | 599 | 600 |

United States District Court

P R O C E E D I N G S

1

2      THE COURT:  Thank you.  Good morning.  Please be
3  seated.

4      As you all know -- good morning to you, first of all.
5  As you all know, we asked the jury to be here by 9:45.  So I
6  simply wanted to come out to see if we had any matters to take
7  up prior to their coming out.

8      So let me go ahead and begin with the Government.

9      MR. KREPP:  Nothing, your Honor.  I think the Court
10  had two inquiries yesterday.  The defendants had made a
11  proffer at the pretrial conference as to the Department of
12  Revenue issue.  And we are satisfied by their proffer that
13  they made.  And we just confirmed that they do not intend to
14  go beyond what they previously have stated on the record.

15      THE COURT:  All right.  And we're really talking
16  about as it relates to opening statement?  Is that the proffer
17  that will -- or are we talking about even during the trial?

18      MR. KREPP:  I believe it's even during trial, your
19  Honor.  But for now just for opening statements.  And
20  Obviously, if defendants think a door has been opened, they
21  can certainly revisit it at that point.

22      THE COURT:  Got it.  All right.

23      MR. KREPP:  And then I think I let the Court know
24  that the parties are on the same page about those
25  stipulations, but we're going to admit them as exhibits.  And

1    they're between the Chrisleys and the United States.  And then
2    Mr. Tarantino is not going to object to the stipulation.
3            THE COURT:  All right.  And how will the stipulations
4    be presented?  Will they be read into the record by one of the
5    attorneys or --
6            MR. KREPP:  So I have printed copies, your Honor.  So
7    they will be marked with an exhibit.  It's Government's
8    Exhibits 1200 and 1201.  And we would ask that they go back
9    with the jury.  And at the time of admitting them, I would
10   read them to the jury.
11           THE COURT:  All right.  Thank you so much.
12           MR. KREPP:  Just one quick question.
13           THE COURT:  Yes.
14           MR. KREPP:  Is there an ELMO in here?
15           THE COURT:  Yeah.
16           MR. KREPP:  Is it just attached on the other side of
17   there?
18           THE COURTROOM DEPUTY:  Yes.
19           THE COURT:  And that's already set up, Ms. Beck?
20           THE COURTROOM DEPUTY:  Yes.  They just open the
21   drawer and I'll click to it when they need it.
22           THE COURT:  Okay.
23           MR. KREPP:  And I think the Court wanted a position
24   on the juror issue for Thursday.
25           THE COURT:  Yes.  Ms. Ferrans.  Yes.
                    United States District Court

1          MR. KREPP:  So I think -- we've talked, all of us.

2     And I think we're in agreement that it might make sense to

3     start in the afternoon on Thursday.  If the juror does have a

4     conflict at 10, I can't imagine her being able to come in at 9

5     and us do a half an hour worth of witnesses and just have

6     everyone wait around until after lunch.  I let the Court know

7     about certain health things I'm facing right now.  And I could

8     use the rest on Thursday morning.

9          THE COURT:  Is it Thursday?  Yeah, Thursday at 10 was

10    her appointment.

11         All right.  Thank you so much.

12         Turning my attention to the defense.  Mr. Morris.

13         MR. MORRIS:  May it please the Court.

14         THE COURT:  May it please the Court, yes.

15         MR. MORRIS:  With regard to the stipulation on the

16    Chrisleys, if we're stipulating to certain facts, we're doing

17    that so that there doesn't have to be testimony getting into

18    difficult issues.  We're just saying these are facts you need

19    to accept.  I don't know why they would go out as an exhibit.

20    No testimony goes out as an exhibit.

21         THE COURT:  Okay.  I was under the impression that

22    was something to which you all had agreed.  I thought you all

23    discussed the stipulation and how it would be presented and

24    whether or not it would go back.  But perhaps just that last

25    element has not been agreed to.

1       MR. MORRIS:  The last element I was not aware of.  We

2  agreed to the wording and we agreed it should be read to the

3  jury.

4       THE COURT:  Okay.  All right.  I'm not going to take

5  that up now.  You-all can discuss that because that would be

6  at the end of the trial when we iron out what does need to go

7  back.  But I'd encourage you-all to discuss that further.  And

8  if I do need to make a ruling on that, I will.  I don't even

9  know the exact nature of the stipulation.  I agree that if it

10 is in the form or the realm of testimony, there could be a

11 continuing witness type issue and it probably should not go

12 back, but I don't know that that's what it is.  So you-all

13 talk some more and then let me know if there's something I

14 need to rule on prior to the evidence going back.

15      MR. MORRIS:  Thank you, your Honor.

16      THE COURT:  Thank you.

17      Mr. Friedberg?

18      MR. FRIEDBERG:  Nothing further, your Honor.

19      THE COURT:  Thank you.

20      Mr. Griffin?

21      MR. GRIFFIN:  Good morning, your Honor.

22      One thing I will be saying in the opening statement

23 is, we got a bill of particular response from the Government,

24 and that they -- the Government does not claim Mr. Tarantino

25 entered into the conspiracy until February of 2016.  I've been

                    United States District Court

1  talking to the Government over the course of this.  At some

2  point I've got to put that in the record, but I am going to

3  reference it in opening statement.  And I think Mr. Krepp

4  might also be doing that.

5          THE COURT:  I see Mr. Krepp nodding his head yes, so

6  I believe we have no issue there.  So thank you for letting me

7  know.

8          MR. GRIFFIN:  And this trial -- I don't know what

9  will happen today, but this trial will have a lot of 404(b)

10  that doesn't relate to Mr. Tarantino.  And I don't know what

11  the Court's practice is.  Does the Court give an instruction

12  as it comes in?  I just would like to make it clear as to who

13  it's coming in with respect to.

14          THE COURT:  I do usually give a contemporaneous

15  charge.  It's the same one that's from the pattern.  "During

16  the trial you may hear evidence of acts allegedly done by the

17  defendant on other occasions that may be similar to acts with

18  which the defendant is currently charged.  You must not

19  consider any of this evidence to decide whether the defendant

20  engaged in the activity alleged in the indictment.  This

21  evidence is admitted and may be considered by you for the

22  limited purpose of assisting you in determining whether the

23  defendant had the" -- and we fill in the purpose, whether it's

24  state of mind, absence of mistake, whatever it is, intent --

25  "necessary to commit the crime charged in the indictment, the

1  defendant acted according to a plan or in preparation to

2  commit a crime or the defendant committed the acts charged in

3  the indictment by accident or mistake."  So those are the

4  other examples.  So we tailor that to the particular purpose.

5          The second paragraph is, "Bear in mind as you

6  consider this evidence, at all times the Government has the

7  burden of proving that the defendant committed each of the

8  elements of the offenses charged in the indictment.  I remind

9  you that the defendant is not on trial for any act, conduct or

10  offense not charged in the indictment."

11          So that is the pattern one.  If we need to -- what I

12  would need to know is, given what you've just said, if there

13  are several times throughout the trial where I will need to

14  give this or if you-all are suggesting that I just give it

15  once and how it will be tailored so that the jurors know that

16  it only applies to certain defendants and not all of them.

17          Does everyone have a copy of this pattern charge that

18  you can work on to tailor that for me or do I need to --

19          MR. GRIFFIN:  I think we can do that.  I just wanted

20  to make it clear that I would be asking to make sure that if

21  it says the defendant that's not this defendant.

22          THE COURT:  Well, you're telling me that.  And I get

23  it.  What I'm saying to you is, you-all need to address that

24  in a way that it can be presented to the jury so that they get

25  it.  I understand exactly what you're saying.  And I have no

1  problem with that.  But I'm not going to tailor this myself so
2  that it fits this case.  You-all will need to present to me a
3  version that I'm happy to read, but I don't have that before
4  me now.  I just have the pattern one that I just read.
5          MR. GRIFFIN:  I will discuss it with the Government.
6  I'm sure we can work something out.
7          THE COURT:  Okay.  Thank you.
8          Anything else from anybody else?
9          All right -- yes, sir.
10         MR. ANULEWICZ:  I'm sorry, your Honor.  Two things.
11 One is, we have an objection or an issue with regard to one of
12 the witnesses that we understand the Government is going to
13 call today.  I don't know if you want to take that up now or
14 after our openings.  And then the second issue is just the
15 rule of sequestration that we're going to -- I'm not sure
16 whether there's witnesses in the courtroom.  We would just ask
17 that that be invoked right away.
18         THE COURT:  All right.  Well, with respect to the
19 second issue, my policy is, in invoking the rule I only invoke
20 it after opening statement.  And so I have no problem with
21 that.
22         With regard to the first issue, what type of witness
23 issue are we talking about?
24         MR. ANULEWICZ:  We have an objection to one of the
25 witnesses.  It's both relevance and 404(b).  We understood
                    United States District Court

1 last night that the prosecution intends to call a gentleman

2 named Paul Desisto. And we believe that any testimony

3 Mr. Desisto would give is irrelevant to anything -- any claims

4 in the indictment and at best it's undisclosed 404(b)

5 testimony. Frankly, we are kind of surprised that he's being

6 called.

7 Mr. Desisto was the Chrisleys' contact at a company

8 call CEG. And CEG from 2015 through 2019 helped the Chrisleys

9 get endorsement deals from social media platforms, basically

10 online endorsements. He did that for Todd Chrisley, Julie

11 Chrisley, Savannah Chrisley, and Chase Chrisley. These

12 endorsement deals from CEG were separate from payments from

13 Bright Road, which is the payments that are from the

14 Chrisleys' TV show Chrisley Knows Best.

15 Prior to March of 2017, payments from CEG from --

16 payments to CEG went to a 7C's Productions bank account, which

17 is owned by Julie Chrisley. 7C's is owned by Julie Chrisley.

18 After March of 2017, CEG endorsement payments were made to a

19 separate bank account that was utilized by the Chrisleys. And

20 this was done to segregate the account from the growing

21 endorsement payments, which started picking up in 2017. But

22 even though they were made to this separate bank account, all

23 the monies paid into CEG were noted on the 2017 tax returns

24 that were filed by 7C's, so all the taxes were paid on them.

25 And absolutely all of the revenues from the CEG account for

1  the past tax obligation were noted on the Chrisleys' 2017
2  joint tax filings.

3        Nothing in the indictment suggests that there was
4  anything wrong with the 2017 tax returns.  So they reported
5  all the CEG income to the IRS, they reported everything on the
6  tax returns to the IRS.

7        Now, the indictment as it relates to 2017, the only
8  real conduct that's alleged in there is related to Julie
9  Chrisley's allegedly obstructing justice with regard to a 7C's
10 account at Bank of America.

11       The best that we can figure out, the Government
12 intends to call Mr. Desisto to testify that around March of
13 2017 Todd Chrisley e-mailed him to tell him to send the CEG
14 payments to a separate account rather than to the 7C's
15 account.  At least these are the only documents that we are
16 seeing from the Government, So that's why we think that that's
17 why they're calling Mr. Desisto.

18       Now, again, this is not in the indictment.  While it
19 appears to be a stretch, what the Government seems to be
20 saying is that this is an attempt to hide income by
21 Mr. Chrisley from the IRS that they could put a tax lien on.
22 But the problem with that argument is that whether CEG was
23 paying 7C's or whether CEG was putting the money in a separate
24 account, which 7C's recognized, Mr. Chrisley did not own 7C's.
25            THE COURT:  Let me stop you right there.  Let me let
                  United States District Court

1   you have a seat and let me hear from the Government a proffer

2   of what Mr. Desisto will say so that we can make sure that

3   we're addressing exactly what the testimony will be, not what

4   we think it will be.

5         MR. ANULEWICZ:  Thank you.

6         MR. KREPP:  Yes, your Honor.

7         I believe Mr. Desisto's testimony will be that on

8   March 7th, 2017, he received an e-mail from Todd Chrisley

9   stating to stop sending payments to the current account on

10   file because the account had been, quote, compromised.  Now,

11   that is of particular importance in this case because, as

12   referenced in Paragraph 38 of the superseding indictment, it's

13   alleged that on March 6th, one day beforehand, the IRS had

14   requested all bank accounts to which Todd or Julie Chrisley

15   had access to.  So one day after that, Mr. Chrisley, the

16   defendant here, e-mailed Mr. Desisto to say their account had

17   been, quote, compromised, and then payments thereafter were

18   diverted to an account owned by the defendant's mother.

19         So we think this is highly probative of the tax

20   evasion charge here.  The 2017 -- let me be clear, those

21   payments in 2017 were sent to a third party, to Elizabeth Faye

22   Chrisley, not to Todd Chrisley and not to 7C's Productions.

23   So the defendants have previously filed a motion for a bill of

24   particulars.  The Government objected.  And our position was

25   that we don't need to itemize every single alleged false

United States District Court

1  statement or false act taken on behalf of -- in furtherance of
2  the conspiracy.

3       But really I'm hearing two arguments here.  One is a
4  402 argument and the second is a 403 argument.  I think these
5  are all perfectly valid arguments to make at closing for the
6  jury as to what Todd Chrisley's state of mind was.  But the
7  facts are what they are, that Todd Chrisley sent this e-mail a
8  day after receiving the request from the IRS.  And let me just
9  be clear.  All of these underlying documents, all of them were
10 properly disclosed at the time of arraignment or before the
11 case was certified.

12       THE COURT:  All right.  And the paragraph to which
13 you just referred was 38?

14       MR. KREPP:  Yes, your Honor.  And specifically
15 March 6th --

16       THE COURT:  Hold on one second.  Let me get there.
17 Okay.

18       MR. KREPP:  And aside from that, your Honor, so I'll
19 just read it into the record.  On March 6th, 2017, Tarantino
20 notified Todd and Julie Chrisley that an IRS revenue officer
21 had requested copies of bank statements for accounts over
22 which Todd and Julie Chrisley had signature authority.  The
23 event in question, again, is one day after that.

24       And what's further important here, your Honor, is
25 there was subsequent communications where an IRS form W-9 was

                    United States District Court

sent, basically authorizing Faye Chrisley to take payments on behalf of Todd Chrisley.  So we believe this is -- yet again, it's highly probative.  We plan on addressing this in opening statements.  And it goes to the defendant's state of mind, his willfulness, which as the Court is well aware, the Government has the burden of proving that the defendant had the specific intent to violate a known legal duty.

So we believe the fact that the day after he received this request from the IRS that he diverted funds into his mother's account contemporaneous with Julie Chrisley changing the name of 7C's to the mother is highly probative as to defendant Todd Chrisley's state of mind with respect to Counts 8 and 9.

THE COURT:  Mr. Anulewicz, now that you have a more specific idea of what the testimony would be from Mr. -- is it Desantis, Desoto?

MR. ANULEWICZ:  Desoto -- Desisto.  Excuse me.

THE COURT:  -- Desisto, what is your argument?

MR. ANULEWICZ:  My argument is still pretty much the same.  I think that Mr. Krepp may be forgetting that the letter from the IRS on March the 6th asked the Chrisleys to disclose bank accounts of which they were signatories as of February 28th, 2017.  And they in fact did that.

So there is no allegation in the indictment that they did not comply with the IRS's request or that anything in the

United States District Court

1  IRS's request was never met.  The IRS never asked again about
2  those accounts.

3       What is important here -- and again, I think the
4  Government is also forgetting -- is that to the extent that
5  they are looking to lien Todd Chrisley's past tax obligations,
6  whatever those might be, that it is both illogical and not in
7  the indictment.  If the monies went from CEG to 7C's, Todd
8  Chrisley doesn't own 7C's.  Not lienable.  Not attachable.  If
9  it goes to this other account, if it belongs to Todd Chrisley,
10 they could get it.  They could have gone to CEG or these other
11 companies to put a garnishment on.  They didn't.  But in any
12 event, there's nothing changed.  There's no attempt to hide
13 because they could never lien the money in the first place.
14 It just logically doesn't make any sense.

15      And the Government is trying to bootstrap this
16 argument into something that it clearly is not.  Just
17 respectfully to the Government, this case is going to take
18 three to four weeks.  We now have tons of 404(b) evidence
19 that's coming in.  We have jurors that are going to be here
20 for a long time.  We already have to take some time off
21 Thursday.  If we keep putting in this type of evidence that's
22 irrelevant to the pleadings in the case, this case is going to
23 go on forever.  And again, we believe that it is both
24 irrelevant and prejudicial to our clients.

25           THE COURT:  Well -- and I don't know enough about the
                     United States District Court

1   case.  I certainly don't know as much as you-all know to know
2   if it is relevant.  But to me, based on the Government's
3   argument, it sounds like there is at least some relevancy if
4   the action was taken to divert the e-mails one day after the
5   March 6th date when the IRS asked for all accounts.  And so I
6   think it's at least arguable.  I mean, whether or not you
7   think it's a valid argument, I agree with the Government that
8   is something that can be argued during closing.

9          But I guess I'm not really following your position
10  that it has no relevancy, no bearing at all, because I think
11  that there is at least a basis for an argument to be made
12  there.

13         MR. ANULEWICZ:  Well, can I make -- if I can --
14         THE COURT:  Yes, sir.
15         MR. ANULEWICZ:  -- just to finish the argument or
16  thought, is that there is no diversion whatsoever; that if the
17  monies are coming from CEG that were paid into the 7C's
18  account, Todd Chrisley is not an owner or a signatory or have
19  any right to that money.  That is Julie Chrisley's account.
20  So the Government cannot put a lien on it.  If the monies go
21  from a non-lienable account to somewhere else, they still
22  can't put a lien on it.  There's no diversion.  There's no
23  sense in it.

24         They're making the argument that monies was diverted
25  from 7C's, a place that they could not have put a lien, to

1   somewhere else.  And if they could not have put a lien on the
2   monies that were going into 7C's, then there is no diversion,
3   there is no hiding.  There is just -- there's just a big --
4   quite frankly, they put it in there because the endorsement
5   deals were kind of getting bigger and they wanted to keep
6   track of them in a separate account that they had used since
7   2012, that the Chrisleys, Todd and Julie Chrisley, had used
8   since 2012.

9        And so there is just simply no diversion.  The
10  Government, they're trying to say that because of the timing
11  we want the jury to infer this.  But as a matter of law --

12       THE COURT:  A lien could not have been placed.

13       MR. ANULEWICZ:  -- a lien could not have been placed
14  in the first place.  And so it just makes no sense.  If we're
15  going to have Mr. Desisto come up here, we're going to have
16  other people come up here to testify to things that maybe
17  taints the jury because they don't understand about, like,
18  when liens can be attached and those types of thing, but it is
19  completely irrelevant and doesn't make any sense with regard
20  to the Government's theory.

21       THE COURT:  All right.  Government, what say you
22  especially with respect to whether a lien could not even have
23  been placed on the account and with respect to Todd Chrisley's
24  specific relationship to the 7C's account?

25       MR. KREPP:  Yes.  So first of all, that is incorrect
                    United States District Court

1  as a matter of law.  The IRS can place what's called a nominee

2  lien.  So if the IRS -- and we're going to hear testimony

3  about this from our third -- what we plan to be our third

4  witness, a revenue officer named Betty Carter, that the IRS

5  can in fact go after third-party assets if it can determine

6  that that third party is holding assets on behalf of somebody

7  who is evading taxes.  So that is just incorrect as a matter

8  of law.

9          Secondly, the Government's theory is that the

10  defendants used 7C's to shelter Todd Chrisley's income.

11          And let's be clear about what the request was from

12  the IRS on March 6th.  It was not just for Todd Chrisley's

13  accounts; it was for Todd and Julie Chrisley's accounts.

14          So this was a -- again, everything Mr. Anulewicz just

15  said, I go back to what I said earlier.  This is perfectly a

16  rational argument for closing argument.  But in terms of 402

17  or certainly 403 where the Government has this heightened

18  burden of proving willfulness and intentional violation of a

19  known legal duty, the Government should be permitted to call

20  this witness.

21          And I will say, I -- this is going to be a very brief

22  witness.  We're talking about at most six or seven e-mails.

23  So with respect to the argument, respectfully, that this is

24  going to be a long trial, 404(b), we're not even in the realm

25  of 404(b).  This is just the heart of a conspiracy to defraud

United States District Court

1 the IRS and the tax evasion charge.

2       THE COURT:  All right.  I appreciate it.  Thank you

3 for the arguments from both sides.

4       I am going to allow Mr. Desisto, after hearing

5 proffers, testify.  So if that is in the form of a motion to

6 exclude or a motion in limine, it is denied.

7       MR. ANULEWICZ:  Thank you, your Honor.

8       THE COURT:  All right.  Is there anything else?  I've

9 just asked Ms. Beck to check on our jurors to see if they are

10 all here.  We're right at 9:40, which is a few minutes before

11 we told them that we were going to start.  Anything else

12 before we bring them out?  If there is, just stand up, one of

13 you attorneys.

14       All right.  I'm going to step off very quickly and

15 hopefully be right back because they are hopefully here or

16 almost here.  So we're in recess for a few minutes.

17     **(A recess was taken at 9:41 a.m.)**

18       THE COURT:  Anything before we bring the jury out?

19       Government?

20       MR. KREPP:  No, your Honor.

21       THE COURT:  Anything on behalf of the defense?

22       MR. MORRIS:  No, your Honor.

23       MR. ANULEWICZ:  No, your Honor.

24       MR. MORRIS:  Would your Honor prefer that we always

25 stand when the jurors come in or leave?

        United States District Court

1        THE COURT:  Yes.

2           **(The jury entered the courtroom at 9:55 a.m., after**

3 **which the following proceedings were had.)**

4        THE COURT:  Ladies and gentlemen, once you come in,

5 please remain standing once you get to your spot.  There are

6 additional seats on the front here that you might not be able

7 to see.  And if you could use the ones closest to me, that

8 would be great.

9        All right.  The jury has entered.

10        Everyone except for the jury may be seated.  Except

11 for the jury.  It's okay.  It's been that kind of morning.

12        So if you all who are still standing would please

13 raise your right hand so that I may swear you in.  As you may

14 recall, the other oath went just to jury selection.  This is

15 the oath you take now as a juror.

16        I do solemnly swear that I will well and truly try

17 the matters in issue now on trial and render a true verdict

18 according to the law and the evidence, so help me.

19        If you agree, please respond by saying I do.

20        THE JURORS:  I do.

21        THE COURT:  Everyone who has either sworn or affirmed

22 in that manner, please lower your hand and take your seat.

23 Thank you.

24        For the record, no juror remained standing.

25        Good morning, ladies and gentlemen.

             United States District Court

1          THE JURORS:  Good morning.

2          THE COURT:  Thank you for being here.

3          Just very quickly.  I cannot stress for you enough

4  that you need to be here and need to be on time.  I will make

5  it an earlier time going forward just for those who have some

6  issues getting here on time.  We cannot start at all until all

7  of you are here.  We're just all waiting and nothing is being

8  done.  So please keep that in mind.  We certainly understand

9  that emergencies happen, but please for the remainder of this

10 trial be on time.  Thank you so much.  I appreciate it.

11         All right.  Well, we are ready to go.  As I told you

12 yesterday, all of the housekeeping matters that I admonished

13 you of yesterday are still in place.  So you are not to

14 discuss the case with anyone, with each other, with anyone

15 else, whether it's at home or in this courthouse.  You are not

16 to do any independent research, whether it's by Google or

17 anything else.

18         You may be thinking there's no way they will ever

19 know if I do something like that at home.  You may think that.

20 But let me tell you from prior trials, it has been the case

21 where a juror has gotten some extra knowledge from a Google

22 search or something, come in and brought it into

23 deliberations, not remembering that they got it from that

24 source rather than in this case.  It comes up.  All of the

25 other jurors are saying, where did you get that, we didn't

United States District Court

1  hear that.  And it comes to my attention.  We have to declare

2  a mistrial, start over.  It causes many problems.  So just

3  insulate yourself from all of that so that your decision, your

4  verdict, is based solely on the evidence presented here and

5  that you all have the same knowledge and that it comes to you

6  under oath.

7         So please, remember, once this trial is over, you can

8  talk about it or not talk about it to whomever you want; but

9  while it is ongoing, please don't discuss any aspect of this

10 trial, don't do any independent research.

11        All right.  The first thing that I need to do is go

12 ahead and give you some preliminary instructions.  This will

13 include some of the legal definitions that probably would have

14 been helpful to you yesterday as you were being asked all

15 those questions and that you had been asked to fill out your

16 questionnaire in the absence of.  So these are just very brief

17 instructions.  You will get more lengthy instructions at the

18 end of the trial before you do deliberate.  And after I give

19 you these instructions, you will hear from the lawyers their

20 opening statements.

21        So ladies and gentlemen, you have now been sworn as

22 the jury to try this case.  By your verdict you will decide

23 the disputed issues of fact.  I will decide all issues of law

24 and procedure that arise during the trial.

25        Before you retire to the jury room at the end of the

United States District Court

1  trial to deliberate upon your verdict and decide the case, I
2  will instruct, that is, explain, to you the rules of law that
3  you must follow and apply in making your decision.  You must
4  follow the law as I explain it to you even if you do not agree
5  with the law.

6       The evidence presented to you during the trial will
7  primarily consist of the testimony of the witnesses and
8  tangible items, including papers or documents called exhibits.

9       There are two kinds of evidence, direct and
10 circumstantial.  Direct evidence is direct proof of a fact,
11 such as testimony of any eyewitness.  circumstantial evidence
12 is proof of facts from which you may infer or conclude that
13 other facts exist.  I will give you further instructions on
14 these as well as other matters at the end of the case.  But
15 for now, just keep in mind that you may consider both kinds of
16 evidence, direct and circumstantial.

17      It will be up to you to decide whether or not you
18 believe each witness, how much of a witness's testimony to
19 believe, how much of any witness's testimony to reject, if
20 there is some you do reject.  I will give you some guidelines
21 for determining the credibility or believability of witnesses
22 at the end of this case.

23      Now let's talk burden of proof.  The defendants are
24 presumed innocent unless and until proven guilty.  And that's
25 for each individual defendant.  The indictment against each

1  defendant brought by the Government is only an accusation,

2  nothing more.  It is not proof of guilt or anything else.  The

3  defendants, therefore, start out with a clean slate.

4         In a criminal case such as this, the Government has

5  the burden of proving its case.  The Government must prove its

6  case beyond a reasonable doubt.

7         What is beyond a reasonable doubt?  A reasonable

8  doubt is a real doubt based on your reason and common sense

9  after you've carefully and impartially considered all of the

10 evidence in the case.  Additionally, reasonable doubt can be

11 based on a lack of evidence.  So proof beyond a reasonable

12 doubt is proof so convincing that you would be willing to rely

13 and act on it without hesitation in the most important of your

14 own affairs.

15        The Government must prove this case beyond a

16 reasonable doubt.  Now, it does not have to prove a

17 defendant's guilt beyond all possible doubt.  The Government's

18 proof only has to exclude any reasonable doubt concerning the

19 defendants's guilt.

20        The burden of proof is on the Government until the

21 very end of this trial.  The defendant has no burden to

22 prove -- and by defendant of course I'm applying that to each

23 of the three defendants here on trial. -- to prove his or her

24 innocence or to present any evidence or to testify.

25        Since the defendants have the right to remain silent

1  and may choose whether to testify, you cannot legally put any

2  weight on a defendant's choice not to testify.  It is not

3  evidence.  At the end of this trial, I will give you further

4  instructions on this standard.

5        Now note taking.  You will be given in just a moment

6  a pad and something to write with.  You may take notes during

7  the trial, but you are not required to do so.  It is up to

8  each of you to decide if you want to take notes.

9        The notepads are to remain in the courtroom during

10  breaks.  They are not to be taken out of the courtroom until

11  you go out to deliberate.  So we'll probably have to keep

12  reminding you.  It's typical that jurors will walk out during

13  a break or something or at lunch time with your pad and we'll

14  say, no, leave your pads here.  You only take them out once

15  you begin to deliberate.

16        If you do decide to take notes, be careful not to get

17  so involved in note taking that you become distracted from

18  what is going on before you in the trial.  Your notes should

19  be used only as aids to your memory.  If your memory later

20  differs from your notes, you should rely upon your memory not

21  your notes.

22        If you do not take notes, you should rely upon your

23  own independent recollection or memory of what the testimony

24  was and not be unduly influenced by the notes taken by any

25  other juror.  Notes are not entitled to any greater weight

1 than the recollection or impression of each juror concerning

2 testimony or evidence presented at trial.

3 Transcripts.  Ladies and gentlemen, please pay close

4 attention to the testimony because it will be necessary for

5 you to rely upon your own memories concerning the testimony

6 presented to you.  Although you do see a court reporter taking

7 down everything that is happening during the trial,

8 typewritten transcripts will not be prepared in time for your

9 deliberations.  So if you send out a note saying can we get a

10 copy of witness X's testimony, the answer will be,

11 respectfully, no.

12 However, exhibits admitted in evidence during the

13 trial will be available to you for you to examine during your

14 deliberations.  So if an exhibit is received in evidence but

15 not fully read or shown at that time, don't be concerned

16 because you will get to see and study it in its entirety

17 during your deliberations.

18 Ladies and gentlemen, during the trial, keep an open

19 mind, avoid reaching any hasty impressions or conclusions

20 reserve your judgment until you have heard all of the

21 testimony and evidence, the closing arguments or summations of

22 the lawyers and then my concluding instructions regarding the

23 applicable law.

24 Because of your obligation, your oath to keep an open

25 mind during this trial, coupled with your obligation to then

1 decide this case only on the basis of the testimony and
2 evidence presented, you must not discuss this case among
3 yourselves or with anyone else while the trial is ongoing.
4 You also should not permit anyone to discuss it in your
5 presence.  And should that happen, please get a note to me
6 through Ms. Beck as soon as possible.

7            From time to time during the trial, I may be called
8 upon to make rulings of law on objections or motions made by
9 the lawyers.  Do not infer or conclude from any ruling or
10 other comment that I make that I have an opinion on the merits
11 of the case favoring one side or the other.

12           If I should sustain an objection to a question that
13 goes unanswered by a witness, you should not guess or
14 speculate what the answer might have been nor should you draw
15 any inferences or conclusions from the question itself.

16           During the trial, it may be necessary for me to
17 confer with the lawyers from time to time outside of your
18 hearing with regard to questions of law or procedure.  As much
19 as possible I try to bring the lawyers up here to talk to
20 them.  But sometimes, if it's a little more involved, I will
21 need to send you out.  Please, should that happen, be patient.
22 At times the trial may be -- may seem to be going slowly or
23 may be delayed.  Just be patient and remember the importance
24 of what you're here to decide.

25           The final thing I want to do, ladies and gentlemen,
                    United States District Court

1  is give you somewhat of a road map so that you will know how

2  this trial will unfold.  So the order of the trial's

3  proceedings will be as follows:  In just a moment the lawyers

4  for each of the parties will be permitted to make what we call

5  opening statements to you.  The Government will then go

6  forward with the calling of its witnesses and present --

7  presentation of evidence during what we call the Government's

8  case in chief.  When the Government finishes, by announcing

9  the Government rests, each defendant will have the opportunity

10 to proceed with witnesses and evidence, after which, within

11 certain limitations, the Government may be permitted to again

12 call witnesses or present evidence during what we call the

13 rebuttal phase of the trial.

14         The Government is the party that begins the case and

15 may present rebuttal evidence at the end, because again, the

16 law places the burden of proof upon the Government.  And

17 again, I will further explain that burden at the end of the

18 case.

19         Once the evidence portion of the trial is completed,

20 the lawyers will then be given the opportunity to address you

21 and make their summations or final arguments, closing

22 arguments in the case.  Once those are completed, I will

23 instruct you on the applicable law.  You will then retire with

24 the evidence and return your verdict after deliberating.

25         So we will now proceed to opening statements by the

                    United States District Court

1 lawyers for each side.  This is their opportunity to make

2 statements, in which they may explain the issues in the case

3 and summarize the facts they expect the evidence will show.

4 You sometimes may hear on television opening

5 arguments.  That is a misnomer.  It's incorrect.  Lawyers are

6 not permitted to argue during opening.  They're only permitted

7 to argue at the end.  So this is their opportunity to tell you

8 in good faith what they expect or anticipate the evidence at

9 trial will show.

10 I caution you that what the lawyers say during this

11 trial is not evidence nor is anything I do or say to be

12 considered evidence.  The statements that the lawyers make

13 now, as well as the arguments they will make at the end, are

14 intended only to help you understand the issues and evidence

15 the parties expect will be presented as well as the positions

16 taken by each side.

17 So ladies and gentlemen, please give the lawyers your

18 close attention as I recognize them for opening statements.

19 Government, are you ready to open?

20 MS. PETERS:  We are, your Honor.

21 THE COURT:  You may proceed.

22 MS. PETERS:  Thank you.

23 THE COURT:  I'm sorry.  If we could get those pads

24 passed down.

25 **(brief pause)**

United States District Court

1          THE COURT:  If you don't have a pad or something to

2   write with, please just wave your hand.  Looks like we are

3   good to go.

4          You may proceed, ma'am.  Thank you.

5          MS. PETERS:  Thank you, your Honor.

6          If it please the Court.

7          THE COURT:  Yes, ma'am.

8          MS. PETERS:  This case is about fraud and tax

9   evasion.  Todd and Julie's fraud schemes are simple.  They

10  make up documents and they lie through their teeth to get

11  whatever they want when they want it.

12          In just a few short years, the Chrisleys manufactured

13  documents and sent them to community banks in the Atlanta area

14  to swindle those banks out of more than $30 million in

15  fraudulent loans.  That's called bank fraud.  And they took

16  those millions and they burned through them on luxury cars,

17  designer clothes, travel, and they used new loans to pay back

18  old loans.

19          Eventually the scheme collapsed.  And when it did,

20  Todd Chrisley filed for bankruptcy and walked away from more

21  than $20 million of those loans that he had obtained

22  fraudulently and burned through.

23          The fraud didn't end there.  Years later, Julie

24  Chrisley was doing the same thing.  She manufactured more

25  documents and sent them to real estate agents so that the

                    United States District Court

1  Chrisleys could rent a luxury house in California.  That's
2  called wire fraud.

3          Now, after the Chrisleys spent those millions upon
4  millions of dollars and after Todd Chrisley filed for
5  bankruptcy, the Chrisleys met a TV producer and they became
6  the stars of their own reality TV show filmed in their Atlanta
7  home.  And as you may have guessed yesterday, their show is a
8  big success.  A lot of people watch it.  And in just three
9  years, the Chrisleys made more than $6 million from their
10 show.

11         But they didn't just commit bank fraud and wire
12 fraud; they also defrauded the IRS.  While they were making
13 that $6 million, they hid money from the IRS to avoid paying
14 taxes that we all have to pay.  While they were earning that
15 $6 million, Todd and Julie Chrisley didn't even file taxes for
16 2013, for 2014, for 2015 or for 2016.  And they didn't pay a
17 dime of that $6 million for any of those tax years.

18         And that's not the end of it.  Todd Chrisley already
19 owed the IRS half a million dollars in delinquent taxes from
20 years earlier.  And when IRS employees started looking for
21 their money to try to collect on those years' overdue taxes,
22 the Chrisleys took their millions and hid them away to evade
23 paying their taxes.  That's called tax evasion.

24         The Chrisleys kept Todd Chrisley's name off of their
25 bank accounts and off of their family company to make sure

                    United States District Court

1  that IRS employees wouldn't be able to find their money, even

2  though behind the scenes, Todd Chrisley was the one calling

3  the shots and in control.

4       Later the IRS started digging deeper and asking more

5  questions about their assets.  They suspected that the

6  Chrisleys might be hiding money.  And when the IRS started

7  asking more questions and digging deeper, the Chrisleys used

8  Todd Chrisley's own mother to keep hiding the money from the

9  IRS.

10      Peter Tarantino, who's a trained and certified public

11  accountant who the Chrisley's hired, helped them hide the

12  money and evade paying their taxes.  In fact, Tarantino played

13  a key role.  He lied to multiple IRS employees about the

14  Chrisleys' income, about the Chrisleys' family company and

15  about the Chrisleys' ability to pay their taxes.  You'll see

16  that Peter Tarantino even filed false tax returns for the

17  Chrisleys' company.

18      And finally, after the Chrisleys and after Tarantino

19  learned about the criminal investigation that's brought us all

20  here today, the lies kept coming.  You're going to hear with

21  your own ears an audio recording where Peter Tarantino lied to

22  the FBI.  And you're going to see that Julie Chrisley

23  submitted to a federal grand jury who was investigating them a

24  sham document and a bogus story to try to obstruct the grand

25  jury's investigation and avoid prosecution.

United States District Court

1      This case is about fraud and tax evasion, pure and
2  simple.

3      Before I tell you more about this case, let me back
4  up and make some introductions.  Good morning to all of you.
5  My name is Annalise Peters.  And I along with my co-counsel,
6  Thomas Krepp, represent the United States.

7      I know you met us yesterday, but I'll reintroduce our
8  three federal agents as well who have been helping with this
9  case.  From the FBI, we have Special Agent Steve Ryskoski and
10  Special Agent Chip Cromer.  From the IRS we have Special Agent
11  Brock Kinsler, who works in the criminal investigation
12  division.  We also have with us Ms. Shannon Dyer, who is our
13  paralegal, who will be helping us show you some of the
14  evidence in this case.

15      And I also want to thank you for being here this
16  morning.  We know this is a burden.  We know this is going to
17  be a long trial.  But jury service is really important and
18  it's a crucial part of our country's system.  So thank you for
19  being here.

20      There's two things that I want to do this morning to
21  get you ready for trial.  First, I want to spend the bulk of
22  our time telling you about the crimes that all three
23  defendants committed and what the evidence is going to show
24  about those crimes beyond a reasonable doubt.  After I do
25  that, I'll briefly tell you about the specific charges that

1  each of the three defendants is facing.

2      So let's start with the crimes.  There are four basic

3  categories of crimes that these three defendants have

4  committed.  So I'll give you an overview before we jump into

5  specifics.

6      First, Todd and Julie Chrisley committed bank fraud.

7      Second, Julie Chrisley committed wire fraud.

8      Third, all three defendants, the Chrisleys and Peter

9  Tarantino, committed a variety of tax crimes against the IRS.

10      And finally, Julie Chrisley committed obstruction of

11  justice.

12      Those are the four categories of crimes that we're

13  going to talk about this morning.  And we'll start with the

14  bank fraud.

15      Between 2010 and 2012, Todd and Julie Chrisley, who

16  are married to each other, lived here in the Atlanta area and

17  they both owned successful real estate businesses.  Todd

18  Chrisley owned a company called Chrisley Asset Management,

19  also known as, for short, CAM, C-A-M.  Julie Chrisley was a

20  real estate agent and she too owned her own business and had

21  multiple real estate agents working under her.

22      Their businesses were doing well.  They were making

23  quite a lot of money around this time.  But the evidence will

24  show they were spending way more than they were making.

25  You're going to see evidence that Todd Chrisley was spending

1   money like water.  You're going to hear stories about his

2   extravagant spending during that time.  And you're going to

3   see e-mails and bank statements showing that Todd Chrisley was

4   taking so much money out of his business, out of CAM, that CAM

5   wasn't able to even cover payroll and was stiffing some of its

6   vendors.

7           The evidence will show that Todd Chrisley wasn't just

8   spending money out of his company.  The evidence will show

9   that during this time the Chrisleys, along with their business

10  partner, were fabricating and manufacturing financial

11  documents and sending those lies to banks to get that more

12  than $30 million in personal loans.

13          They were sending several types of false documents

14  and lies to these banks to induce the banks to give them these

15  big loans; but I want to highlight just two of the ones that

16  you'll see this morning.

17          You're going to see fake and fabricated bank

18  statements that the defendants created and sent to these

19  community banks representing that Todd Chrisley had way more

20  money in the bank than they actually did.  And he didn't have

21  a ton of money in the bank because he was burning through it

22  so fast.

23          One of the other lies that you're going to see is

24  that repeatedly Todd and Julie Chrisley and their business

25  partner submitted a personal financial statement to banks

United States District Court

1 claiming that Todd Chrisley had $4 million in a bank account

2 at Merrill Lynch.  You are going to see that this

3 representation that Todd Chrisley has $4 million at Merrill

4 Lynch, that representation was sent to more than a dozen

5 community banks in the Atlanta area.  But you're also going to

6 see real bank statements from Merrill Lynch for Todd Chrisley

7 from this timeframe.  And those real bank statements are going

8 to show you that at any given time Todd Chrisley never had

9 more than $20,000 in an account at Merrill Lynch.

10       You're also going to hear from bank employees who

11 dealt with the Chrisleys, who will tell you that this

12 information, these lies, were important.  They were relying on

13 the information that the Chrisleys provided when they decided

14 to issue these millions of dollars in loans because they

15 thought, based on this information, that the Chrisleys were

16 good for it and would pay it back.

17       Bank records and employees of Mr. Chrisley's company,

18 CAM, will tell you that by 2012 all the money had dried up.

19 CAM as a business had lost its biggest client and was shutting

20 down.  And equally important by that time, Todd Chrisley had

21 spent all of the loans and couldn't get any more and he owed a

22 lot of banks a lot of money on these 30 plus million dollars

23 of loans.

24       You'll hear that Todd Chrisley filed for bankruptcy

25 and ultimately walked away from more than $20 million of those

United States District Court

1  loans, leaving the community banks holding the bags.

2          You're going to hear from the Chrisleys' business

3  partner who helped them commit the fraud.  His name is Mark

4  Braddock.  Mr. Braddock will tell you that he brought

5  information to the Government about the fraud ten years ago,

6  long before the Chrisleys got a TV show and got famous.  And

7  he'll tell you that he got immunity for his part in the fraud.

8          He'll also admit to you that he's a fraudster.  He

9  will tell you that he lied about everything under the sun to

10 keep the fraud scheme going at the time.  He was in on it with

11 them.

12          But remember, the Government didn't pick him as a

13 witness in this case.  Todd and Julie Chrisley picked him to

14 help them with the fraud.

15          Mr. Braddock will tell you that they were targeting

16 these community banks because those little banks didn't do the

17 diligence that the big banks did and it was easier to get them

18 to give the Chrisleys money.

19          Mark Braddock will tell you that he was creating and

20 sending these lies at Todd Chrisley's direct instructions.

21 He'll tell you that they even had a term for all this fraud.

22 It was called "scrapbooking", where they would merge together

23 documents and create new ones showing that there were way more

24 funds available than there were.  Mr. Braddock will also tell

25 you that Julie Chrisley knew exactly what was going on and she

1  helped scrapbook these documents.

2        Mr. Braddock will also tell you that after all the

3  loan money dried up and after the business closed, the

4  Chrisleys sued him and blamed him, Mark Braddock, for all of

5  the fraud.  The Chrisleys claimed that they had no idea that

6  Mark Braddock was committing more than $30 million of bank

7  fraud and they had no idea that it had been going on.

8        But what Mr. Braddock will tell you really happened

9  is corroborated by key evidence that you're going to see in

10  this case.  You're going to hear from various bank employees

11  who dealt directly with Todd Chrisley during the loan

12  application process.

13        You're going to hear from a woman named Alina Clerie,

14  who was part of the -- she was in control of the finances at

15  Chrisley Asset Management.  She's going to tell you that Todd

16  Chrisley knew everything that went on at that company and was

17  deeply involved in all of the finances.

18        You're going to see e-mails where Todd Chrisley

19  instructed Mr. Braddock to scrapbook.  He told Mr. Braddock

20  what to change, what the numbers needed to show and what

21  documents to create.  You're also going to see an e-mail where

22  Julie Chrisley helped create one of those false documents.

23        And at the end of the day, the money never lies.  The

24  bank records will show you where the money went.  New loans

25  were used to pay back old loans.  And millions upon millions

1  of dollars went directly to the Chrisleys' personal benefit.

2       Let's talk about the second crime.  This is Julie

3  Chrisley's wire fraud.

4       Two years after the bank fraud scheme ended in 2012,

5  Julie Chrisley was still scrapbooking.  That summer the

6  Chrisleys were trying to rent this house in a nice L.A.

7  suburb.  And as you can see, it was a nice house.  The rent on

8  this thing was $13,000 a month.

9       You're going to hear from the listing agent, whose

10  name is Adam Jaret.  He's going to tell you that before he

11  could make any recommendations to the homeowner about renting

12  this house to the Chrisleys he needed to see two things.  He

13  wanted to see that the Chrisleys had a bunch of money in the

14  bank and he wanted to see that they had good credit.  That was

15  important to his recommendation on whether to rent a house for

16  $13,000 a month to the Chrisleys.

17       Now, the evidence will show that the Chrisleys didn't

18  have either of those things.  They didn't have a bunch of

19  money in the bank and they didn't have good credit.  And it

20  was because they were burning through money so fast and

21  weren't paying their bills on time.

22       Nevertheless, you're going to see that Julie Chrisley

23  sent three scrapbook documents to the listing agent so that

24  they could get this house.  First, Julie Chrisley sent two

25  totally fabricated bank statements showing that between these

two accounts the Chrisleys had hundreds of thousands of
dollars available that they would be able to use to cover the
rent on this house over the next year.

The evidence will show that one of those bank account
statements that she submitted showed that they had more than
$400,000 in the account.  But you're going to see the real
bank statement showing that that account had been closed.
There wasn't any money in it.

And let me show you the other scrapbook statement
that she sent.  She e-mailed a bank statement showing that at
the end of June, 2014, the Chrisleys had an account that had
more than $86,000 in it.  But you're also going to see the
real bank statement from that month showing that the account
was thousands of dollars in the hole.

The third scrapbook document that Julie Chrisley sent
to get that rental house was a credit report.  And that credit
report showed that Julie Chrisley herself had excellent
credit, a score over 760.  But you're going to see the real
credit reports for Julie Chrisley around that same time
showing that her credit score was more than 100 points lower
than that scrapbook document showed.

You're going to hear from FBI Special Agent Ryskoski
that during the investigation the FBI executed an electronic
search warrant on the Chrisleys' gmail accounts.  And you'll
hear from Special Agent Ryskoski that the FBI found two of
United States District Court

1  these scrapbook documents saved in Julie Chrisley's Google
2  drive account.  And if you pay close attention, you are going
3  to see how the sausage was made.  You'll be able to understand
4  exactly how they scrapbooked these documents and created these
5  fake ones so that they would get that house.
6       Mr. Jaret, the listing agent, will tell you that
7  after receiving these fake documents the Chrisleys did rent
8  the house, but he'll tell you that just immediately the
9  Chrisleys weren't paying their rent on time, were threatened
10 with eviction and quickly had to leave the house.
11      Ladies and gentlemen, timing in this case is
12 everything.  Remember, you're going to hear that the Chrisleys
13 blamed those $30 million of fraudulent loans all on Mark
14 Braddock.  They said they had no idea what he was doing.  But
15 you'll hear that Braddock and the Chrisleys totally cut ties
16 in 2012.  They were dead to each other after that year.  And
17 two years later, the evidence will show that Julie Chrisley
18 was still scrapbooking the exact same kinds of documents.
19      That brings us to our third set of crimes.  This is
20 all about taxes.  We're going to get a little more in the
21 weeds here and start with covering a little bit of background
22 on the Chrisleys' tax filing and tax paying history.
23      We're going to start with the tax year 2009.  And
24 just note, this is the most important tax year in this case.
25 This is going to be crucial.  You'll see why in just a minute.

United States District Court

1    For the 2009 tax year, the Chrisleys filed their

2  income returns separately.  They separate -- even though they

3  were married, they filed separate returns and they each

4  reported separately the income that they had made that year.

5  And the Chrisleys made a lot of money each in 2009, not

6  including the millions of dollars in fraudulent loans they

7  were getting.  Remember, they were running successful real

8  estate businesses at that time.

9    Mrs. Chrisley reported that she owed about $150,000

10 in taxes for that year.  But Mr. Chrisley owed a lot more.  He

11 initially reported that he owed $700,000; but he later filed

12 an amended return where he signed it and said, I owe the IRS

13 almost half a million dollars just for 2009.  And the evidence

14 will show that neither Todd Chrisley nor Julie Chrisley paid

15 their taxes for that tax year.

16    So remember that $500,000 debt that belonged only to

17 Todd Chrisley is going to be very important in this case.

18    Now, let's talk about the next three years of taxes.

19 In 2010, 2011, and 2012, the Chrisleys filed their tax returns

20 in a way that most of you, if not all of you, are very

21 familiar with, especially if you're married.  They filed

22 jointly.  They filed one return where they reported both of

23 their incomes together, which resulted in a joint tax

24 liability that they owed the IRS.

25    Now, you're also going to hear that for these three

United States District Court

1   years the Chrisleys also didn't pay their taxes on time.  But

2   note, the tax liability that they owed to the IRS for 2010,

3   '11 and '12 was far lower than Todd Chrisley's half million

4   dollar debt from the year before.

5        Now, let's talk about 2013, '14, '15 and '16.  The

6   Chrisleys got their TV show, Chrisley Knows Best, around 2013.

7   And the evidence is going to show that over the next several

8   years they made more than $6 million from that show.  But

9   while they were making that $6 million, they didn't file taxes

10   and they didn't pay a cent of taxes for any of those four tax

11   years.

12        Now, I want to tell you a little bit about what

13   happens at the IRS when someone like the Chrisleys ends up

14   with a big pot of delinquent taxes that they haven't paid to

15   the IRS.  When that happens, the IRS starts looking for assets

16   and trying to collect them.  And you're going to hear from IRS

17   employees in this case about the tools that they have that

18   they can use to try to find money and collect it when someone

19   hasn't paid their taxes like they have to.

20        You're going to hear that normally when a couple --

21   when a married couple is delinquent on their taxes, who's

22   filed jointly, like the Chrisleys did in 2010, '11 and '12,

23   the IRS will look for any assets or bank accounts that belong

24   to the couple or to one of them and will try to collect those

25   to recoup the taxes that that couple failed to pay.

1    But for the 2009 year, something is different.
2  Again, that's why this half million dollar liability is really
3  important.  Because the Chrisleys filed separate tax returns
4  in 2009, you'll hear that when the IRS was trying to collect
5  that half million dollar debt from Todd Chrisley, they could
6  only go after assets that were in Todd Chrisley's name.  In
7  other words, if the couple had assets that they kept only in
8  Julie Chrisley's name, the IRS probably wouldn't be able to go
9  after them because it was only Todd's debt from that year.

10    And this, ladies and gentlemen, this is key to
11  understanding the tax evasion in this case.  The Chrisleys
12  were using Julie Chrisley to hide Todd Chrisley's income to
13  avoid paying that half million dollar tax debt.  Now, to
14  understand how they were using Julie Chrisley to hide Todd
15  Chrisley's money, you need to know about the family company
16  that the Chrisleys set up when they got their TV show.

17    You'll hear that when they landed their reality TV
18  show, Chrisley Knows Best, around 2013, they set up a company
19  called 7C's Productions.  That's standard in the industry.
20  And what 7C's Productions would do is enter into contracts
21  with the TV production company for the services of the
22  Chrisley family members.  And in turn the TV production
23  company would pay the income for all of the Chrisleys into
24  7C's Productions.

25    The evidence will show that Todd Chrisley used 7C's,
                     United States District Court

1  used their family company like a personal bank account.
2  You're going to see e-mail after e-mail showing Mr. Chrisley
3  spending money out of this account, showing that Mr. Chrisley
4  was in control of the account, and that behind the curtain
5  Mr. Chrisley controlled everything.
6          But here's the key to the tax evasion.  Again,
7  Mr. Chrisley's biggest tax debt by far was that half million
8  dollars from 2009.  And they wanted to make sure that the IRS
9  couldn't find his money to take that huge sum that he had
10 failed to pay.  And remember, that debt was just his.  It
11 didn't belong to Julie Chrisley.
12         So even though Todd Chrisley's income was paid into
13 7C's and even though Todd Chrisley controlled the company and
14 made all the decisions, as you will see in e-mail after
15 e-mail, the Chrisleys kept everything only in Julie Chrisley's
16 name.  They kept Todd Chrisley's name off of the bank accounts
17 and off of the company so that the IRS wouldn't be able to
18 find his money and take back the half million dollars that he
19 owed.  That is called tax evasion.
20         Now, let's talk about defendant Peter Tarantino.
21 Mr. Tarantino entered the picture around 2015.  After the
22 Chrisleys started doing quite well with their TV show, they
23 hired Mr. Tarantino to be their accountant.  Mr. Tarantino is
24 a certified public accountant.  And you will see that he's had
25 hundreds of hours of training in tax preparation and tax

filing.  He owns his own company, CPA Tarantino, that he has

and he had an office in town in Roswell, Georgia.

In 2016 Mr. Tarantino started helping the Chrisleys

hide their money from the IRS to evade paying that big

enchilada, the half million dollars from 2009.

You're going to hear from multiple IRS employees who

dealt directly with Mr. Tarantino when they were trying to

find and collect the Chrisleys' unpaid taxes.  And they're

going to tell you about their interactions with Mr. Tarantino.

These IRS employees are going to tell you that Mr. Tarantino

gave them false and misleading information about all kinds of

things related to the Chrisleys.

You're going to hear from these IRS employees that

Peter Tarantino lied to them about the Chrisley's income.

You'll hear that Tarantino lied to them about the family

company, 7C's.  And you'll hear that he lied to the IRS

employees about the Chrisleys' ability to pay their taxes.

For instance, you're going to hear that Tarantino

told an IRS agent that he didn't know where the Chrisleys'

banked.  But you're going to see e-mails and records showing

not just that Mr. Tarantino knew where they banked, he

actually had access to log into their bank accounts online.

You're going to see e-mail after e-mail showing that

Mr. Tarantino knew all about the Chrisleys' finances, all

about the company, and all about how the Chrisley family

1   members were paid.

2        You're also going to hear a recorded interview where

3   Mr. Tarantino talked with FBI Special Agent Ryskoski and an

4   IRS agent and he told them that he didn't know how Todd

5   Chrisley got his income.  But you are going to see e-mail

6   after e-mail showing that Tarantino knew exactly how Todd

7   Chrisley got his income.  It was paid into 7C's Productions.

8        You're also going to see that Mr. Tarantino filed two

9   false tax returns for the Chrisleys' company for the 2015 and

10  2016 tax years.  Each of those returns were blank.  In other

11  words, he told the IRS by filing those returns that there was

12  no money in and no money out of the family company.  But

13  again, you will see e-mail after e-mail showing that Tarantino

14  knew that wasn't true.  He knew that lots of money was coming

15  in and lots of money was being spent out of the company.

16       And again, timing in this case is everything.

17  March 2017 is key to understanding the tax evasion crime.

18  Remember, the Chrisleys had been using Julie Chrisley to hide

19  all of Todd's income from the IRS.  So they kept the bank

20  accounts and the company in Julie Chrisley's name.

21       The first witnesses at trial are going to tell you

22  what changed, what happened, in March of 2017.

23       You're going to hear from one of those IRS employees

24  who was working to try to find and collect Todd Chrisley's

25  unpaid taxes.  She's an IRS revenue officer.  Her name is

United States District Court

1  Betty Carter.  Ms. Carter is going to tell you that she was
2  assigned to try to find the Chrisleys' assets and collect
3  them.  She'll tell you that she thought the Chrisleys might be
4  hiding money.

5          She'll tell you that on March 6, 2017, she talked to
6  Peter Tarantino and she started requesting information about
7  some of the Chrisleys' bank accounts.  You'll see that that
8  same day after Tarantino talked to Ms. Carter, Tarantino sent
9  an e-mail to the Chrisleys from Peter Tarantino to Michael
10  Chrisley -- that's Todd -- and to Julie Chrisley reporting:
11  "The first request from the IRS is the following, copies of
12  bank statements and canceled checks for the period of
13  October 2016 through February 2017" -- and this is what's key
14  -- "for all bank accounts on which Todd Chrisley or Julie
15  Chrisley have signature authority."

16          The evidence will show, ladies and gentlemen, that
17  this was the first time that the IRS started asking questions
18  about Julie Chrisley's finances and about where her money was.
19  You're going to see a flurry of activity after this request.

20          You're going to hear from a woman named Lisa Stone.
21  Ms. Stone was a bank branch manager of a Bank of America store
22  in Nashville, Tennessee, which is where the Chrisleys were
23  living at the time.  Ms. Stone will tell you that on
24  March 7th, one day after the IRS started asking for
25  information about Julie Chrisley's bank accounts, Ms. Stone

United States District Court

1  was working that day and Julie Chrisley marched into that Bank
2  of America branch with Todd Chrisley's mother and demanded
3  that her name be taken off of all of the family bank accounts
4  for 7C's.

5      Now, the evidence will show that up until that day,
6  up until the day after the IRS started asking questions about
7  Julie Chrisley's accounts, always the 7C's bank account had
8  been only in Julie Chrisley's name.  She was the sole signer.
9  Remember, they were keeping everything in Julie Chrisley's
10 name to hide Todd Chrisley's money.  But one day after the IRS
11 started asking for information about Julie Chrisley's money,
12 Julie Chrisley took her mother-in-law into Bank of America,
13 removed her name from the company bank and replaced it with
14 her mother-in-law, Elizabeth Faye Chrisley.

15      And that's not all.  You're going to hear from Bank
16 of America that in order to make that change, Bank of America
17 needed some kind of proof to show what involvement Elizabeth
18 Faye Chrisley had with 7C's if they were going to take
19 Mrs. Chrisley off of the account and replace it with Todd's
20 mother.  Bank of America needed to understand why that was
21 happening.

22      You're going to see that later that afternoon, Julie
23 Chrisley e-mailed to Bank of America a corporate resolution
24 from 7C's falsely stating that Todd Chrisley's mother,
25 Elizabeth Faye Chrisley, was the sole owner of 7C's

1  Productions.  Ladies and gentlemen, the evidence will show,
2  that was never true.
3        Ladies and gentlemen, that's still not all that
4  happened the day after the IRS started asking questions.
5  After Julie Chrisley and her mother-in-law went to Bank of
6  America and made this change, that night you're going to see
7  that Todd Chrisley e-mailed one of the companies that paid
8  part of his income into 7C's and reported to them that the
9  7C's bank account had been compromised and he told them that
10  they'd be providing new information about a different account
11  where future funds should be sent into.
12        Ladies and gentlemen, the evidence will show that the
13  only way that bank account had been compromised was that the
14  IRS started asking questions about it because they were trying
15  to find and collect the unpaid half million dollars in taxes.
16        And finally, the money doesn't lie.  You're going to
17  see that after this flurry of activity in early March 2017,
18  yes, it's true that Todd and Julie Chrisley through
19  Mr. Tarantino answered the questions asked by Ms. Carter and
20  provided the bank statements that were requested.  But what
21  you'll hear from Ms. Carter is that she didn't tell you that
22  the Chrisleys didn't tell her that they changed where their
23  money was going.  After the IRS request, Todd and Julie
24  Chrisley started redirecting all of their income into accounts
25  that were controlled by Todd Chrisley's mother.  They did not

1  tell the IRS about that.

2         Now, ladies and gentlemen, you're going to see a lot

3  of evidence about taxes in this case.  And I want to be clear

4  about something, about what all of the evidence is going to

5  show.  All along the goal of Todd and Julie Chrisley and

6  Mr. Tarantino was to hide their money and avoid paying the

7  half million dollar debt.  Some of the evidence may not seem

8  at first blush like that's what it was about, that this was

9  the goal.  But pay close attention because everything will

10 point to this goal.

11        For instance, you're going to see e-mails where

12 Mr. Tarantino or the Chrisleys were laying out reasons that

13 they hadn't filed those tax returns for 2013 through 2016.

14 But you're also going to see e-mails where Tarantino and the

15 Chrisleys had prepared the returns and just hadn't filed them

16 but were e-mailing them to banks and to a car dealership under

17 the representation that they had been filed.

18        You're also going to see and hear that the Chrisleys

19 were paying some taxes during this time.  They were.  They

20 were making some payments on Julie Chrisley's 2009 debt, on

21 the 2011 and 2012 debts.  But if you pay close attention,

22 you'll see there were reasons that they were making those

23 payments.  It was to get liens released on properties that the

24 IRS had put a lien on.  And the Chrisleys were ready to sell

25 it or buy a new property.  And they weren't able to do a

                    United States District Court

1  transaction they wanted to do until they paid enough to get
2  that lien released.
3      You're also going to see that those payments were
4  made to clear Julie Chrisley's name with liability.  They
5  wanted to get rid of her small 2009 debt and that small '10,
6  '11 and '12 debt.  Because remember, the evidence will show
7  the Chrisleys were keeping everything in Julie Chrisley's name
8  to avoid paying Todd Chrisley's half million dollar debt.
9      The evidence will show that even when the Chrisleys
10 were making those other tax payments, the goal was the same.
11 It was to avoid paying the big enchilada, that half million
12 dollar debt from 2009.
13     You're also going to hear that on February 2nd, 2018,
14 the Chrisleys and Peter Tarantino were both served with a
15 federal grand jury subpoena.  That was the date, February 2nd,
16 2018, that they all found out they were under federal criminal
17 investigation for tax evasion.  And you're going to see that
18 right after that, they tried to quickly cover their tracks.
19 Mr. Tarantino immediately filed those delinquent '13, '14, '15
20 and '16 returns.  And the Chrisleys very quickly started
21 making big payments on years of delinquent taxes.  But, ladies
22 and gentlemen, that was after they got caught.  It was after
23 they found out that they were under investigation.
24     You're going to hear a radio interview of Todd
25 Chrisley from about a year before the Chrisleys found out they
                    United States District Court

were under investigation. The interview was in February 2017. And during that interview, Todd Chrisley publicly claimed that they paid close to a million dollars to the IRS in income taxes every year. But when he made that statement, the evidence will show that he hadn't even filed tax returns for the last four years and he hadn't paid a dime to the IRS for those four years either.

The evidence will show that the Chrisleys knew they owed the IRS a lot of delinquent taxes over many years and they hid their money to avoid paying them.

The final crime I want to cover this morning is obstruction of justice. Now, you've already seen this document here. This is that false corporate resolution that Julie Chrisley sent to Bank of America claiming that Todd Chrisley's mother owned 7C's. And the evidence will show that Julie Chrisley had sent this document so that they could move all their money from Todd and Julie Chrisley's name into Todd Chrisley's mother's name.

You're going to see a different version of this document. After February of 2018, after the Chrisleys found out that they were under investigation for tax evasion, Julie Chrisley took this document, struck out her mother-in-law's name and made some handwritten changes. She then submitted that document to a federal grand jury and claimed that on March 8th, the day after she had e-mailed the original

United States District Court

1  document, that Todd Chrisley's mother, her mother-in-law, had

2  hand walked in that changed document to Bank of America.

3  You're going to hear from Bank of America, that never

4  happened.  That document is a lie.  It would have been

5  directly against Bank of America policy to ever accept a

6  document like that.

7        The evidence will show that Julie Chrisley submitted

8  that hand changed false document trying to obstruct the grand

9  jury's criminal investigation that's brought her here today as

10 a criminal defendant.

11        Finally, I'm going to tell you briefly about the

12 charges that each of the defendants are facing.  You're going

13 to see the indictment at the end of the trial.  And as we've

14 all heard at length yesterday, Judge Ross is going to give you

15 instructions about the law.  So for now I want to just briefly

16 tell you the specific charges each person is facing.

17        First, Todd and Julie Chrisley are charged with bank

18 fraud conspiracy.  They're charged with having an illegal

19 agreement with each other and with Mark Braddock to create and

20 submit false documents to community banks to fraudulently

21 obtain more than $30 million in loans.

22        Todd and Julie Chrisley are also charged with bank

23 fraud.  Now, those charges are about the actual lies that they

24 told to banks to get money during this scheme.

25        Julie Chrisley is charged with wire fraud for
                United States District Court

1  submitting those three scrapbooked bogus documents to real

2  estate agents to get that fancy rental house in Los Angeles.

3          The Chrisleys and Tarantino are charged with

4  conspiring to defraud the IRS.  In other words, the three of

5  them are charged with having an illegal agreement to try to

6  evade the assessment and the payment and the collection of the

7  Chrisleys' delinquent taxes.

8          Todd and Julie Chrisley are also charged with

9  attempting to evade paying Todd Chrisley's half million dollar

10  tax debt from the 2009 tax year.

11          Peter Tarantino is charged with filing those two

12  false corporate returns from 7C's Productions where he falsely

13  claimed that no money came in and no money came out of the

14  company when the bank records that he had showed otherwise.

15          And finally, Julie Chrisley is charged with

16  obstructing a grand jury investigation by submitting a sham

17  document with a sham story to try to avoid prosecution and

18  mislead the grand jury.

19          Members of the jury, you're going to see a lot of

20  evidence in this case.  I want you to keep in mind the two

21  basic things that the evidence will show.  This case is about

22  fraud and tax evasion.  On the fraud, you will see that the

23  Chrisleys make up documents whenever they want to get whatever

24  they want, whether it's loans, a fancy rental house, a secret

25  bank account, or even to try to avoid prosecution.

United States District Court

1          And on the tax evasion, the evidence will show beyond

2   a reasonable doubt that all three defendants were trying to

3   hide money from the IRS to avoid paying the Chrisleys' half

4   million dollar tax debt.

5          After you've seen and heard all of the evidence, my

6   colleague, Mr. Krepp, will have an opportunity to stand up and

7   talk with you again today.  And when he does, he's going to

8   ask you to return the only verdict that's consistent with all

9   of the evidence that you're going to see in this case -- Todd

10  Chrisley, Julie Chrisley and Peter Tarantino are guilty beyond

11  a reasonable doubt.

12         Thank you for your time.

13         THE COURT:  Thank you so much.

14         Ladies and gentlemen, before we proceed with the

15  first defense argument, I'm going to give you just a

16  five-minute stretch break.  Remember, it's really important to

17  stay alert and awake.  And if there's anything we can assist

18  you with, water, coffee, let us know, but you need to stay

19  awake during the trial.

20         Thank you so much.  Five minutes.  We're in recess.

21         **(The jury exited the courtroom at 10:55 a.m. and a**

22  **recess was taken at.)**

23         THE COURT:  All right.  Let's go ahead and get them

24  in, please.

25         **(The jury entered the courtroom at 11:02 a.m., after**

United States District Court

1  which the following proceedings were had.)

2  　　　　THE COURT:  Once you find your place, unless you're

3  waiting for someone to cross in front of you, you're free to

4  sit.  We're standing out of deference to you.

5  　　　　All right.  The jury is seated.

6  　　　　Everyone else may be seated.

7  　　　　Mr. Morris, are you ready to proceed with opening

8  statements, sir?

9  　　　　MR. MORRIS:  I am your, Honor.  Thank you.

10 　　　　May it please the Court.

11 　　　　THE COURT:  Yes, sir.

12 　　　　MR. MORRIS:  From the very first moment that Mark

13 Braddock met Todd Chrisley, he was obsessed with Todd.  He

14 wanted to be around him.  He wanted to be him.  He befriended

15 Todd.  He gained Todd's confidence and trust.  He worked his

16 way into Todd's life and into his business.  He got keys to

17 Todd's house so he could come and go when he wanted to.  He

18 bought one of Todd's houses so he could live like Todd.  He

19 bought Todd's car so he could drive a car like Todd.  He took

20 some of Todd's furniture so he could sit in the very chair

21 that Todd sat in.

22 　　　　He took control of Todd's business.  He paid Todd's

23 bills.  He learned how to sign and forge Todd's signatures and

24 he did forge Todd's signatures on many, many, many documents.

25 　　　　He impersonated Todd on the telephone.  He got all of
　　　　　　　　United States District Court

1  Todd's passwords so he could work in Todd's e-mails sending
2  e-mails as Todd and receiving e-mails as Todd.

3       He took over being Todd Chrisley.  Now, how did that
4  happen?  And why?  Well, let's start at the beginning.

5       Todd Chrisley grew up with very little.  Never went
6  to college.  Never finished high school.  He obtained a GED.

7       In his early adult life, he worked in a textile mill
8  in Clemson, South Carolina, one of those huge machines where
9  you stand there feeding yarn into the machine that's weaving.
10 Along the way, he got the opportunity to buy a beat up old
11 house, which he fixed up, decorated and sold for a little bit
12 of profit.  He said, this is a lot better than running a
13 machine.  And he bought another house.  And he fixed it up and
14 he decorated it and he sold it.  And he made a good deal of
15 profit each time.  What he lacked in education, he made up for
16 in hard work and instincts.

17       His business grew and he was doing well.  But his
18 formula stayed the same, no matter how big his business grew.
19 He would pay cash for a house.  He would use the money he had
20 to fix it up.  He would decorate it.  He would sell it, take
21 the cash and buy another.

22       Eventually Todd and the family moved to Atlanta,
23 Georgia.  And he soon met Mark Braddock, of all places, at a
24 PTA function at his children's elementary school.  Now,
25 Braddock is college educated, very impressive.  Got a computer

software degree.  He knows his way around computers and IT.

Todd was starting a new business helping companies take foreclosed homes, fix them up and sell them, bigger than he'd ever had the opportunity to do on his own.  But he didn't know how to handle something that large.  Braddock said, that's my specialty, I know how to set up a whole platform to be doing that for you, I will do it.  So he offers to Todd, let me do the support, that Todd doesn't know how to do.

So they start this business.  Now, it's still the real estate business, but it's operating in a way that Todd Chrisley was not familiar with and had never done before.  So Braddock took charge.  He took charge and was largely responsible for everything.

The evidence will be that Todd Chrisley hardly ever even came into the office except to say hello or have lunch with somebody.  He was out decorating houses, fixing up houses and flipping houses, not in the office running the business.  And this was a business that you heard a moment ago called Executive Asset Management.  And it did well.  It did well.

The only mistake that Todd made at that time -- I think he would admit to you. -- was his main mistake, that he wasn't there.  He didn't come to the business and run it.  His mistake was in letting Braddock handle everything, both his business and his personal finances.  And Braddock worked his way into handling all of that.  He worked his way into

becoming an owner of the business called Chrisley Asset
Management with Todd when that began in 2008. He ran
Executive Asset Management from 2003 to 2006, then he started
with CAM, Chrisley Asset Management, with Todd in 2008. He
totally ran the business, he'll tell you that, without Todd,
but in Todd's name.

Braddock handled all of the money. Braddock handled
all of the bank accounts. Braddock filled out all of the loan
applications. He supplied all of the back-up documents that
banks asked for. He created false documents and sent them to
the bank. And he personally made millions of dollars doing
it.

Now, all the while, while he's handling all of this
and Todd is nowhere around, he is lying to Todd about, first,
Todd's personal finances, and second, the business finances.
He tells other employees at CAM, lie to Todd about money
coming in, lie to Todd about bills being paid. He lies to
Todd and says, oh, bills, are paid, but they're not. He tells
other people, lie to Todd and tell him bills have been paid,
but they have not.

The biggest bill, when Todd's 2009 tax return was
filed in October of 2010 and he initially believed he owed
$700,000 in taxes, Braddock was supposed to send a check with
his return for $250,000 to the IRS. Now, Todd is in
California and Braddock is in the office handling everything.

1  And Braddock tells him, we sent $250,000.  And Todd says, are
2  you sure?  He says, oh, yeah, we sent it.  Got a copy of the
3  check if you need to see it.  It cleared.  Well, unbeknownst
4  to Todd, no such check was actually sent by Braddock.
5  Braddock lied.  But Todd assumed it had been sent.  So
6  naturally he's $250,000 behind before he even starts and knows
7  about it.

8          Chrisley Asset Management had as its major customer
9  Fannie Mae.  Fannie Mae would take foreclosed houses, houses
10 that people lost because the market was so bad at this
11 point in time, that they would take them, find somebody to fix
12 them up and then a real estate agent to sell them, give the
13 money to Fannie Mae.  And Fannie Mae was their biggest
14 customer.  And Braddock, not Todd Chrisley, lied to Fannie Mae
15 about how CAM, Chrisley Asset Management, was doing.  He
16 presented employees to people from Fannie Mae who came to
17 visit as employees of CAM when they weren't.  He just wanted
18 it to look bigger than it was, lying to Fannie Mae.

19         He stole money from Todd and CAM to pay mortgages on
20 his own house.  And toward the end, he opened a new secret CAM
21 bank account without telling Todd so that he could divert
22 money from the CAM account to another account that he
23 controlled.  And to do that, he had to lie to Fannie Mae.  He
24 impersonated Todd.  He sent them e-mails from Todd Chrisley
25 saying change this.  He sent them, Braddock sent them, not

1  Todd.  And he finally started a new business to compete with
2  CAM behind Todd's back.

3       The evidence will be that he regularly used Todd
4  Chrisley's e-mail account to impersonate Todd and created
5  e-mails to make it seem that Todd was sending e-mails or that
6  he was pretending to be Todd.

7       Now, how could all of this happen?  The Government
8  says, Todd Chrisley knew everything that was going on.  He was
9  there every day.  The evidence will be that he wasn't there
10 every day.  The evidence will be that he had no actual role in
11 CAM.  Everything was controlled by Braddock.  The witnesses
12 will tell you that.

13      The evidence will be that during this period of time
14 when Braddock is manipulating these banks and falsifying
15 records, that he will admit he falsified, Todd was dealing
16 with the sickness and death of his father, his oldest son had
17 a significant addiction and a problem that needed the
18 attention of his parents, and he was available for his son.
19 His daughter Lindsie, his eldest daughter, had some serious
20 psychiatric problems and could not be alone.  And Todd stayed
21 with her 24/7 to make sure that she was safe.  And during six
22 months of this period when Braddock was falsifying documents,
23 Todd Chrisley was living in California.  Couldn't possibly
24 have been in the office knowing what was going on.

25      So what happens in July of 2012?  CAM employees tell
                    United States District Court

1  Todd what Braddock has been doing.  And he finds out for the
2  first time about all the cheating that Braddock has done, all
3  the signatures of Todd that Braddock has forged, all the
4  e-mails that he has sent as Todd, and Todd fires him.
5  Braddock is caught.  He is fired.  Todd is outraged.  Says to
6  him, you are going to jail for what you have done.  Julie sues
7  him for stealing money from them and for other crimes.

8       In the summer of 2012, as this is happening,
9  Braddock, who is now rejected and scared, sought protection
10  and revenge.  He immediately, after he is fired and accused of
11  committing crimes and sued, runs to the federal government and
12  says, I know about big time bank fraud.  I want to tell you
13  about big time bank fraud committed by Todd Chrisley.  Todd
14  Chrisley is behind all of this bank fraud that has occurred.
15  But before I tell you, I want to make sure that I am
16  protected.

17       So he meets with the federal government and he gets
18  himself immunity from prosecution for anything.  "Immunity" is
19  a fancy word for a get out of jail free pass.  And once he
20  gets his free pass, he confesses to all of his crimes.  He
21  tells the federal government, prosecutors, FBI agents, yep, I
22  forged documents, yes, I lied to banks, yes, I created false
23  financial statements for Todd and for CAM.  I did that.  But,
24  but, he blames Todd and Julie.  To save himself, he says, Todd
25  told me to do this.  Todd knew what I was doing.  I did it all

United States District Court

1  for Todd.  I got nothing.  I got nothing.  All lies.

2         But in 2012, the feds didn't charge Todd or Julie, so

3  he ran to the State of Georgia Department of Revenue and he

4  said, Todd and Julie have been cheating you, State of Georgia,

5  out of taxes.  And he got them to begin investigating Todd and

6  Julie Chrisley.  But no criminal charges, so he ran back to

7  the feds and he got yet another immunity promise guaranteeing

8  no charges against him.  All he has to do is talk about and

9  blame Todd and Julie.

10        And he accomplished his goals.  Remember, first goal,

11 self-protection.  He avoided total responsibility for all of

12 the crimes that he had committed and admitted committing.  He

13 got the civil case against him by Julie dismissed.  And he got

14 his revenge because he got Todd and Julie criminally

15 prosecuted.

16        What I tell you will be borne out by the evidence.

17 You will see and hear and conclude that Mark Braddock was

18 computer savvy; that he had access to Todd Chrisley's e-mails;

19 that witnesses saw him in his office with two computer

20 screens, one with his e-mails on it, the second with Todd's

21 e-mails on it; and they saw him create an e-mail from Mark

22 Braddock, send it to Todd Chrisley and then answer it as Todd

23 Chrisley.

24        The evidence will show that experts who analyzed

25 Todd's e-mails found evidence that his computer had been

United States District Court

1  remotely entered, that is, not by him but by somebody
2  somewhere else inside his computer e-mails.

3       There will be evidence even from Braddock himself,
4  who admits that he impersonated Todd and that he created false
5  documents and that he signed Todd's name to those documents.
6  And the evidence will be that Braddock got money from each and
7  every one of the loans that Braddock handled.

8       Did Todd talk to bankers and say, I'd like to borrow
9  money?  Yes, he did.  Yes, he did.  And the banker would say,
10  we're going to need information.  Todd would say, Mark
11  Braddock will take care of that.  And Todd believed Mark
12  Braddock would take care of that and had no reason to believe
13  that Mark Braddock would lie or cheat.

14       Mark Braddock sold his lies to the Government.  And
15  he'll try and sell them to you.  Don't buy them.  Listen
16  carefully to what he says.  And as you listen, ask yourself
17  two questions.  First, why is he here?  Second, what's in it
18  for him?  And the answers to these questions will be very
19  clear.  And it will be clear that you cannot believe or rely
20  on what Mark Braddock says.  It will be clear that any bank
21  that was given false information got it from Mark Braddock.
22  And the only person who says otherwise is Mark Braddock, the
23  same person who claims to be Todd Chrisley.  You're going to
24  see examples of it, but I want to give you two right now.

25       Mark Braddock took advantage of the BP oil spill that
                    United States District Court

1  occurred and the damage it did to the ocean in Florida.

2  Braddock had a house there.  Braddock filed false claims for

3  himself and for Todd and for Julie saying:  Oh, we couldn't

4  rent our houses because the beach was nasty from the oil.  We

5  lost a ton of money.  And he did it without Todd's knowledge,

6  he did it without Julie's knowledge.  He got on the phone and

7  talked to the BP oil claims folks claiming he was Todd

8  Chrisley.

9          Would you play the first audio.

10          **(An audio recording is played.)**

11          MR. MORRIS:  Thank you.

12          Would you play the second one.

13          I don't want you to think that's a mistake when he

14  says I'm Michael Chrisley.  Here comes the second conversation

15  later.

16          **(An audio recording is played.)**

17          MR. MORRIS:  Thank you.

18          Michael Chrisley, the voice you just heard both

19  times, is Mark Braddock.  The only person who committed these

20  crimes is Mark Braddock.  The only person who says otherwise

21  is Mark Braddock.  The person who is truly guilty of bank

22  fraud is Mark Braddock.

23          Now, let's talk for a few minutes about the tax

24  charges in this case.  Until 2003 in the beginning of

25  Executive Asset Management, Todd Chrisley had not done

United States District Court

1 anything very complicated in business. As I told you, the

2 evidence will show that up until that time he would buy a

3 house, fix it up, decorate it, sell it for a small profit, and

4 buy another one.

5        When it came -- when the opportunity came to enlarge

6 that and handle a bunch of houses at one time, he took that

7 opportunity. But as we discussed a moment ago, he didn't have

8 the bandwidth to handle something like that, so he hired Mark

9 Braddock. That's where Braddock came into the picture and

10 that's where Braddock started running the business and taking

11 charge. Well, the business went well. And in 2004, Todd sold

12 Executive Asset Management for $8 million. He was to receive

13 $4 million in 2005 and $4 million in 2008. And he received

14 it. He did.

15        Now, before this time, he had never had that kind of

16 money, ever. And he really wasn't qualified to handle it. As

17 a result he made some very poor investments. And this was

18 just before the real estate market came crashing down in 2008

19 and 2009.

20        But he was lucky enough after CAM to be contacted by

21 Fannie Mae to see if he would handle foreclosed homes for

22 Fannie Mae. That was the beginning of Chrisley Asset

23 Management. And who came and said I can run Chrisley Asset

24 Management for you? Yes, Mark Braddock. Mark Braddock ran

25 Chrisley Asset Management. Todd was never there, not present.

1  Came in and out casually.  Everything was handled by Mark
2  Braddock.

3        Well, it's now 2009 and tax returns are due at the
4  end of the year.  An extension is obtained.  So the tax return
5  is due in the fall of 2010.  And Todd dutifully files his 2009
6  tax return in September 2010.  And I agree with the
7  Government, the evidence shows that Todd and Julie filed
8  married but separate.  And they did that on the advice of an
9  accountant, Mr. George Grimsley.  And he will tell you, look,
10  when I have taxpayers who are husband and wife, I look at the
11  best way for them to file.  Sometimes it's better for them to
12  file married jointly.  Sometimes it's better for them to file
13  married separate.  I make a recommendation.

14        In this case, Todd Chrisley consulted with an
15  accountant.  The accountant made a recommendation.  Todd
16  Chrisley relied on the recommendation.  The money was
17  dutifully reported.  The return was timely filed.  He did not
18  have $701,000 to pay to the IRS at that time.  He didn't have
19  it.  He suffered such losses that he didn't have it.

20        But he believed that $250,000 was being sent with his
21  return from the office to at least pay some of that.  And he
22  was told that by Mark Braddock.  And he double checked with
23  Mark Braddock's assistant, who Mark had told, tell him it was
24  paid.  But it wasn't paid.  Later that return is amended by
25  the original accountant.  And the $700,000 is now 400 and
                    United States District Court

1  something.  The Government says it's 500,000.  It's under

2  500,000, but close enough.  But it's less than it was.  Again,

3  Todd thinks 250 of it has already been paid.  He doesn't find

4  out until 2012 that Braddock had lied to him about the

5  $250,000 payment.  So he is way behind in his taxes.

6       He files his 2010 tax return jointly with Julie.  And

7  they don't owe any taxes because of investment losses that

8  they've suffered from all of the bad investments that Todd had

9  made, the economy had tanked, the bottom fell out of the real

10  estate market.  He doesn't have much income.

11       Come 2012, in fact, Todd is bankrupt.  His

12  investments have gone very poorly.  He goes to a lawyer and

13  says, what do I do?  The lawyer said, I would advise you to

14  file bankruptcy.  And he does.  Unfortunately, after Todd

15  finds out about Braddock and Fannie Mae finds out about

16  Braddock, CAM loses Fannie Mae as a client, their biggest

17  client.  So in 2013 April, CAM had to file bankruptcy.

18       So the 2012 return is filed.  Todd and Julie owe

19  $24,000.  Todd has no job.  He can't pay the $24,000.  What

20  money he does have is in the hands of the bankruptcy court,

21  because he's in bankruptcy.

22       2013, out of the blue, Todd and Julie get the

23  opportunity to audition for a reality show, Chrisley Knows

24  Best, an outrageous, somewhat comical, bigger than life

25  persona Todd Chrisley and his unpredictable family.  And they

1   audition for it.  It's called a sizzle reel.  And the network
2   loves it.  They think these folks are outrageous and funny.
3   And it's a, quote, reality show, end quote, which means a
4   bunch of it is scripted and a bunch of it is made up.  Some of
5   it is real.  Some of it is not.

6           You are going to see, I think, a piece where Todd
7   says, I spent $300,000 on my clothing in my closet here.  He's
8   got a big closet.  He was in bankruptcy at the time.  He
9   didn't spend $300,000 on his clothes.  When the Government
10  says, in 2017 Todd Chrisley went on the radio and said I pay a
11  million dollars a year in taxes, was that true?  No.  It's all
12  part of the sizzle.  It's all part of the show.  It's all part
13  of the act.

14          But underneath, underneath the sizzle, there is
15  truth.  Underneath there is a real family.  They're close.
16  They look out for each other.  They help each other.  Todd and
17  Julie Chrisley are parents who have high expectations for
18  their kids.  And when things don't go well, they try
19  everything they can to support those kids.  They have serious
20  problems like every family and they face those problems as a
21  family and they handle them as a family.

22          Now, the Government says 7C's was set up to hide
23  money.  When the network said we'd like to do a show, they
24  send a contract and they say, and this is what we'll pay you.
25  The first year wasn't that much, but it got more and more and

United States District Court

1  more.  But they said, in order to pay you, you have to set up

2  a corporation.  We don't pay individuals.  We need you to set

3  up a corporation.  So Todd and Julie go to a lawyer and an

4  accountant and say, what do we do?  And they say, well, you

5  set up a corporation.  So they set up a corporation, 7C's

6  Production.

7          Now, the Government says, well, that was to hide

8  income.  Yeah.  That's a real hidden name, 7C's.  The seven

9  Chrisleys -- Todd, Julie, Lindsie, Savannah, Kyle, Chase and

10  Grayson, the Chrisley family, the 7C's.

11          Well, the network pays the money to 7C's, just as it

12  insisted that it wanted to do.  7C's was set up by a lawyer.

13  The ownership of 7C's was discussed.  And the lawyer

14  recommended Julie should be the owner.  After all, Todd is

15  still in bankruptcy.  He can't even have a bank account.  He

16  doesn't even have a checking account.  He's in bankruptcy.

17          So 7C's is set up.  Around this time, Todd and Julie

18  are introduced to Peter Tarantino.  Very nice fellow.  They

19  like him.  And their former accountant is in Florida.  They

20  have parted ways with him.  So they hire Peter Tarantino.  And

21  he begins to try and organize their personal and business

22  information for their 2013 and '14 tax returns.  And it's

23  complicated.  It's complicated because there was EAM, there

24  was CAM, there's 7C's Productions.

25          And one of the problems is that both Todd and CAM are

United States District Court

in bankruptcy and the bankruptcy court has all of the
financial records that are needed to prepare tax returns. So
it's complicated. They need information that they try to get.
Chrisleys try to get it. Mr. Tarantino tries to get it.

Mr. Tarantino reaches out to the IRS to get the exact
amounts that Todd and Julie owe in back taxes. Can you tell
me what is it they owe? We want to work on this. At the same
time he's trying to organize documents for the 2013, 2014 and
later the 2015 tax returns so he can prepare tax returns for
the Chrisleys.

Now, the evidence will be that there was no terrible
urgency for 2014 and '15 because the Chrisleys had had such
massive losses and bankruptcy that they didn't think they were
going to owe any taxes for 2013, '14 and '15. So it really
wasn't a priority. Maybe it should have been, but it wasn't.

But all through 2014, '15 and '16, you're going to
see evidence that Todd and Julie regularly, consistently
e-mailed Mr. Tarantino and talked to Mr. Tarantino about
getting their tax returns finished and filed. And it's a
struggle because it's complicated. And Mr. Tarantino e-mails
back sometimes and says, I just don't have all the information
yet. You got to help me get this information.

Several times Mr. Tarantino prepares what he believes
to be final drafts of the '13, '14, '15 returns, only to be
told by Todd, wait a minute, these don't look right, you are

1  missing information. So the returns are not completed yet.

2      Now, even though the returns are not filed timely in

3  '13, '14 and '15, Mr. Tarantino does apply for extensions.

4  And even though they're not filed when they should have been,

5  some tax payments are indeed made by the Chrisleys. There's a

6  $55,000 tax payment made. There's a $36,000 tax payment made.

7  There's a $95,000 tax payment made. There's a $21,000 tax

8  payment made.

9      In 2016 the Chrisleys discuss, we've got a warehouse

10  full of all this furniture from houses I've decorated and sold

11  and things we've accumulated, a huge warehouse with seven

12  houses full of furniture. Can we have this appraised and

13  auction it off and take the money and pay the IRS, and what's

14  not bought from the auction, we can donate to a charity and

15  get a tax deduction, and thereby reduce our taxes by paying

16  some and getting a deduction for what we donate? Answer:

17  That's, yes, they can. And they began to do that and hired an

18  appraiser, put the stuff in a warehouse and were ready to do

19  it until the Georgia Department of Revenue, who, remember,

20  were contacted by Mark Braddock, come and put a lien on the

21  furniture and seize it and prevent the Chrisleys from selling

22  it or donating it. So the plan to raise $300,000 either by

23  auction and money to the IRS or tax deduction for donating it

24  doesn't happen. They're prevented from doing it.

25      It's now 2017. Mr. Tarantino is still working on the
                    United States District Court

1  tax returns.  He completes in the fall of 2017 -- by the way,
2  IRS is not -- criminal folks have not visited him.  He's
3  working on the tax returns in the fall of 2017 and he sends
4  them to Todd and Julie -- '13, '14, '15.  And they look at the
5  drafts.  And Todd immediately, immediately contacts
6  Mr. Tarantino and says, these are not correct.  You have not
7  included a significant loss of over a million dollars that I
8  paid coming out of this bankruptcy thing that I had to pay.
9  You should have included that.  And Mr. Tarantino says, well,
10  I'm not sure I understand it, but I'll look at it.  I'll look
11  at it.

12          So he's looking at it.  And the IRS agents come to
13  visit Mr. Tarantino.  And what does he tell them?  He tells
14  them, I'm still working on the returns, I'm still working on
15  them.  He ultimately does finish the 2013, 2014, 2015 returns
16  and they're filed.  They have to be amended because they still
17  weren't correct.  But once they are amended, once they're
18  filed, guess what.  The evidence shows, in 2013 Todd and Julie
19  Chrisley owed no taxes, just as they thought.  In 2014, Todd
20  and Julie Chrisley owed no taxes, just as they thought.  In
21  2015, they owed $108,000 jointly, but it had already been paid
22  by the time the amended return was filed.

23          There was no conspiracy to evade taxes.  There was no
24  conspiracy to defraud the United States.  It is not a crime to
25  operate as a corporation, especially when the production

1  company says you've got to operate as a corporation.

2         These folks are not charged with filing -- just
3  filing their return late.  They're not just charged with being
4  slow paying their taxes.  They are charged with conspiring and
5  acting with the intent to willfully and intentionally violate
6  the law.  But there was no intent to evade.  Todd Chrisley and
7  Julie Chrisley followed the advice of their accountants.  They
8  followed the advice of their lawyers.

9         The evidence will even show that when Todd Chrisley
10 was contemplating the need to go into bankruptcy in 2012, he
11 discussed with his lawyer the opportunity to have his 2009
12 $500,000 tax debt wiped out, wiped out, fully discharged in
13 bankruptcy.  And he chose not to do so, but to work on paying
14 it off as he could after the bankruptcy was over.

15        Now, could he have been more attentive?  Yes.  Could
16 he have worked faster?  Yes.  Could he have done better?  Yes.
17 But those things aren't crimes.  The evidence will show clear
18 and persistent efforts and intent to straighten out what was
19 owed, to get what was owed paid, and to get the returns filed.

20        Folks, Todd Chrisley comes into this not guilty.  He
21 pleads not guilty.  By his plea of not guilty, he says, I may
22 have done a lot of things wrong, but I didn't commit bank
23 fraud and I didn't intentionally try to cheat and evade the
24 United States Government and the IRS.

25        He has with him the presumption of innocence.
                    United States District Court

1   Although indicted -- and that's a nasty word.  Although
2   indicted, he is a thoroughly innocent man.  Unless and until
3   the Government proves to your satisfaction, with evidence
4   beyond a reasonable doubt, to the contrary, that presumption
5   of innocence stays with him.  The Government must satisfy that
6   burden.  It must satisfy it to your satisfaction.
7           I trust that when you consider the evidence in this
8   case and the lack of evidence and the credibility or lack of
9   credibility of the witnesses the Government must rely on, you
10  will conclude that the Government has not carried that burden.
11  And the only just verdict you can render for Todd Chrisley is
12  not guilty of all charges.
13          Thank you.
14          THE COURT:  Thank you.
15          Ladies and gentlemen, I'm going to keep taking breaks
16  between the attorneys because I want you to be refreshed and
17  hear their opening statement.  So again, a five-minute break.
18          Just to let you know, our lunch break will be a
19  little later than normal today.  It will be about 12:45 or
20  12:50, again, because I do want to push through and have all
21  of the opening statements without separating them by lunch.
22  But I do like to take a quick stretch and refresher break
23  between each one.  So about five to seven minutes.  Thank you
24  so much.
25          **(The jury exited the courtroom at 11:44 a.m. and a**
                    United States District Court

recess was taken, after which the jury entered the courtroom
at 11:51 a.m.)

        THE COURT:  The jury is seated.

        Everyone else may be seated.

        Mr. Friedberg, are you ready to do opening, sir?

        MR. FRIEDBERG:  I am, your Honor.  Thank you.

        THE COURT:  All right.  You may proceed.

        MR. FRIEDBERG:  Good morning.  It's still morning.

        May it please the Court --

        THE COURT:  Yes, sir.

        MR. FRIEDBERG:  -- opposing counsel, co-defense
counsel, ladies and gentlemen of the jury.

        If I may formally introduce myself and my client.
I'm Steve Friedberg, and I have the privilege of representing
one of the matriarchs of the Chrisley family, Julie Chrisley.
And, of course, the other matriarch is someone you've heard
the name, Elizabeth Faye Chrisley.  Julie is, of course, the
wife to Todd and the mother to Chase, the mother to Savannah,
the mother to Grayson, and she also has become a mother to
their grandchild, Chloe, who also appears on the show on a
fairly regular basis.

        And the reason that occurred is because you heard
that the elder son of Mr. Chrisley had some addiction
problems.  And the Court in its best interest -- excuse me,
determined that it was in the best interest of the minor
            United States District Court

child, Chloe, to reside and live with a loving family. And
therefore, Chloe is now one of the members of their family.
So she's now the mother to five.

You also have heard the names I believe at least
Lindsie, but also the gentleman who is the elder son. His
name is Kyle. He did have some addiction problems. And he is
doing very, very well now. But they are the biological
children of Todd not of Julie at this stage -- I'm getting
ready to tell you something different, though, regarding
Lindsie -- and that they're from his former marriage.

But as I said a minute ago, one of the happiest days
and best days in Julie's life was when Lindsie approached
Julie and asked Julie to be her mom. Needless to say, Julie
loved it and they initiated immediately adoption proceedings
to adopt Lindsie. And Julie -- excuse me. And Lindsie became
the legitimate child and the natural child by adoption of
Julie in 2010.

Now, by way of background, Julie Marie Hughes was
born on January 12th, 1973, and grew up in Seneca, South
Carolina, with her parents and younger brother.
Unfortunately, her younger brother passed away in 2002.

Julie has a high school education; but she actually
began working when she was 12 years old when she was working
with her grandmother to clean offices in corporate offices in
buildings. Julie has worked ever since.

United States District Court

1          Julie and Todd met and fell in love and they got

2   married in 1996 and began their lives together raising a

3   family.  Julie and Todd, of course, welcomed Chase, welcomed

4   Savannah, and then had the privilege of having another child

5   later in life, Grayson, who happened to turn 16 yesterday.

6   And he is not here today.

7          Julie got into real estate by doing what Todd was

8   doing as well, and that is, they were renovating older houses

9   that they lived in and then selling them.  And eventually she

10  began working outside the home selling real estate while still

11  being a housewife, cooking all of their meals, and still being

12  a mother to all five children.  Now Julie combines her role on

13  Chrisley Knows Best with her favorite roles as wife,

14  daughter-in-law and mother to their five children.

15         In March of 2012, Julie was diagnosed with breast

16  cancer, and after several months of chemotherapy underwent a

17  double mastectomy and radical hysterectomy in January of

18  2003 -- excuse me, '13.  I'm sorry.  This was a very low

19  point in their lives, as Julie was prescribed very, very

20  strong medications, from which she suffered the side effects

21  of muscle aches and also there was significant memory loss.

22  But as a real survivor would do, as we say in the military,

23  she carried on as if nothing at all had changed her life.

24         I'm sorry.  My pages are sticking together.

25         Julie -- forgive me, Julie, but you're totally

                    United States District Court

1  unaware of this.  But since I have known you for approximately

2  ten years, had the privilege and pleasure of knowing you for

3  ten years, you have no idea what I call you at my house.  I

4  call you Elmer.

5          And the reason I call her Elmer is because she is the

6  glue that holds the entire Chrisley crew together.  Julie

7  somehow maintains a positive attitude through all the trials

8  and tribulations she has faced over the years.  And the one

9  thing, the one thing that remains constant in Julie's life, is

10  her love of her family, which is reflected in everything she

11  does.

12          Now, for those of you who are old enough to remember

13  Paul Harvey, he used to always say, "now for the rest of the

14  story."

15          Everybody see my hands or think you see my hands?

16  What I submit you see is really just my palms.  The other side

17  of my hands (indicating).  I have two sides.  And just like my

18  hands, this case has two sides.  And you've already heard from

19  Mr. Morris on behalf of Todd Chrisley.

20          And as the Court has previously instructed you,

21  opening statements -- and I think this is very important. --

22  they are not evidence.  What I say, what Ms. Peters has said,

23  what Mr. Morris has said, is not evidence.  And as I -- as you

24  all heard the judge instruct you, evidence consists of sworn

25  testimony, any exhibits that have been properly tendered and

1   accepted into evidence, as well as stipulations that have been

2   agreed upon by all counsel.

3           The Government would have you believe that Julie

4   Chrisley is guilty of bank fraud, wire fraud, obstruction and

5   tax evasion.  At this time, I will briefly address these

6   charges, which will be elaborated much more openly during the

7   entire course of this trial.

8           Let's start in the same order.  Bank fraud.  The

9   first six counts of the indictment basically deal with bank

10  fraud.  All of the allegations of bank fraud are based on the

11  allegations of the unindicted coconspirator, Mark Braddock,

12  all of which allegedly occurred during Mr. Braddock's

13  employment at Chrisley Asset Management.

14          As you heard from Mr. Morris, complete immunity,

15  Braddock received complete immunity from the prosecution in

16  exchange for his testimony.  But what did the Government get?

17  I submit to you, that will come forward from the evidence.

18  The Government gets a prosecution parrot, a prosecution

19  parrot, that will say that he committed the same crimes that

20  he's accusing the Chrisleys of committing and -- but at the

21  direction of Julie Chrisley.  And in several -- excuse me, at

22  the direction of Todd Chrisley.

23          And in several of the statements he has made to law

24  enforcement officers, he says, and I believe, not that I know,

25  I believe that Julie was aware of what was going on and

                    United States District Court

1   therefore was complicit.  What you didn't hear, but will hear

2   from the evidence, is that Julie Chrisley never, I mean never,

3   dealt with any banker or loan officer on any of these alleged

4   transactions.  In fact, all of these alleged fraudulent

5   transactions allegedly occurred while Mark Braddock was at

6   CAM, which is Chrisley Asset Management.

7        But the evidence will show that like Todd, Julie was

8   rarely, rarely ever at the offices of Chrisley Asset

9   Management.  And in fact, to illustrate this, she was never

10   given a key fob, she was never given a parking space.

11        Now, I realize that the Government has basically

12   alluded to the fact that Mark Braddock doesn't come in with

13   clean hands.  The evidence will represent that as early as

14   2013 to 2014 -- and I'm going to be a little redundant on

15   this. -- the year or so after Mark Braddock was terminated

16   from his employment at CAM, he and his attorney approached the

17   United States Attorney's Office and brought up these same

18   allegations, 2013, 2014, which were investigated by a

19   different Assistant U.S. attorney, and no charges were brought

20   at that time.

21        Fast-forward to 2018, 2019.  And you heard what

22   Mr. Morris said in terms of Mr. Braddock going to the Georgia

23   Department of Revenue and then back to the federal government.

24   And Mr. Braddock is back.  What is he back with now?  He's

25   back with spoof e-mails and his assuming other individuals'

1  identities without their consent or knowledge through fraud
2  and scheming.  Examples of this fraud and scheming, many
3  examples of this fraud and scheming will be elaborated upon
4  during the course of this trial, inclusive of all the
5  inconsistent lies that Mr. Braddock alleged to various members
6  of the prosecution team, as well as the inconsistent testimony
7  he gave under oath in depositions when he was sued and when
8  other civil matters were coming up against Mark Braddock.

9        Mark Braddock got the deal of a lifetime.  And the
10  Government is now asking each of you, each of you, to believe
11  him now, a man who has told many different statements,
12  depending on who he was talking to, and has lied under oath.
13  So when he's under oath before you, how do you know when to
14  believe him?  Does a leopard change his spots?

15        Let's go to wire fraud.  The Government is alleging
16  that Julie sent a false credit report and false financial
17  documentation to secure a lease on a home in California.  One
18  of Mark Braddock's former allies at CAM before he was
19  terminated and before all was made known to both Julie and
20  Todd that had been going on behind their backs, he had an ally
21  by the name of Donna Cash, who worked basically for Mark
22  Braddock.

23        And after Mark Braddock was terminated sometime
24  later, she came back to the Chrisleys and began working for
25  the Chrisleys, admitting what she had done.  And you will hear

1  that it was Donna Cash, not Julie Chrisley, who will testify

2  and explain what she did in submitting this information,

3  without Julie's knowledge.  And that's the main thing.  Julie

4  had no idea that any of this was going on, nor was there any

5  need for it to go on.  Because, quite candidly, there will be

6  evidence that the network itself would have provided

7  reimbursement to the Chrisleys for any work related expenses.

8  So it doesn't make really any sense.

9       But let's get to the obstruction charge.  It involves

10  the grand jury subpoena that was sent to 7C's requesting

11  submission of various documents.  It is true that on or about

12  March 6th, 2017, Julie learned that the IRS was contacting

13  their accountant, Peter Tarantino, regarding submission of

14  bank statements and other financial documents.

15       The Government would have you believe that Julie with

16  criminal intent went the very next day to the Bank of America

17  in Nashville, Tennessee, and presented a corporate resolution

18  changing ownership of 7C's to Elizabeth Faye Chrisley.  And

19  there is no dispute that that occurred.  Absolutely no

20  excuse. -- excuse me.  Absolutely it occurred.  Excuse me.

21       But the purpose, the purpose that they thought they

22  were doing was to add Elizabeth Faye Chrisley, affectionately

23  known as Nanny Chrisley, to become a signatory in order to

24  sign checks for her so that the contractors and subcontractors

25  who were working on the home that the Chrisleys now live in

1  could be paid while the Chrisleys were living and working in
2  California.
3        You will hear sworn testimony from Bill Abbott, who
4  assisted Julie during this time period.  And he was asked to
5  prepare a corporate resolution adding Faye as a signatory.
6  Mr. Abbott you will hear went online, found a template for a
7  corporate resolution to accomplish that occurring, but he made
8  a huge mistake.  Later that evening when Julie got home and
9  upon learning of the mistake, the very next day Julie Chrisley
10 crossed out Faye Chrisley as the owner and changed it back the
11 way it was and took the corrected copy to the bank the very
12 next day on March 8th, 2017.
13       And there will be a witness who will say, not only
14 did she do this, but obviously her intent was to change just
15 the signatory because they had gone to the bank before
16 March 7th.  It was a few days before March 7th.  And this is a
17 government witness who will tell you this.
18       And the other thing that is so important is that
19 Julie was always treated as the owner not Nanny Faye.  You
20 will see e-mails and you will hear recordings of her
21 conversations with bankers and everything else trying to clear
22 this up.  And they're communicating with whom?  They're
23 communicating with Julie Chrisley, not Nanny Faye Chrisley.
24       Now, a copy was originally made for Julie by Bill
25 Abbott.  As it turned out, Julie apparently had left this

1   corporate resolution -- and this is where the alleged

2   obstruction comes. -- in the trunk of her car.

3           She cooks every meal.  Believe it or not, she does.

4   She's an outstanding cook.  And she had a helper at the house

5   that day when she came back from the grocery store.  His name

6   is Chad Bryant.  And you will hear from him personally.  Chad

7   offered to help bring the groceries out of the trunk.  He goes

8   in, he brings all the groceries.  He brings them in the

9   kitchen.  Brings them all in the kitchen.

10          As she's unloading the groceries, she sees this

11  plastic bag that definitely has crumped up papers, like it's a

12  trash bag.  And inside she finds the corporate resolution.

13  What does she do?  Does she try to hide it?  No.  What she

14  tries to do is do the right thing.  She calls our

15  investigator, Bill Salinski.  And what does Bill tell her?

16  Send it to me immediately, which she does.  And then both

17  Mr. Morris and I review it and really determine that this

18  would be responsive to that same grand jury subpoena.  So what

19  do we do?  We turn it over to the Government.

20          So what the Government calls it, "obstruction", we

21  call it "an honest mistake".  She didn't do anything to

22  conceal that with criminal intent.  And as soon as she found

23  it, she turned it over.

24          In addition, what's interesting too is that you will

25  hear from Nanny Faye.  She went to the bank on March the 7th

1   with Julie, and she was there.  And what was -- what will she

2   tell you?  She will tell you she knew nothing about 7C's.

3   This was purely for her to become a signatory.  And it's also

4   corroborated by Lindsie, who you will hear from, because guess

5   what?  Lindsie was at the house when the corporate resolution

6   was found.  And it had been discussed, let's go right back to

7   the bank the very next day -- that same day, excuse me, when

8   it was discovered.

9        And Lindsie had to go to the bank to make deposits.

10  And she has those deposit slips that will show you, at the

11  time that Julie and Faye were at the bank, so was Lindsie.

12  And everybody knew it was to make Faye the signatory.  Why?

13  Because Julie and Todd were going to live and work in

14  California for approximately six months.

15       Julie Chrisley had had no intent to obstruct the

16  grand jury.

17       Julie Chrisley is also an alleged coconspirator in

18  the tax evasion count in the indictment.  You-all will hear

19  and see a plethora of e-mails reflecting their efforts to pay

20  their taxes.  They're going among a lot of people, but mainly

21  between Julie and Peter Tarantino.  And you will see all of

22  these e-mails, which would truthfully be reflecting their

23  intent to pay the taxes.

24       And Mr. Morris has already indicated to you that

25  prior to the seizure by GDOR of all of the furniture that was

United States District Court

1  in this warehouse, which had been appraised, it was appraised
2  solely for the purpose -- and you've already heard this.  I
3  apologize for being a little redundant, but I find it very
4  important -- that even one of the government employees stated,
5  this was done -- it was her understanding that it was done
6  with the intention to apply it to taxes, which they couldn't
7  do.

8          Please, I urge you, do not make up your mind until
9  you have heard all of the evidence, until you have had a
10 chance to be instructed as to the applicable law to apply to
11 the facts by Judge Ross, and until you have had an opportunity
12 to sit down and work with your fellow jurors and use the
13 collective wisdom of the jury to get an understanding if you
14 have any, any conflicts so that you can deliberate.

15         Julie is grateful for this day, as she has been
16 anxiously awaiting for a few years for the whole truth to come
17 out so that a jury of 12, just like yourselves, could end this
18 nightmare with a verdict that speaks the truth, a verdict of
19 not guilty.

20         Thank you very much.

21         THE COURT:  Thank you.

22         Mr. Griffin, are you ready to go since that one was
23 shorter or would you like a five-minute break?

24         MR. GRIFFIN:  I'm ready to go, your Honor.

25         THE COURT:  All right.  You may proceed, sir.

1          MR. GRIFFIN:  Thank you.

2          THE COURT:  Thank you.

3          MR. GRIFFIN:  This is how it's going to go.  I'm

4    always last.  I'm just last.

5          Let me reintroduce myself.  My name is Danny Griffin.

6    I represent, along with Jack Van Why, Peter Tarantino.

7          Peter, if you could stand, please.

8          The evidence will show this:  There was no conspiracy

9    among Peter Tarantino, Julie Chrisley and Todd Chrisley.

10   There was no illegal agreement.  There was no conspiracy.

11   They didn't have an agreement to not file tax returns.  There

12   was no conspiratorial agreement to not pay the Chrisley's past

13   tax debt.  Those debts, by the way, were in place long before

14   Peter Tarantino was even on the scene.

15         The evidence will also show this:  The corporate tax

16   returns that Peter Tarantino filed in 2016 and 2017 are not a

17   crime.  Peter acted in good faith with a clear conscience.

18   And that is a complete defense to those charges.

19         Now, as you could probably tell already, Peter is a

20   bit player in this drama.  There's going to be days, maybe a

21   week, where you don't even hear his name.  And that's because

22   he's not charged in the bank fraud, he's not charged with wire

23   fraud, he's not charged with obstruction.  He's got three

24   charges against him.

25         Also, the conspiracy to defraud the IRS is -- the

                    United States District Court

1  indictment says it started in 2010; but the Government will
2  tell you during this trial, it does not claim that Peter
3  entered into the conspiracy until February of 2016.  That
4  claim is not going to be supported by the evidence.  Peter did
5  not enter into any kind of a conspiracy then.

6         But let me tell you a little bit about Peter.  He
7  grew up in New York.  He went to Pace University.  He went
8  there for a year.  He wasn't that great of a student.  It was
9  full-time.  Being a student was not his cup of tea, so he took
10  a job at the sanitation department and finished out his
11  college career going to night school.  When he finally
12  graduated from night school, Peter took the CPA exam in 1985.
13  Did he pass it the first time?  No.  No.  It took Peter 20
14  years to pass that exam.  He took it 12 to 13 times.  It's one
15  of his proudest moments when he passed it.

16         Peter is married.  He's got two college-age kids.  He
17  moved his family from New York to Atlanta in about 1999.  He
18  opened his own accounting practice in 2007 and has a small
19  shop.  It's over on -- near the corner of Crabapple and
20  Crossville Roads.  For the most part, it's only been Peter and
21  his assistant.  He's like in a little office park over there.

22         Peter's a regular Joe.  His clients are regular
23  hardworking people -- landscapers, electricians, salespeople,
24  salt of the earth people.  That's who Peter represents.  His
25  practice is not huge.  And it's not overly sophisticated or

1  complicated.

2      But you will hear during this trial that Peter worked
3  six to seven days a week.  Not because his practice is huge
4  but because it takes Peter longer.  He has to spend more time
5  to do what it takes than other people to get things done.

6      Peter met the Chrisleys at a mutual friend's
7  Christmas party around 2011.  That's it.  He met them there.
8  It was two or three years later, the Chrisleys called Peter
9  and said, we remembered you're an accountant, can you help us
10  out.  The relationship didn't -- you know, it wasn't about tax
11  returns in the beginning, then it was.

12      First time, maybe the first time he met them they
13  went to lunch.  And people noticed the Chrisleys.  That made
14  Peter proud, you know, that he was going to be maybe working
15  for people who had their own cable show.

16      In the beginning, Peter didn't have -- he had no idea
17  what this would morph into.  And of course, he never had a
18  show business client before with accounting issues like
19  production costs, the studio costs, the way you have expenses
20  when you have your own show.

21      This is important.  Peter charged the Chrisleys the
22  same hourly rate that he charged the plumber, the nurse, all
23  of his other clients.  This was not about Peter making money.

24      And you hear tax fraud.  This sounds too complicated
25  to understand.  I'm with you.  But there's some basics,

1   there's some real basics that the evidence -- you'll learn
2   from the evidence.
3       First, 7C's Corporation and the contracts the
4   Chrisleys had with the studio were already in place when Peter
5   came onboard.  He had nothing to do with it.
6       Second, while 7C's files tax returns, no taxes are
7   owed or paid by that company.  They flow through to the owner.
8   It's an S corporation.  It's just like an LLC.  The
9   corporation files tax returns, but no taxes are owed and no
10  taxes are paid.  It flows through to the owner of the company.
11  That owner is Julie Chrisley, 100 percent owner.
12      Number 3, at all relevant times the Chrisleys
13  believed they would not owe any taxes for 2013, 2014 and 2015.
14  Why?  Why?  Well, before Peter was ever their accountant in
15  2012, the Chrisleys had a massive business loss.  When you
16  have a loss like that, sometimes it's called a loss carried
17  forward.  But just remember, it's a business loss that carries
18  forward to the next year's returns, until you use that loss
19  up.  And what it does is, if you have income this year but a
20  loss from last year, the loss reduces your taxable income.
21      The Chrisleys also believed that they had a
22  significant deduction, like over a million-dollar deduction,
23  that could be applied to 2013, '14 and '15 tax returns.  They
24  told Peter about it.  Peter tried to research it.  Couldn't
25  wrap his head around it, so he never put it on the returns.

cut it, the taxes owed for 2013 by the Chrisleys was zero.

He told Todd Chrisley, I hear you.  I understand you think this is a deduction, but I'm not comfortable putting it on any of these returns.  If you get me a second opinion from other accountants, then I'll consider it.

No matter how you cut it, when you cut it, how you cut it, the taxes owed for 2013 by the Chrisleys was zero. The taxes owed by the Chrisleys for 2014 was zero.

Now, those are the basics.

Everything started out at a manageable way.  Peter eventually learned that the Chrisleys -- he learned about their tax debts.  And there was a lot of talk about getting an installment plan to pay off these debts, how much, let's pay them off.  There was a lot of talk about that.  Todd Chrisley was always interested in trying to get an installment plan or getting his debt reduced.

The Chrisleys were constantly asking Peter, call up, write the IRS, find out how much we owe.  Because, you know, as months go by, interest racks up, penalties rack up, the amount changes and grows.  You can owe 25 one year and in two years you're going to owe 50.  But they were constantly asking Peter to find out how much we owe.  And he would.  And then there were attempts made to pay down those taxes.

Julie Chrisley -- and remember, we're talking about a conspiracy that says, impede and impair the IRS from collecting tax debts.  Julie Chrisley owed $170,000 or about

United States District Court

1  there.  That money was paid under Peter's watch.  At the end
2  of 2016, 36,000 was paid, then 80,000 was paid, then in March
3  of '17 another $55,000 was paid.

4       Todd Chrisley's debt didn't just sit there.  The
5  house was sold.  Checks were written.  His debt was reduced by
6  $100,000.

7       Now, most of the information Peter had to prepare
8  these corporate tax returns, which then would flow onto
9  individual returns, came from one source, the 7C's Corporation
10 bank statements.  It was Peter's job to take these bank
11 statements, look at them, and then categorize the money.
12 Okay.  Money came in.  Is that revenue that belongs to the
13 company?  Does it need to be reported?

14      And expenses, are these personal?  Well, then it's
15 personal.  That's your -- that's your revenue.  You can't
16 deduct it.  Or are they business expenses and can be deducted?

17      What Peter had to do is, he would prepare what he
18 called a suspense item list.  And that just meant, I got
19 categories of checks I don't know how to categorize them.  I
20 put them in my suspense chart and I send them to Julie
21 Chrisley and say, Julie, you're the owner of 7C's.  I need
22 your help.  Help me categorize these expenses.

23      Now, by the time we get to the fall of 2016, here's
24 what happened:  Peter is talking to a revenue officer.  She's
25 very much interested in collecting debts.  She's talking about

1  the returns.  When are they going to get filed?  What's the
2  status?  Peter said, I will get these filed.
3         Here's what was happening.  Here's what did happen.
4  Peter was in over his head.  He was under water.  Completely
5  under water.  He had fallen so far behind, he had a huge
6  suspense item list and he had bank account statements that he
7  hadn't categorized.  But he didn't tell the Chrisleys.  He's
8  embarrassed.  His pride was affected.  He didn't tell the
9  Chrisleys, you -- I've got to get you more help.  You need to
10 go to a more resourceful accounting firm.  He didn't say that.
11 He kept saying to himself, I'll get it done, I'll get it done.
12 He would promise himself.
13        And then he would look at the stack.  He's got like
14 500 clients.  It's not a huge client.  But he would look at
15 the stack and he would say, that's a lot of work, and he would
16 go back to his other clients and work on them.  He
17 procrastinated.
18        He made promises he thought he could keep to the IRS.
19 He never told the Chrisleys that he couldn't do it.  And the
20 Chrisleys wanted him to prepare the tax returns and get them
21 filed.  They wanted him.  Who wouldn't?  They didn't think
22 they were going to owe.  Why would they be shy about tax
23 returns that were going to say you owe zero taxes?
24        Let me back up a little bit.  You will hear testimony
25 about other information being requested by the IRS.  When

1  Peter got those requests, he would immediately turn them over
2  to the Chrisleys.  An accountant like Peter can only produce
3  to the revenue officers the information that he gets from his
4  clients.  If he doesn't have it, he can't produce it.  Right?
5           But there came a time when a lot of information
6  started flowing from the Chrisleys to Peter to the IRS.  For
7  example, in March and April of 2017, he sent a stack of bank
8  statements to Revenue Officer Carter.  She said:  I want them.
9  You've got this much time to get them.  The Chrisleys gave the
10  bank statements to Peter and he got them to Revenue Officer
11  Carter.
12           Two weeks later she says, I want this, and she gave a
13  list of things that she wanted.  All right.  They gathered
14  that list.  Included in this list, included in this list, the
15  Number 1 request, I want year-to-date pay stubs for Julie and
16  Todd Chrisley.  She got them.  Peter got them from the
17  Chrisleys.  He produced them to Agent Carter.  Those pay stubs
18  show that in the first two and a half months of 2017 the
19  Chrisleys combined had earned $470,000.  When I say earned,
20  the pay stubs -- and Agent Carter will tell you, the pay stubs
21  say, the checks are written to 7C's for the services or Julie
22  Chrisley and for the services of Todd Chrisley.  That's what
23  they say.  Those are the documents that were provided.
24           Mortgage documents were provided, showed when the
25  home was bought, those kind of things.
                    United States District Court

1    Now, one key document that is requested by the IRS in
2  all of these kinds of situations, it's called, you know,
3  whatever -- Form 433-A.  That form is a very in-depth personal
4  financial statement, very in-depth.  A lot of the questions
5  that Peter Tarantino was asked would be if the clients filled
6  out 433-A -- he would answer all the questions -- where do you
7  bank?  What's your address?  How many houses do you own?  How
8  many businesses do you own?  It's a long form.  It even goes
9  down, how much do you spend on your utilities every month?  We
10 want to know because we want to know how much you can pay back
11 to the IRS.

12    Twice when that request was made, Peter passed it on,
13 and twice -- you know, it's going to be a typical response
14 from taxpayers.  Twice Todd Chrisley says, oh, the heck with
15 it, we'll just pay all the debt off rather than fill out the
16 433-A.  That's where we were.  That's where Peter was.

17    Now, Peter didn't lie to any of the IRS employees.
18 He did not lie.  I ask that you listen to and watch as the
19 evidence comes in.  When there's problem areas, ask yourself:
20 Is Peter on this?  Does this involve Peter?  Many times, if
21 not all, the answer is no.

22    Now, let me get back to the evidence about why there
23 wasn't a conspiracy to file tax returns.  When Peter was
24 talking to the revenue agent in April of 2017, he did -- his
25 plan was to get the returns done by the end of that month.

1    The Chrisleys also knew that was his plan.

2           April of 2017, apparently unsolicited by that revenue

3    officer, Peter said, I'm going to get these returns prepared.

4    And let me just tell you, it's a chronology that cannot be

5    changed.

6           April 13th, 2017, Todd Chrisley e-mails Peter

7    Tarantino:  Hey, never heard from you.  What's the status of

8    the tax returns?

9           Three weeks later, Todd Chrisley e-mails Peter again:

10   Good morning.  Do you have the tax returns ready?  It's been

11   several weeks and we would like to get this behind us, Peter.

12   We never received a list of items that you said you were

13   sending that you had questions on.

14          This is when Peter gets on the stick.  He says, I'll

15   get back to you by the end of the day.  He doesn't.  He gets

16   back to the Chrisleys the next day.  Peter spent 11 hours

17   trying to get this stuff organized.  And he puts together --

18   he gets the suspense list together as much as he can.  He

19   responds on May 2nd saying, I have questions about all of

20   these items.  And he sends a spreadsheet.  You will see it.

21   Seventeen pages long.  It's like this (indicating).  And it's

22   got hundreds of items of things he can't answer.  I don't know

23   what this check is for.  Help me so we can categorize it.

24          It has a total at the bottom.  It's $5 million in

25   questions that he has, 5 million.  This shows how far Peter

1 | was behind at the time.

2 | Julie Chrisley did her best.  The next month -- a
3 | couple weeks later and the next month in June, she responds
4 | and says, I've answered what I could, I still have some
5 | questions.  But she sends it back to Peter.

6 | In August of 2017, Peter sends out another suspense
7 | item list.  Because of what Julie was able to respond to and
8 | Peter's ability to plug it all in, this suspense item had been
9 | cut in half.  There's still $2.6 million that Peter can't
10 | explain.  He needs to in order to prepare the 7C's returns,
11 | which will allow him to prepare the individual returns.

12 | That's when things switch from Peter to the
13 | Chrisleys.  The Chrisleys are slow to respond.  This is the
14 | moment Peter says, in August, I've got to just get these
15 | finalized.  I'm going to do what I promised.  I'm going to get
16 | these returns done.  And then once we're filed, I'm going to
17 | tell them, you're too big for me, this is too much for me, you
18 | need to go to a better shop with more resources.

19 | Things slow down from the Chrisleys.  He doesn't get
20 | a response.  In September there's a phone call where he says,
21 | hey, I sent you those items, I haven't heard.

22 | Now, in September of 2017, that's when the 7C's
23 | corporate return is due.  Peter did file that return and put a
24 | zero on it.  He did it in good faith.  For a reason, he
25 | believed it was allowed.  And this is why:  He didn't have

United States District Court

1  enough to file, you know, a totally accurate one.  He knew --

2  because the personal returns were due in October, he knew he

3  would get this done and he would get their personal returns

4  done and he would just amend the 2016 return in a matter of

5  weeks.  He will explain -- or it will be explained to you in

6  this trial why that's allowed.

7          Okay.  We get -- I'm on September 15th.  I know this

8  is a lot, but it's in a chronology.  September 15th, he does

9  it.  Four days later, the IRS issues a memo to the State of

10  Georgia, because of Hurricane Irma, everybody's tax returns

11  that were due, you now have until the end of January 2019.

12  Well, when you're a procrastinator like Peter Tarantino, you

13  go, that gives me more time.  So he took his foot off the gas,

14  but he didn't stop.

15          In November, on November 25th I believe, he e-mailed

16  the Chrisleys -- or there was an e-mail about something else.

17  But Peter says, hey, I've never heard back from you.  I need

18  this stuff.  Crickets.

19          December 20th, one month later, the Chrisleys are in

20  Paris e-mailing back and forth.  Peter says, I need to get

21  this.  I need to tell you what this says.

22          December 20th, 2017, Peter writes:  When you get back

23  to the States, we need to do these things:  Number 1, finish

24  our joint review of the business taxes to get those filed;

25  Number 2, get your personal tax filings up-to-date, including

1 the returns that Georgia has requested.  No meeting happened.

2         We get into January 2018.  Todd Chrisley wants to buy

3 a Bentley.  He's got to have tax returns to do that.  So

4 Peter, on January 18th, you know what, he just says, the heck

5 with it.  I don't need answers to the suspense items.  All

6 those expenses that maybe could have been expenses, I'm just

7 going to throw it into revenue on 7C's.  It's going to flow

8 through.  You know, your return is just going to say, you have

9 more reportable income.

10        He prepares returns on the 18th of January and sends

11 an e-mail to the Chrisleys.  He attaches most of them.  But

12 his e-mail is just saying -- you know, a lot of people have

13 e-mails from their accountant -- saying, here's the bottom

14 line:  2013, you're going to owe zero; 2014, you're going to

15 owe zero; 2015, $192,000; and 2016, $290,000.

16        A week later, he sends the same returns to the

17 Chrisleys.  I would like to wrap up these prior years.  I

18 would like to finalize these and get them filed.  I need to

19 confirm the official date of the move to Tennessee so I can

20 report the corrected information to Georgia.  Once I have that

21 information, I will finalize these and get the necessary forms

22 for you -- to you and Julie for signature.

23        He's done.  He's saying these are final.  Here they

24 are.  The information he needs relates to the Georgia State

25 return.  It's not necessary for the federal.  Peter thinks

                United States District Court

1  he's done.

2       He sends those returns on the 23rd, 24th.  The
3  Chrisleys get in touch with him and say, Peter, you didn't
4  capture all of our expenses.  Well, you're kidding.  Why do
5  you think that happened?  Because you didn't respond to the
6  suspense items.  But two, they said, Peter, where is the
7  Rialto Capital deduction?  That changes everything.  And he
8  said, I told you I don't understand the deduction.  This is
9  the coconspirator who says, I'm not -- I don't feel
10 comfortable putting that deduction on these returns.  I'm
11 going to need a second opinion before I do it.  That's where
12 things stood.  Now, Peter was wrong.  That deduction is a
13 valid deduction.  He was just wrong.

14      Ten days later, the IRS agent and the FBI show up at
15 Peter's office.  Peter didn't lie to these agents.  They
16 showed up cold.  Peter is relaxed.  Peter didn't say hold on a
17 minute, let me go get a lawyer, I'm afraid.  He says, come on
18 in.  Talks with them for an hour.  It's recorded.

19      Four months later, the IRS agent and FBI agent call
20 him and say, hey, we'd like to come back and talk to you some
21 more.  Sure.  He doesn't even ask what about.  He says, sure,
22 come on over.  They come to his office.  He sits down for two
23 hours.  He has no idea that he's any kind of a focus of
24 anything.  Two-hour recorded interview.

25      Now, in this trial I'll -- I will point out some
                  United States District Court

things about those tapes that kind of just established how
messy Peter's mind is.  And I'll just tell you, the evidence
is going to show, he's sitting down with the agent in the
first interview and they said what do the 2013 and 2014
returns -- Peter looks at the wrong thing.  Can't -- for some
reason can't remember that eight, nine days ago he just told
the Chrisleys you owe zero.  He looks at an earlier draft
that's on his computer somewhere and gives them all the wrong
numbers.  He has to take time to concentrate.  It's not a lie.
No one is saying that was a lie.  It just is -- it establishes
kind of the messiness here.

        Now, what happened after the IRS and the FBI showed
up?  Yes, one of the things that happened is Peter says to
himself, I got to look at these returns and make sure they're
bullet proof.  He looks at the returns by himself, no help, no
discussion with the Chrisleys, and says -- acid begins to turn
in his stomach.  He has been doing the studio production costs
wrong.  He's been overstating the expenses, which has been
understating the taxable income.  He has to go to the
Chrisleys and say, I've been doing this wrong.

        Nevertheless, they file tax returns for '13 and '14
in February.  Still no Rialto Capital deduction on this.
Still no.  Because he doesn't get it and he won't do it.

        Then in May, we finally get second opinions from two
different accountants that say, yes, this is a deduction and

here's where you put it on the tax return.  Peter says, okay,
I'll do it.  '13 is zero.  '14 is zero.  '15 and '16 get
filed.  That's what this case is about.

At the end of this case, which means I'm at the end
of this opening statement -- at the end of this case, what
we're going to ask is -- yes, you may find and conclude he's
messy or that he was in over his head at times, but that, that
is not a conspiracy, it's not a crime.  Sorry.  I'm losing my
voice.  It's not a crime.  And so what we're going to ask is
that you render a verdict of not guilty because Peter is not
guilty.

So thank you.  I think I'm hungry too.  Thank you for
your time.

THE COURT:  Thank you, Mr. Griffin.

It's very difficult to be the one that goes right
before lunch, so thank you again, Mr. Griffin.

Ladies and gentlemen, we're going to pause right
there at 12:41 for you to enjoy your lunch break.

Ms. Beck, will you be giving them some guidance or
direction?

THE COURTROOM DEPUTY:  Yes.

THE COURT:  Ms. Beck will meet you back there to just
remind you of where to go and where to be back, but I need you
back here, I'm going to say at this point 1:30.  That's a
little under an hour, but 1:30, to make sure that we are ready
United States District Court

1  to go by 1:40.  So thank you so much.  Enjoy your lunch.

2  Don't discuss the case.  Don't do any research.  Thank you.

3  Leave your pads in.

4         **(The jury exited the courtroom at 12:41 p.m., after**

5  **which the following proceedings were had.)**

6         THE COURT:  All right.  The jury has exited.  You all

7  may either sit down or otherwise be at ease.  I just wanted to

8  take a moment to ask the Government what our afternoon looks

9  like in terms of your order of proof, please.

10        MR. KREPP:  Yes, your Honor.  We're calling Paul

11 Desisto first, who is the gentleman we spoke about earlier.

12 And then we're going to be calling Bank of America employee

13 Lisa Stone.  And assuming there's still time, we'll be calling

14 IRS Revenue Officer Betty Carter.

15        THE COURT:  All right.  Thank you so much.

16        I will see you-all back here right at 1:30.  Thank

17 you so much.

18    **(A recess was taken at 12:43 p.m.)**

19        THE COURT:  Anything before we bring the jury back

20 out?

21        Government?

22        MS. PETERS:  No, your Honor.

23        THE COURT:  Defense?  Mr. Morris, are you here?  Lost

24 you over there.  Anything from you?

25        MR. MORRIS:  Thank you.  No, your Honor.
                     United States District Court

```
1              THE COURT:  Mr. Friedberg?

2              MR. FRIEDBERG:  Nothing, your Honor.

3              THE COURT:  And Mr. Griffin?

4              MR. GRIFFIN:  Nothing.

5              THE COURT:  Let's go ahead and get them in.

6              (The jury entered the courtroom at 1:30 p.m., after

7    which the following proceedings were had.)

8              THE COURT:  All right.  The jury is back in place.

9              Everyone may be seated.  Thank you so much.

10             Ladies and gentlemen, I do hope that you enjoyed your

11   lunch.

12             We are going to go ahead and get started with the

13   Government's case.

14             Before we do that, I do note for the record that the

15   rule has been invoked.  So if you are a witness in this case,

16   I direct you to step outside of the courtroom and not to

17   discuss your testimony with any other witness.

18             Attorneys, just make sure that you scan the courtroom

19   every so often just to check to see if one of your witnesses

20   has slipped in and is seated in the courtroom without my

21   knowledge, since I won't recognize them.

22             All right.  Government, are you prepared to call your

23   first witness?

24             MS. PETERS:  We are, your Honor.  And for our first

25   witness, the United States calls Paul Desisto.
```

United States District Court

```
 1        THE COURT:  All right.  If we can get him and get him
 2   on the witness stand, I'll swear him in.  Thank you.
 3                        (brief pause)
 4        THE COURT:  Good afternoon, sir.  If you come on up
 5   and around, I will swear you in.
 6        If you would please raise your right hand.  Good
 7   afternoon to you.
 8                        PAUL DESISTO,
 9   A WITNESS HEREIN, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED
10   AND TESTIFIED AS FOLLOWS:
11        THE COURT:  Go ahead and take the witness stand,
12   please.  And once you are seated comfortably, if you would
13   first state your name and then also spell it for the record.
14        THE WITNESS:  Sure.  My full name is Paul Desisto.
15   P-A-U-L.  Desisto, D-E-S-I-S-T-O.
16                      Direct Examination
17   BY MS. PETERS:
18   Q    Thank you.
19        Good afternoon Mr. Desisto.
20   A    Good afternoon.
21   Q    Could you please tell the jury where you live, just city
22   and state?
23   A    Sure.  I live in Manahawkin, New Jersey.
24   Q    And have you traveled here to testify in this case?
25   A    Yes.
```

United States District Court

1    Q    How are you currently employed?

2    A    I am self-employed.  I own my own business and I'm

3    self-employed.

4    Q    What kind of business do you run?

5    A    I own a DJ entertainment.  I own my management company

6    I've had since 2012.  I'm a nightclub DJ.  I also manage

7    endorsements.  I do personal appearances.  I was self-employed

8    as an independent contractor at CEG for a number of years.

9    Q    So let's talk about that.

10         Were you an independent contractor with CEG around

11   2017?

12   A    Yes.

13   Q    What is CEG?

14   A    CEG is a talent agency that works with influencers.  They

15   work with celebrities.  They also work with brands doing brand

16   endorsement deals.  They do personal appearances, things of

17   that nature.

18   Q    Okay.  What were your responsibilities when you were an

19   independent contractor for CEG?

20   A    To generate business, maintain certain relationships,

21   broker deals, things of that nature.

22   Q    All right.  And in 2017, when you were an independent

23   contractor for CEG, did you ever work with Todd Chrisley or

24   Julie Chrisley?

25   A    Yes.

                    United States District Court

1    Q    And did you ever meet with them in person?

2    A    One time.

3    Q    Do you see Todd Chrisley and Julie Chrisley in the

4    courtroom here today?

5    A    Yes.

6    Q    Could you describe what Todd Chrisley is wearing?

7    A    Todd is wearing a navy suit and a navy tie.

8    Q    And how about Julie Chrisley?

9    A    Julie is wearing a -- looks like a navy blazer and a white

10   shirt.

11          MS. PETERS:  Your Honor, may the record please

12   reflect that Mr. Desisto has identified both of the

13   defendants.

14          MR. MORRIS:  We'll stipulate that, your Honor.

15          THE COURT:  All right.  The record will so reflect,

16   as well as the stipulation.  Thank you.

17   BY MS. PETERS:

18   Q    Mr. Desisto, you mentioned that you had some business

19   dealings with Todd and Julie Chrisley during that time?

20   A    Yes.

21   Q    Did you do work for other Chrisley family members as well?

22   A    Yes.

23   Q    Which Chrisley family members did you do work for?

24   A    We did endorsements for Chase Chrisley, for Savannah

25   Chrisley, Lindsie Campbell.  She was part of the family, and

1  podcast for her as well.  Yeah.

2  Q    Okay.  When you say you did endorsement deals for them,

3  could you describe -- I'm not an entertainment specialist and

4  I imagine a lot of the jurors aren't either.  Could you tell

5  us what exactly that means?

6  A    Sure.  They would promote like a protein shake on their

7  social media, on their Facebook or on their Instagram.  Maybe

8  it was a vitamin that helped you with your hair growth.  And

9  then they would be compensated for promoting that on their

10 social media.

11 Q    Would you help arrange some of those deals and contracts

12 between the brands and the Chrisley family?

13 A    Myself or other people at CEG.

14 Q    Okay.

15         MR. MORRIS:  Excuse me.  Could I ask you to move that

16 thing in front of you there?

17         THE WITNESS:  This?

18 BY MS. PETERS:

19 Q    Just pull the microphone a little bit closer to you.

20         MR. MORRIS:  And could you move that -- it's blocking

21 you.

22         MS. PETERS:  I'm sorry.

23         MR. MORRIS:  Thank you.

24         MS. PETERS:  Thanks, Mr. Desisto.

25         First witness.  A lot of moving parts.

                    United States District Court

1  BY MS. PETERS:

2  Q    While you were working for the Chrisleys, would you say

3  that you communicated more with Todd Chrisley, with Julie

4  Chrisley or did you communicate with them in equal amount?

5  A    Todd.

6  Q    What types of things would you and Todd Chrisley

7  communicate about?

8  A    Mostly business, schedules, endorsement deals.  Yeah.

9  Q    All right.  Tell me whether or not, based on your deals

10 with Mr. Chrisley, you believed him to be a sophisticated

11 businessman?

12 A    Sophisticated businessman.  Can you rephrase that?

13 Q    Sure.  Based on your communications with him, did he seem

14 to have a good sense of the contracts he was entering into,

15 how he was going to be paid and what was expected of him?

16 A    Yes.

17 Q    Based on your communications with him, did you ever get

18 the impression that he didn't understand anything about any of

19 the contracts or the business he was entering into?

20 A    I would assume that he did for most of the stuff.  If he

21 had any questions, obviously, you know, we were available to

22 answer them.  But I would say yes.

23 Q    Okay.  How were Todd and Julie Chrisley paid for

24 endorsement deals facilitated by CEG?

25 A    Sure.  There was one deal that they did called Little

United States District Court

Things.  It was a Facebook publisher.  And Little Things paid
them directly.  And they paid CEG a commission separately.
For all of the other endorsement deals for the most part --
actually, all of them outside of Little Things, let's say they
were paid a flat fee of, like, to do a certain deal, it was
paid to CEG, we took our commission and then we paid them the
balance.

Q    When CEG would pay the Chrisleys, where -- do you know
where or what company that money was paid into for the
Chrisleys?

A    Sure.  Just to -- you know, everyone knows, I was in
accounts payable.  Nothing with finance.  I have no access to
payments or accounts receivable or any of those things.  But I
do know that they had 7C's opened up.

Q    So just to clarify, do you know what company -- when CEG
would pay the Chrisleys, what company was the money paid into?

A    7C's.

Q    Okay.  Now, do you have any knowledge about what happened
to the money once it went into 7C's?

A    No.

Q    Did you and Todd Chrisley ever have communications about
how he and Julie Chrisley were paid for services?

A    How they were paid?

Q    Meaning what bank account money should go into.

A    So for CEG to set them up in their system, they would have
                    United States District Court

1  had to have their bank account wiring and payment information.

2  So yes.

3  Q   Do you recall a time in March 2017 when Todd Chrisley

4  asked you to send payments to a different account than the one

5  CEG had on file?

6  A   Through e-mail recollection, yes.

7      **(Government's Exhibit 119 was marked for purposes of**

8  **identification.)**

9          MS. PETERS:  All right.  At this time, your Honor,

10 the United States moves for the admission or Government's

11 Exhibit 119.  And the parties have stipulated to authenticity

12 of this e-mail.

13         THE COURT:  Okay.  Any -- I don't know if that

14 stipulation covers everything or just authenticity, so I'm

15 still going to ask.  Any objection?  Mr. Morris?

16         MR. MORRIS:  If I could have just a second, your

17 Honor.

18         THE COURT:  Sure.

19         MR. MORRIS:  Have you moved it into evidence?

20         MS. PETERS:  No.  I am trying to move it into

21 evidence.

22         MR. MORRIS:  Go ahead.

23         THE DEPUTY SHERIFF:  Your Honor, just a moment.

24         THE COURT:  Okay.  Where are we here?  Are you still

25 asking for time to review that, Mr. Morris, or consider it, or

United States District Court

1  have you expressed that you have no objection?

2          MR. MORRIS:  I don't think -- I don't have an

3  objection to her asking him about the exhibit.  I don't -- I

4  can't identify it yet.  It hasn't been identified.

5          THE COURT:  But she has moved for its admission into

6  evidence.  So do you have any objection to that?

7          MR. MORRIS:  I would object.  There is no foundation.

8          THE COURT:  Okay.  I don't know what the stipulation

9  you just reported covered then, so go ahead.  I assume that

10  that's why you skipped over the foundation.  I don't even know

11  what it is, but I assumed that we were further than we are

12  just because of the stipulation you expressed.  So since he is

13  saying there is not one or taken issue with one, go ahead and

14  establish a foundation.

15          MS. PETERS:  Yes, your Honor.  And clearly we've had

16  some confusion among us about what the stipulations were, so

17  we will address that at the next break.  But in the meantime,

18  I will have the witness authenticate these e-mails.

19  BY MS. PETERS:

20  Q    Mr. Desisto, you've got some documents to the right there.

21  If you could take a look at the first one, which is marked as

22  Government's Exhibit 19.

23          Do you recognize that document?

24  A    Yes, I do.

25  Q    Is this an e-mail that you're on?

                    United States District Court

1   A   Correct.

2   Q   Does this appear to be a fair and accurate copy of an

3   e-mail that you received on March 7th, 2017?

4   A   Yes.

5           THE COURT:  I'm sorry.  Is it 19 or 119?

6           MS. PETERS:  119.  I may have misspoken.

7           THE WITNESS:  It was in 2017.

8           THE COURT:  So it's an e-mail thread from 2017?

9           MS. PETERS:  Yes, your Honor.  And it's Exhibit 119.

10          With that foundation, at this time the United States

11  moves for the admission of Government's Exhibit 119.

12          MR. MORRIS:  I have no objection.

13          THE COURT:  Mr. Friedberg?

14          MR. FRIEDBERG:  No objection, your Honor.

15          THE COURT:  Mr. Griffin?

16          MR. GRIFFIN:  No objection.

17          THE COURT:  119 is admitted.

18          MS. PETERS:  Thank you, your Honor.

19      **(Government's Exhibit 119 was admitted into evidence.)**

20          MS. PETERS:  Ms. Dyer, could we please publish

21  Government's Exhibit 119.  And if we could zoom in on the top

22  half there.

23  BY MS. PETERS:

24  Q   All right.  Mr. Desisto, let's take a look at Government's

25  Exhibit 119 together.  Who is this e-mail from?

United States District Court

1  A    It is from Todd.

2  Q    All right.  Also known as Michael Chrisley?

3  A    Yes.

4  Q    Who did he send this e-mail to?

5  A    Myself, Julie and Ryan.  I don't remember who Ryan is.  I

6  think he might have been from Little Things.

7  Q    Okay.  And what is Little Things?

8  A    It's a Facebook publisher.

9  Q    Is that the publisher that you mentioned that paid Todd

10  and Julie Chrisley directly for some endorsement deals?

11  A    It was only -- it's not some endorsement deals.  It was

12  one company.

13  Q    Endorsement deals for one company?

14  A    Yes.  But it's not -- it wasn't really endorsement.  It

15  was Facebook publishing.

16  Q    But just so I'm clear, is Little Things a company that

17  paid Todd and Julie directly for services?

18  A    Yes.  Correct.

19  Q    Could you tell us the date on this e-mail?

20  A    March 7th, 2017.

21  Q    What's the time on it?

22  A    11:53 p.m.

23  Q    All right.  Now, I'm going to read this e-mail out loud.

24  Just follow along with me and let me know if I get this right.

25          "Good evening.  Please refrain from sending any
                    United States District Court

1  deposits to the account you have on file, as that account has
2  been compromised.  We will be sending you another new account
3  number tomorrow morning or Thursday morning."

4      Did I read that right?
5  A   You used the word "tomorrow morning".  It was just
6  "tomorrow or Thursday morning".
7  Q   Thank you.  Good catch.
8      "So we'll be sending you another new account number
9  tomorrow or Thursday morning."

10     All right.  Now to be clear, was this the first time
11 that Todd Chrisley had told you to send information or send
12 payment to a different account?
13 A   Through e-mail recollection in -- asked me to -- okay.  So
14 there was -- can you repeat the question?
15 Q   Sure.  All right.  Let's back up.  Let me ask this:  Did
16 you review some old e-mails before you came to court today?
17 A   Yes.
18 Q   And did those e-mails help refresh your recollection about
19 business dealings you had with the Chrisleys?
20 A   I don't remember it.  Like I saw it and I guess it
21 happened, but I don't remember them.  But I would say yes.
22 Q   So reviewing old e-mails helped you remember what probably
23 took place in past e-mails?
24 A   Yes.
25 Q   Based on your review of prior e-mails, did you see at

United States District Court

1   least another instance where Mr. Chrisley told you that a bank
2   account had been hacked?
3   A   The word "hacked" I don't believe was used.  I don't think
4   "hacked" was used.  He might have used the word "compromised".
5   He might have told us just to change the bank account.  But
6   that would have been in January of that year, from those
7   e-mails.
8   Q   So this wasn't the first time you were getting information
9   from Todd Chrisley that things should go somewhere that they
10  weren't currently going; is that fair to say?
11  A   Is this the first time -- not the first time?
12  Q   We're talking about March 2017.
13  A   So this would -- yes, this was not the first time.
14  Q   All right.  After getting this e-mail from Todd Chrisley,
15  did he provide to you payment instructions for a different
16  bank account to send money into?
17  A   In March -- in 2017 -- okay.  In March 2017, did he ask --
18  did he provide it?  If they were getting paid to a different
19  account, he would have had to have provided a different
20  account.
21      (Government's Exhibit 123 was marked for purposes of
22  identification.)
23  BY MS. PETERS:
24  Q   All right.  Why don't you take a look at Government's
25  Exhibit 123.

United States District Court

1   A   Okay.

2   Q   Do you recognize that e-mail?

3   A   123, yes -- could you --

4          THE COURT:  You can't read it aloud until it's in.

5   Please just read it to yourself.

6          THE WITNESS:  I'm sorry.

7          THE COURT:  That's okay.

8                          **(brief pause)**

9   BY MS. PETERS:

10  Q   Do you recognize that document?

11  A   Do you want me to read it?

12  Q   No.  I'm just asking you if you recognize the document

13  you're looking at, Exhibit 123.

14  A   I do recognize it, yes.

15  Q   Is that an e-mail that you were part of?

16  A   Yes.

17  Q   All right.  Does it appear to be a fair and accurate

18  representation of an e-mail thread that you were on?

19  A   Yes.

20         MS. PETERS:  Your Honor, at this time we'd move for

21  the admission of Government's Exhibit 123.

22         THE COURT:  Any objection, Mr. Morris?

23         MR. MORRIS:  No objection.

24         THE COURT:  Mr. Friedberg?

25         MR. FRIEDBERG:  No objection, your Honor.

                    United States District Court

```
 1          THE COURT:  Mr. Griffin?

 2          MR. GRIFFIN:  No objection.

 3          THE COURT:  It's admitted.

 4          MS. PETERS:  Thank you.

 5      (Government's Exhibit 123 was admitted into evidence.)

 6          MS. PETERS:  Ms. Dyer, if we can publish Government's
 7  Exhibit 123 and zoom in on that top part.  Sorry.  The
 8  "to/from" at the very top.  Thank you.
 9  BY MS. PETERS:
10  Q   All right.  Mr. Desisto, does this appear to be an e-mail
11  from you to Todd Chrisley with Julie Chrisley copied on it?
12  A   Yes.
13          MS. PETERS:  All right.  Now, Ms. Dyer, if we can go
14  to the very bottom of Exhibit 123.  Next page, please.  On
15  that very bottom e-mail.
16  BY MS. PETERS:
17  Q   All right.  Mr. Desisto, it looks like this is an e-mail
18  dated March 8th of 2017 from Todd Chrisley.  Is that right?
19  A   It appears to be right, yeah.
20  Q   Okay.  And is this Todd Chrisley providing a new account
21  number for a bank?
22  A   Bank of America.  Yep.
23  Q   All right.  Who is the account name owner listed in this
24  e-mail?
25  A   Faye L. Chrisley.
                    United States District Court
```

Q    Do you know who Faye L. Chrisley is?

A    Faye is Todd's mother.

Q    Have you ever met Faye Chrisley?

A    No.

Q    Have you ever communicated with Faye Chrisley?

A    No.

Q    Have you ever had any business dealings with Faye
Chrisley?

A    No.

        MS. PETERS:  Ms. Dyer, if we could please go to the
next e-mail up.

BY MS. PETERS:

Q    All right.  This is an e-mail from you; correct?

A    From me to -- yes.

Q    All right.  And can you read to the jury what you wrote
back?  You can go off the screen if that's easier.

A    "Hi, Todd.  We can only write out a check to the
information on your W-9 for legal/tax purposes.  We have the
W-9 for 7C's and can write checks to that name only.  It would
not be able to be deposited into Faye's account."

Q    What did you mean here?  Why were you asking for
information about a W-9?

A    That's what the back office of CEG was asking.

        MS. PETERS:  If we could go to the next e-mail up.
Actually, let's not zoom in.  I think we can do it like this.
                United States District Court

1  It will move things a little bit faster.

2  BY MS. PETERS:

3  Q    What did Todd Chrisley write back to you on March 8th, at

4  the bottom of Page 1?

5  A    "She's the owner in -- is 7C's.  And if you need another

6  W-9 signed, that's fine."

7  Q    Who did you understand that he was referring to as "she"?

8  A    His mother.

9  Q    Okay.  All right.  And then you -- it looks like you

10 e-mailed back and asked:  "Could you please send the W-9" --

11 there's a typo.  But it says, "that has Faye's information on

12 it so we can write the check in Faye's name and it is

13 deposited into the account whose name is listed."

14          Did I read that right?

15 A    Yes.

16 Q    And then Todd responds:  "Yes, just send us the W-9,

17 please."

18          Did I read that right?

19 A    Yes.

20 Q    And then it looks like you provided them a link to a W-9

21 form.

22 A    Yes.

23 Q    What is a W-9 form used for?

24 A    I'm not an accountant or a financial expert and I don't do

25 accounts payable, so I wouldn't be able to give you a correct

                    United States District Court

1    answer to that.

2    Q   All right.  So why were you -- if you don't know about

3    W-9s, which is fine -- I'm not an accountant either. -- why

4    were you asking for a W-9?

5    A   Because CEG back office was asking for it.

6        **(Government's Exhibit 124 was marked for purposes of**

7    **identification.)**

8    BY MS. PETERS:

9    Q   If you could take a look at Government's Exhibit 124.

10   A   Okay.

11   Q   All right.  And --

12       MS. PETERS:  Your Honor, at this time I think there's

13   going to be an objection here, but we're going to move for the

14   admission of Government's Exhibit 124.  And I'll note for the

15   Court that the parties did stipulate to the authenticity of

16   the e-mail.

17       THE COURT:  Only the authenticity?

18       MS. PETERS:  The authenticity.

19       THE COURT:  Okay.  Any objection to 124, Mr. Morris?

20       MR. MORRIS:  Your Honor, with the greatest of

21   respect, I can see what it is and I have no doubt that it

22   maybe authentic, but this witness can't testify to that.

23       THE COURT:  Well, what is your objection with respect

24   to --

25       MR. MORRIS:  No foundation.  This witness has no

                    United States District Court

1  personal knowledge.

2          THE COURT:  I don't know what it is, so --

3          MR. MORRIS:  It's an e-mail from one person to

4  another person and not to him.

5          THE COURT:  Okay.

6          MS. PETERS:  Your Honor, the purpose of laying a

7  foundation is to show that a document being offered is

8  authentic.  And here the parties have stipulated -- you know,

9  I understand Mr. Morris's objection is not to authenticity,

10 it's that the witness doesn't have personal knowledge of the

11 e-mail, but the parties have stipulated that it's authentic.

12         THE COURT:  It's authentic, but is this the witness

13 to get it in?  I mean, it can be authenticated, but I don't

14 know that that is the entire foundation.  So your response as

15 to whether this defendant -- excuse me, this witness has

16 personal knowledge and can testify to it is what?

17         MS. PETERS:  Well, this witness is on all of this

18 e-mail except for the top part.  And I want to publish the

19 e-mail and ask him one question about it.

20         THE COURT:  But it includes the top part on which he

21 is not part of?

22         MS. PETERS:  That's correct.  He's not on that top

23 e-mail.

24         THE COURT:  And so what is your response with respect

25 to his personal knowledge as to that part?  I don't know if

                   United States District Court

1  the rest of it is a continuation that includes that or what,

2  but what is your response?

3          MS. PETERS:  Sure.  Your Honor, it is the fact that

4  the witness doesn't have knowledge about it that is relevant.

5  And that is why we'd like to show it to him and ask him did

6  you know that this happened, did you know that that top e-mail

7  was sent.

8          THE COURT:  Then I'm going to sustain the objection

9  as to that.  If you are trying to get something in to know --

10  for this witness to say I don't know about this, and I didn't

11  know that existed, even if it's that portion, I don't know if

12  that portion can be redacted so that you're only dealing with

13  the part that he does have personal knowledge of.  But I'll

14  sustain at this time.

15          MS. PETERS:  Yes, your Honor.

16      **(Government's Exhibit 125 was marked for purposes of**

17  **identification.)**

18  BY MS. PETERS:

19  Q    Mr. Desisto, if you could take a look at Government's

20  Exhibit 125 that's in front of you.

21  A    Okay.

22  Q    Do you recognize that document?

23  A    It is a W-9 with Elizabeth Chrisley's name on it.

24  Q    And do you see the e-mail that goes with it?

25  A    Yes.

                    United States District Court

Q    All right.  And are you on this e-mail?

A    Yes.

Q    Does this appear to be a fair and true copy of the e-mail that you received?

A    Yes.

         MS. PETERS:  Your Honor, at this time we'd move for the admission of Government's Exhibit 125.

         THE COURT:  Any objection, Mr. Morris?

         MR. MORRIS:  No objection.

         THE COURT:  Mr. Friedberg?

         MR. FRIEDBERG:  No objection, your Honor.

         THE COURT:  Mr. Griffin?

         MR. GRIFFIN:  No, your Honor.

         THE COURT:  125 is admitted.

    **(Government's Exhibit 125 was admitted into evidence.)**

         MS. PETERS:  All right.  And if we could publish, Ms. Dyer, the first page of Government's Exhibit 125.

BY MS. PETERS:

Q    All right.  At the top of this e-mail, it looks like Julie Chrisley on March 8th sent you, Mr. Desisto, and Todd Chrisley an e-mail; is that right?

A    Correct.

Q    And what was attached to this e-mail?

A    The W-9 form.

Q    And who's listed on that W-9 form?

1   A    Elizabeth Faye Chrisley.

2        **(Government's Exhibit 130 was marked for purposes of**

3   **identification.)**

4   BY MS. PETERS:

5   Q    Okay.  If you would take a look at Government's

6   Exhibit 130.

7            Do you recognize that?

8   A    Yes.

9   Q    What is that document?

10  A    It is an e-mail.

11  Q    All right.  Are you on that e-mail?

12  A    Yes.

13  Q    Does that appear to be a true and accurate copy of the

14  e-mail you received?

15  A    Yes.

16           MS. PETERS:  Your Honor, at this time we'd move for

17  the admission of Government's Exhibit 130.

18           THE COURT:  Any objection, Mr. Morris?

19           MR. MORRIS:  No, your Honor.

20           THE COURT:  Mr. Friedberg?

21           MR. FRIEDBERG:  No, your Honor.

22           THE COURT:  Mr. Griffin?

23           MR. GRIFFIN:  No, your Honor.

24           THE COURT:  130 is admitted.

25      **(Government's Exhibit 130 was admitted into evidence.)**
                    United States District Court

1          MS. PETERS:  If we could, please, publish, Ms. Dyer.

2   BY MS. PETERS:

3   Q   All right.  So at the bottom of this e-mail, Mr. Desisto,

4   is that part of the e-mail we just looked at where Julie

5   Chrisley sent you a signed W-9 form for Faye Chrisley?

6   A   Is -- I mean, yeah.  Yes.

7          MS. PETERS:  All right.  Ms. Dyer, if we could go to

8   the next part of that e-mail.

9   BY MS. PETERS:

10  Q   All right.  Your response is on March 13th; is that right?

11  A   Yes.

12  Q   So a few days after Julie Chrisley sent the signed W-9?

13  A   Yes.

14  Q   You wrote to Julie:  "Julie, our account team has asked if

15  you could please type up a few sentences saying that you're

16  authorizing monies to be paid to Faye on behalf of Julie and

17  Todd Chrisley and sign, please.  It's called a letter of

18  direction.  Would that be okay to send over"?

19          Did I read that right?

20  A   Yes.

21  Q   Why did you send that e-mail?

22  A   The CEG back office required it.

23  Q   Okay.

24  A   They asked -- they said they needed that in order to issue

25  any sort of payments.

                  United States District Court

1    (Government's Exhibit 132 was marked for purposes of
2 identification.)
3 BY MS. PETERS:
4 Q   All right.  If you could take a look at Government's
5 Exhibit 132 and let me know if you recognize that document.
6 A   Yep.
7 Q   All right.  Are you on this e-mail?
8 A   Yes, I am.
9 Q   All right.  Is this a true and accurate copy of an e-mail
10 that you received?
11 A   Yes.
12       MS. PETERS:  Your Honor, at this time we'd move for
13 the admission of Government's Exhibit 132.
14       THE COURT:  Mr. Morris?
15       MR. MORRIS:  No objection.
16       THE COURT:  Mr. Friedberg?
17       MR. FRIEDBERG:  No objection.
18       THE COURT:  Mr. Griffin?
19       MR. GRIFFIN:  No objection.
20       THE COURT:  It's admitted, 132.
21    (Government's Exhibit 132 was admitted into evidence.)
22 BY MS. PETERS:
23 Q   All right.  And here, Mr. Desisto, does this show that
24 Julie Chrisley later on March 13th e-mailed you and Michael
25 Chrisley, Todd Chrisley, a scanned document?
                United States District Court

1    A    Yes.

2            MS. PETERS:  All right.  Ms. Dyer, if we could go to

3    the document.

4    BY MS. PETERS:

5    Q    All right.  It appears this letter says:  "On March 13th,

6    2017, letter of direction.  To whom it may concern.  Please

7    allow this letter to serve as notice that I, Julie Chrisley,

8    authorize monies to be paid to Faye Chrisley on behalf of

9    Julie and Todd Chrisley."

10           Did I read that right?

11   A    Yes.

12   Q    All right.  And who signed there?

13   A    It appears to be Julie Chrisley.

14        **(Government's Exhibit 137 was marked for purposes of**

15   **identification.)**

16   BY MS. PETERS:

17   Q    All right.  If you could take a look at Government's

18   Exhibit 134 -- I'm sorry, 137.  Let me know if you recognize

19   that document.

20   A    It's an e-mail and it looks like it's a screen shot.

21   Q    All right.  Is this an e-mail that you're on?

22   A    Yes.

23   Q    Is it a fair and accurate copy of that e-mail?

24   A    Yes.

25           MS. PETERS:  Your Honor, at this time we'd move for
                     United States District Court

 1  the admission of Government's Exhibit 137.

 2          THE COURT:  Mr. Morris?

 3          MR. MORRIS:  No objection.

 4          THE COURT:  Mr. Friedberg?

 5          MR. FRIEDBERG:  No objection.

 6          THE COURT:  Mr. Griffin?

 7          MR. GRIFFIN:  No objection.

 8          THE COURT:  137 is in.

 9     **(Government's Exhibit 137 was admitted into evidence.)**

10  BY MS. PETERS:

11  Q   All right.  And this appears to be another e-mail from

12  that date, March 13th, 2017, where Julie Chrisley e-mails you

13  and Todd Chrisley; is that right?

14  A   Yes.

15  Q   What is the subject line on that e-mail?

16  A   New Wiring Instructions.

17          MS. PETERS:  Could we go to Page 2, Ms. Dyer?

18  BY MS. PETERS:

19  Q   All right.  And is this -- what are we looking at now

20  Mr. Desoto?

21  A   Desisto.

22  Q   Desisto.  Sorry.

23  A   It appears to be a screen shot of an account number and

24  routing numbers.

25  Q   Did you provide this information to the accounting office

                United States District Court

1  at CEG after you received it from Julie Chrisley?

2  A    I don't remember, but I probably did.

3  Q    All right.  After the Chrisleys provided you with that

4  wiring information for a different account and provided the

5  W-9 for Faye Chrisley and the letter from Julie Chrisley, did

6  CEG start sending payments into that new account?

7  A    You'd have to talk to accounts payable, but through e-mail

8  recollection, I believe that they were paid to that account.

9  Q    Do you know if any of the money that was paid into that

10  new account was for work done by Faye Chrisley?

11  A    We never worked with Faye, so we would not have been able

12  to -- the answer to your question is, was it for Faye, no.

13  Q    Did Todd Chrisley or Julie Chrisley ever tell you that the

14  day before Todd Chrisley e-mailed you saying that the account

15  had been --

16       MR. MORRIS:  Objection to the leading question.  I

17  believe she can ask if he had a conversation and what the

18  conversation was, but I don't believe she should supply the

19  substance of it.

20       THE COURT:  Let me just look at the question again.

21       MS. PETERS:  I can rephrase it, your Honor.

22       THE COURT:  Okay.  Go ahead and rephrase.

23       MS. PETERS:  Ms. Dyer, if we could please publish

24  Government's Exhibit 119.  And zoom in on the e-mail, please.

25  BY MS. PETERS:

United States District Court

1 | Q    What is the date on this e-mail, Mr. Desisto?

2 | A    March 7th, 2017.

3 | Q    Can you tell the jury whether or not Todd Chrisley told

4 | you that the IRS --

5 |         MR. MORRIS:  Objection.  Leading.

6 |         THE COURT:  I'll sustain.

7 |         MS. PETERS:  I'll rephrase, your Honor.

8 |         THE COURT:  Okay.

9 | BY MS. PETERS:

10 | Q    Mr. Desisto, can you tell the jury whether or not Todd

11 | Chrisley indicated anything about the IRS asking any

12 | information --

13 |         MR. MORRIS:  Objection.  Leading.

14 |         THE COURT:  Hold on.  Let me just hear her

15 | question first before the witness responds.

16 |         Go ahead.

17 | BY MS. PETERS:

18 | Q    Can you tell the jury whether or not Todd Chrisley

19 | mentioned anything about the IRS happening the day before he

20 | sent you this e-mail?

21 |         MR. MORRIS:  Objection.  Leading.

22 |         THE COURT:  I'll overrule.  I'll overrule at that

23 | point.

24 |         THE WITNESS:  He did not mention it, no.

25 |         MS. PETERS:  Thank you.

1       No further questions.

2       Thank you, Mr. Desisto.

3       THE COURT:  All right.  Cross-examination by

4   Mr. Morris.

5       MR. MORRIS:  Thank you.

6                     **Cross-Examination**

7   BY MR. MORRIS:

8   Q   Hello, Mr. Desisto.

9   A   Hey.  Hello.

10  Q   You are testifying after looking at a bunch of e-mails

11  that were given to you by the federal prosecutor sometime ago;

12  right?

13  A   Yes.

14  Q   And before they gave them to you, you really didn't have

15  very much of a memory of all of this, did you?

16  A   This stuff's five years ago.  And unfortunately, without

17  seeing it, I have very little memory of them.

18  Q   So basically what you're doing is just reading the --

19  reading what's in here and assuming it's correct?

20  A   Assuming, yes.  I might have scattered memory here and

21  there of it.  But again, it's five years ago, so --

22  Q   Okay.  Do you have any notes from anytime that this

23  occurred five years ago in March of 2017?

24  A   There are notes, possibly old e-mails.

25  Q   Pardon me?

                     United States District Court

1  A    I guess these e-mails.  Right.

2  Q    Other than this, I mean, did you take any notes of any

3  conversations you had with Todd Chrisley?

4  A    No.

5  Q    Did Todd Chrisley ever tell you, listen, I want you to

6  hide money from the IRS?

7  A    No.

8  Q    Did Todd Chrisley say I'm moving this money to Faye

9  Chrisley because I don't want anybody to know where it is?

10  A    No.

11  Q    And as I understand it -- you correct me if I'm wrong. --

12  in March of 2017, he contacts you, he meaning Todd Chrisley,

13  contacts you in Government's Exhibit 119 and says, stop

14  sending deposits to this particular account because it's been

15  compromised.  Right?

16  A    Correct.

17  Q    That's not the first time he brought to your attention

18  that their account had been compromised; correct?

19  A    Correct.

20  Q    Two months before there had been a problem with the

21  account, hadn't there?

22  A    Yes.

23  Q    Okay.  And are you aware that in March of 2017, right

24  about this time, in fact the Bank of America account had been

25  compromised?

1   A    I'm not aware of that.

2   Q    Are you aware that there were several unauthorized

3   transactions that happened in the account?

4   A    No.

5   Q    Okay.  Did you ask?

6   A    No.

7   Q    Okay.  I mean, look -- again, correct me if I'm wrong. --

8   you've got a client who's being paid through a company, that

9   is, 7C's; right?

10  A    Paid through CEG to 7C's?

11  Q    Yes, 7C's.

12  A    Yes.

13  Q    And that's not unusual, is it, to pay a company, what I

14  would call a loan-out company?  Is that right?

15  A    Yes.

16  Q    That's sort of normal; isn't it?

17  A    Yes.

18  Q    I mean, people do that every day?

19  A    Yes, they do.

20  Q    It's not to hide money from the IRS or anybody else, is

21  it, as far as you know?

22  A    As far as I know, no.

23  Q    It's the norm; isn't it?  A loan-out company gets the

24  money and disburses it to whomever it disburses it to?

25  A    Loan-outs are normal.

                    United States District Court

1  Q   Pardon me?

2  A   They're normal.

3  Q   That's normal.

4       Okay.  So we have 7C's getting the money.  And 7C's

5  has -- do you recall this is a Bank of America 7C's account?

6  Do you recall it?

7  A   I don't know.

8  Q   Okay.  Well, at the bottom of Exhibit -- sorry.

9  Exhibit 137.

10       MR. MORRIS:  Could I have Page 2 of 137, please,

11  Shannon?  Thank you.

12  BY MR. MORRIS:

13  Q   That says Bank of America; right?

14  A   Yes.

15  Q   So if the original 7C's account was Bank of America, it's

16  being moved to a different Bank of America account; right?

17  A   Yes.

18  Q   Okay.  And CEG is given the account number?  This is not a

19  secret; right?

20  A   Yes.

21  Q   And CEG is given the name on the account, which is Faye

22  Chrisley?

23  A   Yes.

24  Q   And Faye Chrisley is the mother of Todd Chrisley?

25  A   Yes.

                    United States District Court

1  Q    Faye Chrisley is on the show, Chrisley Knows Best?

2  A    Uh-huh.

3  Q    Right?

4  A    I don't watch the show, but yes.

5  Q    You understand that she was?

6  A    Yes.

7  Q    Okay.  All right.  Do you recall also at this time in

8  March discussing with Todd that they were going to be moving,

9  that is, the family was going to be moving to California?

10 A    I don't remember that.

11 Q    Don't remember that?

12 A    No.

13 Q    You don't recall -- do you recall that in fact -- we were

14 still representing him at the time.  Do you recall the fact

15 that indeed in the late spring, early summer of 2017 the

16 family did relocate to California?

17 A    I don't disagree.  I just don't remember.  I just don't

18 remember.  I'm sorry.  I don't remember.

19 Q    If you don't remember, it's okay.

20       And that the only one left in Tennessee to take care

21 of things was Faye Chrisley, his mother?

22       MS. PETERS:  Objection, your Honor.  This is outside

23 the scope of the witness's knowledge.

24       THE COURT:  I'll sustain.  I mean, if he's already

25 said that he doesn't remember, for you to continue asking him

1  questions is basically you testifying.  I'll sustain.

2  BY MR. MORRIS:

3  Q   Do you know where Faye Chrisley lived?

4  A   I mean, if you look at her W-9, maybe it has the address

5  on there, that was provided.  So it's Nashville, Tennessee.

6  Q   Nashville, Tennessee?

7  A   On the W-9.  I don't know where she lives.  This is just

8  what the W-9 says.

9  Q   And tell me this:  Where does the -- strike that.

10         The W-9, that's a form that CEG's back office

11  requires to be filled out; is that right?

12  A   Correct.

13         MR. MORRIS:  May I see that exhibit number, please,

14  Shannon?  Let's see --

15         THE COURT:  The W-9?

16         MR. MORRIS:  W-9.

17         THE COURT:  125, is that --

18         MR. MORRIS:  Thank you.  I think it's 125, second

19  page.

20         MS. PETERS:  It's not in the electronic system.

21         MR. MORRIS:  Oh, it's not?

22         MS. PETERS:  Uh-uh.

23         MR. MORRIS:  I have a copy.  Thank you.

24  BY MR. MORRIS:

25  Q   The W-9 --

United States District Court

1          MR. MORRIS:  ELMO time.

2                    **(brief pause)**

3   BY MR. MORRIS:

4   Q   Oh, look.  There it is.

5          W-9, that's the top of it; right?

6   A   Yep.

7   Q   You've got one in front of you?

8   A   Yes.

9   Q   Okay.  And signed by Elizabeth Chrisley on 3/7/2017;

10  right?

11  A   Yes.

12  Q   Thank you.

13         That document, that's a -- that's an IRS Department

14  of Treasury document; isn't it?  See in the upper left-hand

15  corner, Department of Treasury Internal Revenue Service?

16  A   Yes.

17  Q   That form goes to the IRS from your -- your company, the

18  people who do the bookkeeping stuff, they send this form to

19  the IRS, don't they?

20  A   CEG I guess sends it, yeah.

21  Q   Okay.  Thank you.

22         Okay.  So we have a compromised account and we

23  changed it to a new account; right?

24  A   Yes.

25  Q   We give you all the information you request about the new

                    United States District Court

1  account?

2  A    Gave CEG.  Yes.

3  Q    Any information you asked about was given to you either by

4  Todd Chrisley or Julie Chrisley?

5  A    Any information.  It was more like it was -- oh, yeah,

6  like, the W-9.  Yes.

7  Q    Yeah, gave you whatever you asked for?

8  A    Yes.

9  Q    Asked for a W-9 -- asked for the name of the person, Faye

10  Chrisley?

11  A    Uh-huh.

12  Q    Asked for a W-9 signed by Faye Chrisley; right?

13  A    Yes.

14  Q    Got that.

15        Asked for routing instructions; right?

16  A    I didn't -- that was provided.

17  Q    It was asked for by somebody and you -- it had to be

18  provided to CEG and it was provided; right?

19  A    I would say yes.  But like it could have been just sent to

20  me, right.  Like, it's not like I could have requested it.  It

21  could have just been e-mailed.

22  Q    Okay.  Is there anything either Todd or Julie Chrisley

23  asked you to hide in any way about the fact that this payment

24  from Little Things -- is that it, Little Things?

25  A    Yeah.

                    United States District Court

```
1   Q    -- was now going to a new account?
2   A    Can you say that question one more time?  I'm really
3   sorry.  Can you repeat the question, please?
4   Q    Yeah.  Did anybody ask you to hide anything --
5   A    No.
6   Q    -- about the fact the money was going there?
7   A    No.  No hiding.
8              MR. MORRIS:  Thank you very much.
9              THE COURT:  Any questions, Mr. Friedberg?
10             MR. FRIEDBERG:  No questions, your Honor.  Thank you.
11             THE COURT:  Thank you.
12             Any questions, Mr. Griffin?
13             MR. GRIFFIN:  Yes.
14             THE COURT:  All right.
15                        Cross-Examination
16  BY MR. GRIFFIN:
17  Q    Just one question.  On all the e-mails that you just
18  talked about, Mr. Tarantino, Peter Tarantino is not on that
19  e-mail?
20  A    Correct.
21  Q    Any of them?
22  A    No.
23             MR. GRIFFIN:  Thank you.
24             THE COURT:  All right.  Any redirect of this witness?
25             MS. PETERS:  No, your Honor.
                    United States District Court
```

1          THE COURT:  All right.  Thank you, sir.  You are free
2   to go.
3          THE WITNESS:  Thank you.
4          THE COURT:  Government, call your next witness,
5   please.
6          MR. KREPP:  Thank you, your Honor.  The Government
7   calls Lisa Stone.
8          THE COURT:  All right.
9          Government, I can't remember.  The exhibit that this
10  witness just left, is that the one for our record or was that
11  just his copy?  In other words, what needs to happen with
12  these?
13         MR. KREPP:  I believe those are just copies.  We can
14  reconcile at the end of the day.
15         THE COURT:  Okay.  I just want to make sure that
16  anything that should go to Ms. Beck stays with her.
17         Good afternoon, ma'am.  If you will come on up, I
18  will swear you in.
19         Good afternoon.  If you'll raise your right hand,
20  please.
21                         **LISA STONE,**
22  **A WITNESS** HEREIN, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED
23  AND TESTIFIED AS FOLLOWS:
24         THE COURT:  If you would take the witness stand.  And
25  once you are seated comfortably, please state your name, then
                    United States District Court

1  also spell it for the record.

2         THE WITNESS:  Lisa, L-I-S-A, Stone, S-T-O-N-E.

3                    **Direct Examination**

4  BY MR. KREPP:

5  Q   Good morning, Ms. Stone.

6  A   Good morning.

7  Q   Well, afternoon, actually.  Sorry.  The day is getting

8  away from me.

9         MR. KREPP:  Your Honor, may I approach?  I've already

10  handed a copy of this to defense counsel.  To make it easier

11  for everybody, I have a list of the exhibits I plan on

12  admitting.

13         THE COURT:  Yes.  And you may move freely in the

14  courtroom without request, but thank you.

15         MR. KREPP:  Thank you, your Honor.

16  BY MR. KREPP:

17  Q   All right.  Can you please tell us how you're employed?

18  A   I am a financial center manager for Bank of America.

19  Q   All right.  How long have you been with Bank of America?

20  A   Thirteen years.

21  Q   All right.  And have you always been a financial -- what

22  was the title again?

23  A   Financial center manager, for 11 years.

24  Q   And what did you do for the first two years?

25  A   I worked in a call center.

                    United States District Court

1   Q    All right.

2   A    For Bank of America.

3   Q    And what part of the country do you live in?

4   A    Right now I'm in Nashville, Tennessee.

5   Q    How long have you been there for?

6   A    It's five and a half years.

7   Q    Okay.  Now, can you briefly go through your duties and

8   responsibilities at Bank of America?

9   A    Sure.  As the manager, I stand in the lobby, greet all the

10  clients that come in, get them to the right place to make sure

11  they're taken care of properly, help them get their

12  transactions completed with my team, making sure they're doing

13  things properly.

14  Q    All right.  Great.

15        Now, I want to ask you some just basic background

16  information on bank accounts.

17        Are you familiar with how signature cards work at

18  Bank of America?

19  A    Absolutely, yes.

20  Q    All right.  So what does it mean if somebody has signature

21  authority over a particular bank account?

22  A    It means they're able to transact with that account,

23  deposit, withdrawal, whatever they might need.

24  Q    All right.  Are there limitations?  So if somebody comes

25  into the bank, let's say, and does not have signature

1   authority, are they restricted from certain activities with

2   respect to that account?

3   A    Yes.

4   Q    What type of activities?

5   A    If they're not an owner, they're not able to do anything

6   with the accounts.

7   Q    Meaning can they take money out of the accounts?

8   A    No.

9   Q    All right.  Now, I want to direct your attention to March

10  of 2017.

11          So were you still employed by Bank of America in

12  March of 2017?

13  A    Yes.

14  Q    All right.  And were you working at a particular branch?

15  A    Yes.  Green Hills location.

16  Q    All right.  And obviously most of us in this courtroom are

17  not from Nashville.  Can you give us an idea where around

18  Nashville that branch is located?

19  A    That's just the south part of Nashville called Green

20  Hills.

21  Q    Great.

22          Were your duties and responsibilities there the same

23  as they are right now?

24  A    Yes.

25  Q    All right.  How big of a branch was the Green Hills

1  location when you were there?

2  A    Physically it's very small, very confined location.

3  Q    If you can please just take a look at the binder I handed

4  you.

5  A    Yes.

6      **(Government's Exhibit 102A was marked for purposes of**

7  **identification.)**

8  BY MR. KREPP:

9  Q    We'll start with Government's Exhibit 102A.

10 A    Yes.

11 Q    It's a two-page exhibit.

12      Do you recognize that exhibit?

13 A    That is the Green Hills location.

14 Q    And it's two photographs; is that correct?

15 A    Yes.

16 Q    Do those photographs truly and accurately depict how the

17 Green Hills location would have looked in March of 2017?

18 A    Yes.

19      MR. KREPP:  Your Honor, I'm moving for the admission

20 of Government's Exhibit 102A.

21      THE COURT:  Mr. Morris?

22      MR. MORRIS:  Mr. Anulewicz.

23      THE COURT:  Mr. Anulewicz?

24      MR. ANULEWICZ:  We have no objection.

25      THE COURT:  All right.  Mr. Friedberg?
                United States District Court

1    MR. FRIEDBERG:  No objection, your Honor.

2    THE COURT:  Mr. Griffin?

3    MR. GRIFFIN:  No objection.

4    THE COURT:  102A is in.

5    **(Government's Exhibit 102A was admitted into evidence.)**

6    MR. KREPP:  If we could please publish 102A.  We may

7  need to rotate it.

8  BY MR. KREPP:

9  Q   All right.  Can you just give -- we'll start with Page 1.

10 Just give the jurors an idea of what we're looking at here.

11 A   Sure.  This is as you're coming into the center.  On the

12 right is the lobby station.  That's where I would stand.

13 Basically that's my standing desk.  And then in front of you

14 is the teller line.

15    MR. KREPP:  All right.  If we can go to the next

16 page, please.

17 BY MR. KREPP:

18 Q   What are we looking at here?

19 A   Opposite direction from the teller line, looking at the

20 front door.

21 Q   Okay.  All right.  So if we go back to the first page of

22 this exhibit, where would you generally be located during the

23 day when you were working in March 2017?

24 A   On the right where you see that computer at that desk.

25 Q   Okay.  Great.

United States District Court

1          All right.  Now, are you familiar with an individual

2   named Julie Chrisley?

3   A    Yes.

4   Q    All right.  And how do you know Mrs. Chrisley?

5   A    She would come in and do transactions on the 7C's account.

6        **(Government's Exhibit 103B was marked for purposes of**

7   **identification.)**

8   BY MR. KREPP:

9   Q    All right.  And showing you what's been marked for

10  identification as Government's Exhibit 103B.  If you can turn

11  to the next set in the documents there in front of you.

12          Do you recognize this document?

13  A    Yes, sir.  That's the signature card for the business

14  account.

15  Q    Okay.  The 7C's Productions business account?

16  A    Yes.

17  Q    All right.  Did this come from Bank of America?

18  A    Yes.

19  Q    All right.  Thank you.

20          MR. KREPP:  Your Honor, I move for the admission of

21  Government's Exhibit 103B.

22          THE COURT:  Mr. Morris -- I'm sorry.  Mr. Anulewicz?

23          MR. ANULEWICZ:  No objection.

24          THE COURT:  Mr. Griffin?

25          MR. FRIEDBERG:  No objection, your Honor.

1          THE COURT:  Mr. Griffin?

2          MR. GRIFFIN:  No objection.

3          THE COURT:  103B is admitted.

4     **(Government's Exhibit 103B was admitted into evidence.)**

5          MR. KREPP:  If we can please publish it.  Thank you.

6  And if we can zoom into the top third of the page, please.

7  BY MR. KREPP:

8  Q   Now, just so the jurors know, the document on the screen

9  only has four digits; correct?

10  A   Correct.

11  Q   It says "redacted".

12        But the one in front of you, does it have all the

13  entire account number?

14  A   Yes.

15  Q  So we've redacted portions of documents here because we're

16  in open court.  If you need to refer to the actual document

17  for some reason, let me know.  Okay?

18  A   Okay.

19  Q   All right.  Great.

20        So what is this document again?

21  A   This is the business signature card for account ending in

22  6044.

23  Q   And it's in the name of 7C's Productions; is that right?

24  A   Yes.

25         MR. KREPP:  All right.  And if we can zoom out,

                United States District Court

1  please.

2  BY MR. KREPP:

3  Q    And just looking at the bottom, who had signature

4  authority over this account?

5  A    Julie Chrisley.

6  Q    All right.  And at the upper left-hand portion, the date

7  next to Mrs. Chrisley's name is a bit cut off there from the

8  scan.  But is there a date on the upper left-hand portion of

9  the document?

10 A    Yes.  July 29th, 2014.

11        MR. KREPP:  All right.  And if we can go to the next

12 page of the document, please.

13 BY MR. KREPP:

14 Q    All right.  What is Mrs. Chrisley's title listed as?

15 A    Owner.

16        MR. KREPP:  All right.  Now, if we can go back to the

17 first page, please, Ms. Dyer.

18 BY MR. KREPP:

19 Q    So going back to my question earlier about who -- about

20 what signature authority means, what can you tell us about

21 this account and this signature -- this signature card?  What

22 does this tell you as a bank manager?

23 A    That Julie is the only one that can do transactions out of

24 this account for the 7C's Productions.

25 Q    All right.  Thank you.

                    United States District Court

1      Now, to be clear, this was not opened up at your
2  branch; is that correct?
3  A   That's correct.  If you look at the back page of the card,
4  it shows where it was done in July of 2014.
5      MR. KREPP:  Okay.  So if we can go to the next page,
6  please.
7      THE WITNESS:  Down at the bottom.
8  BY MR. MORRIS:
9  Q   Willow Springs, and that's not, obviously, your branch;
10 right?
11 A   Right.
12 Q   All right.  Now, to your knowledge -- well, let me ask
13 you:  Do you see Julie Chrisley in the courtroom here today?
14 A   I do.
15 Q   Can you please tell me where she's sitting and identify
16 something she's wearing?
17 A   Yes.  She's right over there and she has a black blazer on
18 with white trim.
19     MR. KREPP:  If the record will reflect the witness
20 has identified the defendant.
21     THE COURT:  The record will so reflect.
22     MR. KREPP:  Thank you.
23 BY MR. KREPP:
24 Q   All right.  Now, have you had an opportunity to review
25 internal Bank of America records related to this account, 7C's

United States District Court

1  Productions, prior to coming to court here today?

2  A    Yes.

3  Q    So who had sole signature authority over this particular

4  account from 2014 until March 6th, 2017?

5  A    Julie Chrisley.

6  Q    Did anybody else have signature authority of that account

7  during that timeframe?

8  A    No.

9  Q    All right.  Now, how often would Mrs. Chrisley come into

10  the bank?  Again, I want to first talk about events before

11  March 7th, 2017.  All right?

12  A    We would see her a couple times a week pretty much on a

13  consistent basis definitely weekly.

14  Q    What types of transactions would she be doing?

15  A    Making deposits, withdrawals, getting cashier's checks,

16  typical banking transactions.

17  Q    Would you ever deal with her personally?

18  A    Yeah, just general chitchat while she was working with a

19  teller, learning about what they were doing, where they were

20  going, that kind of stuff.

21  Q    All right.  Now, can you tell me whether or not before

22  March 7th, 2017, from either your direct personal interactions

23  with Mrs. Chrisley or from your review of Bank of America

24  records, tell me whether or not anybody else attempted to get

25  signature authority over this account up until March, again,

1  6th 2017?

2  A   No.

3  Q   All right.  Meaning nobody did?

4  A   Nobody tried.

5  Q   Okay.  Thank you.

6        All right.  Now, so let's talk about March 7th, 2017.

7  A   Okay.

8  Q   Can you tell me if you were working at the Green Hills

9  branch that day?

10  A   I was.

11  Q   All right.  And can you tell me whether or not you saw

12  Mrs. Chrisley that day?

13  A   I did.

14  Q   All right.  And can you tell me if she came into the bank?

15  A   She did.

16  Q   Did she come in alone?

17  A   She did not.  She had Faye with her.

18  Q   Who is Faye?

19  A   That's her mother-in-law.

20  Q   All right.  Now, can you tell me if her mother-in-law had

21  an account at Bank of America as well prior to March 7th,

22  2017?

23  A   She might have.  She had come into the bank with Julie a

24  couple of times, so I had met her.  But I really didn't know

25  much more than that.

United States District Court

1  Q   Okay.  All right.  Now, so can you tell me if you spoke to

2  Ms. Julie Chrisley that morning?

3  A   I did.  I greeted her when she came in.

4  Q   All right.  And because we're talking about Ms. Chrisley

5  and Ms. Chrisley, I'll refer to them as Ms. Julie Chrisley and

6  Ms. Faye Chrisley.

7  A   Okay.

8  Q   Do you recall the conversation you had with Ms. Julie

9  Chrisley that morning?

10  A   Yes.  When she came in, she let me know that she needed to

11  make a change to the account and wanted to know when that

12  could be -- when that could be done.

13  Q   Did she say what kind of change she wanted to make to the

14  account?

15  A   She needed to change ownership.

16  Q   Did she go any further and say ownership -- you know,

17  change ownership to somebody else?

18  A   It was to Faye because she was the only one with her.

19  Q   All right.  So did you speak to Faye Chrisley when they

20  came into the bank?

21  A   Briefly, yes.

22  Q   All right.  Who was leading the discussion with you?  Was

23  it Julie Chrisley or Faye Chrisley?

24  A   It was Julie.

25  Q   All right.  So based upon your conversations with Julie,

United States District Court

what did you do?

A    I went to look up the processes of how something like that can be done and talk to my team about it and then decided the best person for them to meet would be our small business banker, Ben.

Q    And what was Ben's full name?

A    Ben Stranahan, Benjamin Stranahan.

Q    Can you tell me whether or not you saw Elizabeth and Julie Chrisley go to speak to Mr. Stranahan?

A    Yes.

Q    And to be clear, were you present for that meeting?

A    No.  They went into an office that he was in.

Q    All right.  Without telling me anything specifically about what was said, did you have a conversation with Mr. Stranahan after this meeting?

A    Yes.

Q    All right.  And again, without telling me anything Mr. Stranahan said, can you tell me if you directed Mr. Stranahan to do anything?

A    There was a form missing, so I needed him to have that form signed.

Q    Okay.  And if we move forward in your packet -- I believe 107 we're going to move past for now.  But if we can go to Government's Exhibit 118.

          MR. KREPP:  Not admitted yet, Ms. Dyer.
                    United States District Court

(Government's Exhibit 118 was marked for purposes of
identification.)

BY MR. KREPP:

Q   Let me know when you see it, Ms. Stone.

A   Yes.

Q   Do you recognize the e-mail in the "to" line?

A   You said -- hold on.  Maybe I'm not there yet.  Which one?

Q   118.  Here, I'll show you my copy.

A   Yes.  Thank you.

Q   Do you recognize the e-mail in the "to" line?

A   Yes.

Q   Whose e-mail is that?

A   It's Ben's, Benjamin Stranahan's e-mail.

Q   Was that his Bank of America address that he used at the
time?

A   Employee e-mail, yes.

        MR. KREPP:  Your Honor, I move for the admission
of --

BY MR. KREPP:

Q   Well, actually, let me ask you this:  Can you turn to the
next few pages and just look through them.

A   Okay.

Q   Do you recognize those documents?

A   Yes.

Q   Do they appear to be the documents that you requested that
                United States District Court

1  Mr. Stranahan obtained from Mrs. Chrisley?

2  A    Yes.

3       MR. KREPP:  Your Honor, I'm moving for the admission

4  of Government's Exhibit 118.

5       MR. ANULEWICZ:  Your Honor, I object to 118.  First

6  of all, she's not on the e-mails.  It's hearsay.  And I

7  think -- I don't know for sure right now, but I think she's

8  testified previously she's never seen the documents attached.

9       THE COURT:  What say you with respect to the hearsay

10 objection?

11      MR. KREPP:  Well, it's not hearsay.  It's a statement

12 of the defendant, so it's a statement of a party opponent.  So

13 that's by definition not hearsay.

14      As to this issue as to -- I think we're going to have

15 this issue come up again, your Honor.  As I understood,

16 there's a stipulation --

17      THE COURT:  Let's not talk about any

18 misunderstandings with respect to the stipulation right now

19 because that's something that, as stated earlier, needs to be

20 worked out and probably best done outside of the jury's

21 presence.

22      MR. KREPP:  So it's a statement of a party opponent

23 is my response.

24      THE COURT:  Okay.  Tell me again which -- that is --

25 which defendant was on that one?  I can't remember.

                  United States District Court

1      MR. KREPP:  This was an e-mail from Julie Chrisley.

2 And again, directly from Julie Chrisley to Benjamin Stranahan.

3 So our argument is that it's not hearsay, it's a statement of

4 a party opponent.  And it's also not offered --

5      THE COURT:  That is still going to be affected I

6 guess by -- I'll tell you what, ladies and gentlemen, I'm

7 sorry to have you do this, but let me have you step out

8 briefly.

9      I think we will have to talk about the stipulation a

10 little bit.

11      **(The jury exited the courtroom at 2:30 p.m., after**

12 **which the following proceedings were had.)**

13      THE COURT:  You-all be seated or be at ease.

14      I don't know how many of these exhibits are purported

15 to have been covered by the stipulation.  But assuming this

16 was one of them, I guess -- well, authenticity is not being

17 challenged, as I did not hear that as an objection.  I only

18 heard hearsay.

19      So Mr. Krepp, is this one of the exhibits covered by

20 the stipulation that is at issue at this point?

21      MR. KREPP:  If I could just back up a couple of

22 things?

23      THE COURT:  Yes.

24      MR. KREPP:  Yes, it is.  It's our understanding that

25 any documents that -- we've exchanged lists -- that were

                    United States District Court

493

1   covered by grand jury subpoenas or by e-mail search warrants
2   the parties have stipulated as to authenticity.
3           THE COURT:  Okay.
4           MR. KREPP:  Just as an evidentiary matter, we don't
5   need a live witness to authenticate that particular document.
6           THE COURT:  Right.  That's not the full foundation
7   for admissibility, though.  There may still be other things
8   like hearsay.
9           MR. KREPP:  Like hearsay, exactly.  So for instance,
10  if it's an e-mail from John Smith to a random person, that
11  would be hearsay, it would be inadmissible.  Here the
12  document is an e-mail -- two responses.  One, to the extent it
13  is a statement, it's a statement from Julie Chrisley, who is a
14  defendant.  And Number 2, it's the Government's contention
15  that this is a lie, so it's not a statement by definition.
16  The document itself contains a misrepresentation that says
17  that Elizabeth Faye Chrisley is a 100 percent owner of 7C's
18  Productions.  And again, that cuts to the heart of the case.
19  A lie cannot be a statement.
20          THE COURT:  So it is not a statement of the
21  defendant?  I guess I'm misunderstanding.  It is a statement
22  and it's not a statement?
23          MR. KREPP:  It's not offered for the truth of the
24  matter asserted.
25          THE COURT:  Oh, it's not hearsay.
                    United States District Court

1           MR. KREPP:  Yes.  I apologize.

2           THE COURT:  It's okay.

3           MR. KREPP:  But again, I think just moving forward,

4  our understanding was, to streamline things, we would not need

5  to have somebody on the stand to authenticate each and every

6  e-mail because the e-mails are --

7           THE COURT:  Well, I don't think anyone is saying that

8  you need that.  I did not hear authenticity as an objection

9  just now.  That's what you just said.  The objection is

10 hearsay, which is why I said to you what say you with respect

11 to hearsay.  I don't think anyone is challenging whether or

12 not you have to authenticate through a live witness or

13 otherwise.

14         What say you with respect to it's a statement of the

15 defendant and also that it is not being offered for the truth

16 of the matter being asserted so it's not hearsay at all?

17         MR. ANULEWICZ:  Sure.  I think that it is hearsay

18 because he says that there's a statement in here that they're

19 trying to move into the case.  But more importantly, the

20 statement was not made to this witness.  The statement was

21 made to Benjamin Stranahan.  If they want to put Benjamin

22 Stranahan as to who the statement was made, they can talk to

23 him.  And I think previously, at least in their 302s, this

24 witness has said, I have never seen these documents that are

25 appended to this e-mail.  And so what they want to do is they

1  want to shortcut the process and have her introduce this
2  e-mail, which she's never seen, the documents which she's
3  never seen, and the statement was not made to her.
4        THE COURT:  Well, how is the last couple of things
5  you said not part of authenticity?  How would that not be
6  covered by the stipulation?  If you stipulated that it's
7  authentic, she doesn't have to say I've seen it before and
8  this is what it is.  You-all have stipulated that these are
9  what the Government purports them to be.  So I'm just looking
10  for --
11        MR. ANULEWICZ:  They are, but I still believe that
12  it's hearsay because the statement was not made to her and
13  there's a lack of foundation.
14        THE COURT:  That's not -- I'm not going to speak for
15  you.  Go ahead, Mr. Krepp.
16        MR. KREPP:  I think, just so the Court knows -- and
17  we'll talk to opposing counsel at the appropriate time.
18  Again, this is -- your Honor picked up on the issue right
19  there.  It's -- the foundational issue, to the extent there is
20  one, is covered by the stipulation.  And I'll let the Court
21  know, there are going to be allegations that certain e-mails
22  are fabricated in this case.  The Mark Braddock e-mails, for
23  instance, I have no doubt the defendants are going to claim
24  some of them are fabricated.  So we're not trying to back-door
25  those in through this stipulation.

1          THE COURT:  All right.  I would encourage you-all to

2   talk at the break, because what I heard Mr. Anulewicz make was

3   an authenticity objection.  And if there is no challenge as to

4   authenticity because there is a stipulation, then I'm a little

5   confused as to what's going on here.

6          And one last thing.  Mr. Krepp, just give me a

7   synopsis of what is involved in this particular statement

8   here.

9          MR. KREPP:  Sure, your Honor.  Is it all right if we

10  pull it up on --

11         THE COURT:  Sure.  The jury is not in here.

12         MR. KREPP:  So it's an e-mail from Mrs. Chrisley.

13  And we're having some issues with our formatting.  I'm not

14  sure why the L's and I's aren't captured.

15         But go to the next page, please.

16         And this is what's covered in the indictment, your

17  Honor.  I'll find the paragraph in a moment.

18         If we keep going down, I'll let you know when to

19  stop, Ms. Dyer.  Right there.

20         On the bottom:  "The following persons are nominated

21  to serve as the board of directors -- Elizabeth Faye

22  Chrisley" -- I believe it's Paragraph 38 of the indictment.

23  And as we move down, it states right there -- this was covered

24  during the opening statements -- that the stock ownership

25  should be issued to Elizabeth Faye Chrisley.

1        MR. ANULEWICZ:  Your Honor, I'll withdraw the --

2        THE COURT:  Please have a seat, sir.

3        MR. ANULEWICZ:  I'm sorry.

4        THE COURT:  Thank you so much.

5        Mr. Krepp, if it's not being offered for the truth of

6   the matter asserted, for what purpose is it being offered?

7        MR. KREPP:  So it's offered to prove the allegation

8   in the indictment that -- the allegation is that the

9   defendant, Julie Chrisley, lied to Bank of America about who

10  owned the account, so it's the opposite of truth.  It's this

11  is being offered to show the tax fraud scheme in work, that

12  they're trying to remove Julie's name from the account falsely

13  and falsely claim to the bank that Elizabeth Faye Chrisley was

14  a 100 percent owner.

15        THE COURT:  All right.  Mr. Anulewicz.

16        MR. ANULEWICZ:  Your Honor, I'll withdraw my

17  objection to the exhibit.

18        THE COURT:  All right.  Bring them back in.

19        Anything before they come back in from anyone?  If

20  so, please stand, from the defense side.  No?  All right.

21        Thank you, sir.  Good afternoon to you.

22        **(The jury entered the courtroom at 2:36 p.m., after**

23  **which the following proceedings were had.)**

24        THE COURT:  All right.  The jury has reentered and is

25  seated.

1    Everyone else may be seated.

2    I will overrule the objection to that last exhibit,

3 which is 118, and it is admitted.

4    You may proceed.

5    MR. KREPP:  Thank you, your Honor.

6    **(Government's Exhibit 118 was admitted into evidence.)**

7    MR. KREPP:  Ms. Dyer, if we could please pull up

8 Government's 118.

9    THE COURT:  I'm sorry.  Let me back up.  For the

10 record, I think the objection was actually withdrawn.

11    MR. ANULEWICZ:  Yes.

12    THE COURT:  So it's admitted without objection.

13    You may proceed.

14 BY MR. KREPP:

15 Q    Now, if you look at the copy you have in front of you --

16 we're going to try to figure this out at a break.  It may take

17 overnight.  But the e-mail in front you, is it from

18 jchrisley@gmail.com, the printed copy?

19 A    jchrisley1@gmail.com.

20 Q    1.  I'm sorry about that.

21    So does it look like on the screen, for whatever

22 reason, the L's are missing?

23 A    It does.

24 Q    So we're trying to figure that out.  But let's -- is

25 this -- tell me if I read this correctly here on the screen.

United States District Court

"Ben, it was a pleasure meeting you today.  Please
find attached the documents requested.  Thanks, Julie
Chrisley."

Did I read that correctly?

A   Yes.

MR. KREPP:  If we could please zoom out and go to the
next page, Ms. Dyer.

BY MR. KREPP:

Q   All right.  So was this -- does this appear to be a
document that was attached to the e-mail?

A   Yes.

Q   All right.  And does it say, if I'm reading this
correctly, that Elizabeth Faye Chrisley is the registered
agent of 7C's Productions?

A   Correct.

MR. KREPP:  All right.  If we can go to the next
page, please.

BY MR. KREPP:

Q   And right there, is this --

MR. KREPP:  If you can scroll up just a little bit,
please, Ms. Dyer.

This is Page 3, for the record.

BY MR. KREPP:

Q   Does this appear to be an IRS form for 7C's Productions,
Inc.?

United States District Court

1   A   Yes.

2   Q   And the initial date at the very top portion, it's from

3   July of 2013; is that correct?

4   A   July 3rd, 2013, yes.

5           MR. KREPP:  Now, zoom out and go to the next page.  I

6   think we're on Page 4 now.

7   BY MR. KREPP:

8   Q   All right.  Tell me if I read this correctly.  I'm going

9   to start from the top.

10          "Board of directors and shareholders resolution

11  adopting amendment to article of incorporation per 7C's

12  Productions, Inc."

13          Did I do okay so far?

14  A   Yes.

15  Q   All right.  "By duly made and seconded motion, the

16  director of the board of directors of 7C's Productions, Inc.

17  voted to adopt the following resolution.  Resolved, the board

18  of directors find it to be -- find it to be in the best

19  interest of the corporation to amend the following items of

20  the articles of incorporation prepared during organizational

21  meeting dated March 7, 2017, to read as follows:  Proposed

22  amendments.  Item Number 3.  The following persons are

23  nominated to serve as the board of directors, Elizabeth Faye

24  Chrisley."

25          Did I read it correctly so far?

                        United States District Court

1  A    Yes.

2  Q    We scroll down.  "Item 5.  The fifth item of business

3  concerns the distribution of stock for the corporation.

4  Certificates should be prepared for issue reflecting the stock

5  ownership in the corporation to be issued as follows:

6  Elizabeth Faye Chrisley, 100 percent."  Then "Item 6.  The

7  following persons shall hold these offices for the corporation

8  for a term of one year or until such time as the board of

9  directors determine otherwise, President, Elizabeth Faye

10 Chrisley."

11        And then it says, "It is further resolved that the

12 shareholders authorize and direct the president to prepare

13 articles of amendment to be filed with the proper state

14 agency.  The undersigned Elizabeth Faye Chrisley certifies

15 that she is the duly appointed president of this corporation

16 and that the above is a true and correct copy of a resolution

17 duly adopted at a meeting of the shareholders thereof convened

18 and held in accordance with law and the bylaws of said

19 corporation on March 7th, 2017, and that such resolution is

20 now in full force and effect."

21        How did I do?

22 A    You did great.

23 Q    Let's go to the next page.

24        Does there appear to be a signature dated March 7th,

25 from Elizabeth Chrisley?

1  A   Yes.

2      (Government's Exhibits 103 AND 103A were marked for

3  purposes of identification.)

4  BY MR. KREPP:

5  Q   Now, if you can move forward in your binder, please.

6  Let's look at Government's Exhibit 103.  And while you're

7  looking at that, if you can look at the next set, which is

8  Government's 103A and tell me if you recognize those

9  documents.

10 A   I do.

11 Q   What are those?

12 A   That is the new signature card for account ending in 6044

13 from March 2017 and the business resolution from the same

14 date.

15 Q   Do both these documents come from Bank of America?

16 A   Yes.

17      MR. KREPP:  Your Honor, I'm moving for the admission

18 of Government's 103 and 103A.

19      THE COURT:  103B is already in.  There is a 103A and

20 also just a 103, is that what you said?

21      MR. KREPP:  Yes.  I think -- yes, your Honor.  103B

22 is already in.  And 103 is not on the list I handed you.  I

23 apologize.

24      THE COURT:  So there is a 103, 103A and 103B?

25      MR. KREPP:  Yes.

                    United States District Court

1    THE COURT:  As to 103 and 103A, any objection,

2  Mr. Anulewicz?

3    MR. ANULEWICZ:  No objection, your Honor.

4    THE COURT:  Mr. Friedberg?

5    MR. FRIEDBERG:  No objection, your Honor.

6    THE COURT:  Mr. Griffin?

7    MR. GRIFFIN:  No objection.

8    THE COURT:  All right.  103 and 103A are also in now.

9    **(Government's Exhibits 103 and 103A were admitted into**

10 **evidence.)**

11    MR. KREPP:  If we can please pull up 103.  Let's

12 start with that one.  Thank you, Ms. Dyer.

13 BY MR. KREPP:

14 Q   Again, is this the signature card for the account ending

15 in 6044?

16 A   Yes.

17 Q   And it's redacted on the screen in front of us.  But is it

18 the same account we've been talking about thus far today?

19 A   Yes.

20 Q   And it's for 7C's Productions; correct?

21 A   Correct.

22 Q   All right.  If we go to the bottom now, who is listed as

23 the president now of 7C's Productions?

24 A   Elizabeth Chrisley.

25 Q   What's the date that's listed there?

United States District Court

1   A    March 7th, 2017.

2   Q   All right.  And now if we can turn to Government's Exhibit

3   103A.  And just -- we're not going to read through all of

4   this, but if we can just focus on the top third.  If you can

5   explain to the jurors -- obviously there's a lot of bank

6   language there.  And I promise I'm not going to make you

7   squint and read all of it.  Just tell us what this document is

8   and why it was maintained by the bank.

9   A    So there's two parts of an account, the business

10   resolution and the signature card.  This is the business

11   resolution stating 7C's Productions, Incorporated; where, the

12   state of Tennessee; when we did this; and who is the owner of

13   the business account.

14   Q   All right.  And if we go to the second page of this

15   exhibit, again, is there a signature, Elizabeth Chrisley,

16   dated March 7th, 2017?

17   A    Yes.

18   Q   All right.  Let's just go back to your initial

19   conversation with Ms. Julie Chrisley.

20   A    Okay.

21   Q   So you were working.  Was this just a regular day at the

22   bank for you?

23   A    Yes.

24   Q   What was -- do you recall what Ms. Julie Chrisley's

25   demeanor was when she came into the bank?

1    A    She was very determined to get some work done.

2    Q    And you do recall that specifically?

3    A    I do.

4    Q    Okay. All right. Now, based upon what happened that day,

5    can you tell me if you provided any instructions to your staff

6    about this particular account?

7    A    You mean after the transaction was done?

8    Q    Yes.

9    A    So Julie was very well-known in the center and did

10   transactions in and out of the account. Because she was

11   removed from the business account, I told my assistant manager

12   to make sure the tellers knew that Julie could not withdraw

13   from the account or get a cashier's check from the account,

14   she could make deposits only.

15   Q    Why is it she was only allowed to make deposits into the

16   account?

17   A    Because she was no longer an owner of the account.

18   Q    And can you tell me, after March 7th, 2017, how much

19   longer did you work at that particular branch?

20   A    I was transferred the second week in May 2017.

21   Q    So about two months or so afterwards?

22   A    Correct.

23   Q    Can you tell me whether or not Julie ever -- if you ever

24   saw her attempting to withdraw money from the account after

25   that?

                    United States District Court

1  A    No.

2  Q    Can you tell me whether or not Julie ever complained to

3  you about her account access after that?

4  A    No.

5      **(Government's Exhibits 104 and 104A were marked for**

6  **purposes of identification.)**

7  BY MR. KREPP:

8  Q    Now let's look at Government's Exhibit 104 and 104A.

9           Do you recognize these documents?

10 A    Yes.

11 Q    All right.  What are -- let's start with 104.  What is

12 Government's Exhibit 104?

13 A    This is another signature card for account ending in 7889

14 for the 7C's Productions, Incorporated.

15 Q    104A?

16 A    The business resolution for that same account.

17 Q    All right.  Thank you.

18           MR. KREPP:  Your Honor, I'm moving for the admission

19 of Government's 104 and 104A.

20           THE COURT:  Any objection, Mr. Anulewicz?

21           MR. ANULEWICZ:  No objection.

22           THE COURT:  Mr. Friedberg?

23           MR. FRIEDBERG:  No objection, your Honor.

24           THE COURT:  Mr. Griffin?

25           MR. GRIFFIN:  No objection.

                    United States District Court

1          THE COURT:  104 and 104A are in.

2      **(Government's Exhibits 104 and 104A were admitted into**

3  **evidence.)**

4          MR. KREPP:  If we can please publish 104.

5  BY MR. KREPP:

6  Q   So thus far we've been talking about a business account

7  ending in 6044; right?

8  A   Correct.

9  Q   What can you tell the jurors about the document we're

10  looking at now?

11  A   This is for a different account ending in 7889.  So we

12  opened a new account for the business with Elizabeth Faye

13  Chrisley being the only owner of the account.

14  Q   Just so we're clear, there was this former account,

15  correct, ending in 6044?

16  A   Uh-huh.

17  Q   Where was that opened?

18  A   In Georgia.

19  Q   So that's what we've been talking about ever since this

20  moment right now; right?

21  A   Correct.

22  Q   Why did Bank of America open a second account ending in

23  7889?

24  A   I asked Ben that, and he said that they requested that --

25  Q   Without getting into anything Ben said, let's just -- I'll

                    United States District Court

1  back up and I'll ask it a different way.

2  A    Okay.

3        MR. KREPP:  If we can zoom out, please, and go to the

4  bottom of the page.  Just zoom in on the signature.

5  BY MR. KREPP:

6  Q    What's the date we see here?

7  A    March 7th, 2017.

8  Q    All right.  Is that the same day that the other account

9  was changed to Elizabeth Faye Chrisley?

10  A    Correct.

11  Q    And then if we go to Government's 104A, is this the

12  corporate resolution you discussed earlier, but this pertains

13  to account ending in 7889?

14  A    Correct.

15  Q    Thank you.

16        Now, before coming to court today, were you asked to

17  review additional Bank of America records related to account

18  ending in 6044?

19  A    Yes.

20  **(Government's Exhibit 101 was marked for purposes of**

21  **identification.)**

22  BY MR. KREPP:

23  Q    All right.  So let's turn in your packet to Government's

24  Exhibit 101.  And it should be the next set.  And hopefully

25  you'll have what I do, but it should be three pages.

United States District Court

1  A   Yes.

2  Q   Do you recognize those?

3  A   I do.

4  Q   What are those?

5  A   Those are cashier's checks that were withdrawn out of the

6  7C's Productions, Inc., cashier's checks made payable to

7  Julie.

8  Q   Okay.  And do these come from the bank?

9  A   They came from Bank of America.

10  Q   I apologize.  Did they come from Bank of America?  Thanks.

11          MR. KREPP:  Your Honor, I'm moving for the admission

12  of Government's Exhibit 101.

13          THE COURT:  Mr. Anulewicz?

14          MR. ANULEWICZ:  No objection.

15          THE COURT:  Mr. Friedberg?

16          MR. FRIEDBERG:  No objection.

17          THE COURT:  Mr. Griffin?

18          MR. GRIFFIN:  No objection.

19          THE COURT:  101 is admitted.

20      **(Government's Exhibit 101 was admitted into evidence.)**

21  BY MR. KREPP:

22  Q   All right.  So now, we met a couple of weeks ago up in

23  Nashville; right?

24  A   We did.

25  Q   And we spent a lot of time going through a bunch of these

United States District Court

1  documents; right?

2  A   Correct.

3  Q   What can you tell the jurors about --

4         MR. KREPP:  Let's zoom in on the cashier's check, if

5  we can, Ms. Dyer.

6  BY MR. KREPP:

7  Q   So if I'm reading this correctly, it's a cashier's check.

8         What account was this drawn off of; do you know?

9  A   If you look at the back of the check, you can see that it

10  was drawn off of 6044.

11  Q   Okay.  So the first account, not the new Bank of America

12  account?

13  A   The original, yes.

14  Q   All right.  Who is -- what is a cashier's check?

15  A   It's a certified funds check that the bank issues on

16  behalf of the individual or company asking for the funds.

17  Q   All right.  Who was this cashier's check issued to?

18  A   Julie Chrisley.

19  Q   All right.  And let's look at the very next document.

20  That first one was in the amount of $35,000; correct?

21  A   Correct.

22  Q   And then do we see another cashier's check in the amount

23  of $18,200, also payable to Julie Chrisley?

24  A   Correct.

25  Q   And is this drawn off of the same account?

United States District Court

1    A    Yes, it is, 6044.

2    Q    6044.

3         What can you tell me from looking at the face of this

4    where this transaction was done?

5    A    Sure.  If you will look where it says "pay to the order

6    of" and above that that says "pay" and above that that says

7    "Franklin Road".  And then also on the back of the check, it

8    will tell you Franklin Road is in Brentwood, Tennessee.  It

9    also says that on the back.

10   Q    Is that the same location that you worked at in March of

11   2017?

12   A    No, it's not.

13   Q    All right.  What's the timestamp on the upper right-hand

14   side there?

15   A    That's at 9:57 a.m.

16   Q    All right.  Do you recall, when you saw Julie Chrisley and

17   Elizabeth Faye Chrisley come into the bank, was it earlier in

18   the morning or was it afterwards?

19   A    No.  It was later.

20   Q    Later?

21   A    Uh-huh.

22   Q    All right.  So can you tell me whether or not Julie

23   Chrisley told you when she came into the bank that she had

24   gone to a different -- that these cashier's checks had been

25   issued from a different bank on that same day?

United States District Court

1    A    No.

2    Q    Is that something you would remember?

3    A    Absolutely.

4        **(Government's Exhibit 105 was marked for purposes of**

5    **identification.)**

6    BY MR. KREPP:

7    Q    All right.  Now, let's turn to Government's Exhibit 105.

8    Should be the map.

9    A    Uh-huh.  It doesn't have a tag on it.

10   Q    I'm sorry.

11   A    That's okay.

12   Q    So 105, to be clear, you didn't prepare this document;

13   right?

14   A    I did not.

15   Q    All right.  Were you asked to look at the -- just are we

16   looking at a map of Nashville and some location?

17   A    Yes.

18   Q    Were you asked to authenticate the various locations on

19   this map using Bank of America records?

20   A    Yes.

21   Q    All right.  There's --

22           MR. KREPP:  I'll see if anybody has an objection.  I

23   move for the admission right now.  If I need to, I can lay

24   more of a foundation.

25           THE COURT:  Of 105?

                    United States District Court

1          MR. ANULEWICZ:  It's fine.

2          THE COURT:  Mr. Anulewicz has no objection.

3          Mr. Friedberg?

4          MR. FRIEDBERG:  No objection, your Honor.

5          THE COURT:  Mr. Griffin?

6          MR. GRIFFIN:  No objection.

7          THE COURT:  105 is in.

8      **(Government's Exhibit 105 was admitted into evidence.)**

9  BY MR. KREPP:

10  Q   All right.  So let's pull this up.

11         So there's a blue dot with Chrisley home.  Were you

12  able to look at Bank of America records dated from March of

13  2017 to confirm where the home was located?

14  A   Yes.

15  Q   All right.  And Bank of America Number 1, what is that

16  location?

17  A   That's the Franklin Road location in Brentwood, Tennessee.

18  Q   To be clear, that's where the two cashier's checks made

19  payable to Julie Chrisley on the morning of March 7th were

20  drawn off of; correct?

21  A   That is correct.

22  Q   All right.  And then what's Bank of America Number 2?

23  A   That's my location in Green Hills.

24  Q   In Green Hills.  Okay.

25         And at any point during March 7th, 2017, did Julie
                    United States District Court

1   Chrisley tell you that this prior transaction had just

2   occurred out of the account?

3   A    No.

4   Q    Is that the kind of thing you'd remember?

5   A    Yes.

6        **(Government's Exhibit 197 was marked for purposes of**

7   **identification.)**

8   BY MR. KREPP:

9   Q    Now, were you asked to review some additional documents

10  when we met that did not come from Bank of America?  So if we

11  turn to the next page -- Government's Exhibit 197.

12  A    Yes.

13  Q    Did we go through some additional documents when we met?

14  A    Yes.

15       MR. KREPP:  For counsel's reference, I'll be getting

16  to Government's 197 next, 194, 195 and 196.

17                        **(brief pause)**

18       MR. KREPP:  All right.  So I'm going to move --

19  BY MR. KREPP:

20  Q    Just to be perfectly clear, you did not in any way prepare

21  Government's Exhibit 197; correct?

22  A    No, I did not.

23       MR. KREPP:  That being said, your Honor, I'm going to

24  move for the admission of Government's Exhibit 197.

25       MR. ANULEWICZ:  No objection.

                    United States District Court

```
1            THE COURT:  Mr. Friedberg?
2            MR. FRIEDBERG:  No objection.
3            THE COURT:  Mr. Griffin?
4            MR. GRIFFIN:  No objection.
5            THE COURT:  197 is admitted.
6       (Government's Exhibit 197 was admitted into evidence.)
7  BY MR. KREPP:
8  Q    If we look here, is this -- does it look to be a subpoena
9  to testify before a grand jury issued to 7C's Productions?
10 A    Yes.
11 Q    All right.  And if we look at the bottom left-hand side,
12 you will see my name.  And then is there a date that's listed
13 there?
14 A    Yes.
15 Q    What's the date that you see in the bottom left-hand side?
16 A    February 1st, 2018.
17           MR. KREPP:  All right.  If we can, please, Ms. Dyer,
18 go to Government's Exhibit -- I'm sorry.  Same exhibit.  If we
19 can go to Page 8.  So stop right there for a second.
20           We're on page -- bottom of the page number is Page
21 Number 6 in the packet, for the record.
22 BY MR. KREPP:
23 Q    And it says, "Scope of Subpoena.  The records in this
24 request include records pertaining to Chrisley Knows Best and
25 According to Chrisley, hereinafter the shows, the following
```

1  individuals, hereinafter the individuals Michael Todd
2  Chrisley, Julie Chrisley, Elizabeth Faye Chrisley and others.
3  And then two entities."  And then there's a number of
4  production requests listed at the bottom.  Is that right?
5  A  Yes.
6          MR. KREPP:  If we can go to the next page, please.
7  BY MR. KREPP:
8  Q  All right.  Is that letter D -- tell me if I read this
9  correctly.  It's on the screen.  "All federal, state and local
10  tax documentations specifically related to the individuals,
11  the entities and/or the shows, including but not limited to,
12  IRS form 1099, income and payroll tax returns, state sales tax
13  returns, and amended tax returns."
14          Did I read that correctly?
15  A  Yes.
16          MR. KREPP:  Back out, please, and go to the prior
17  page.  Thank you.  Right there.
18  BY MR. KREPP:
19  Q  So the very bottom, the lengthy one written there, it's --
20  I'll read just the first sentence, but tell me if I read this
21  correctly under Production Request D.  "All records, books of
22  account and other documents or papers relative to financial
23  transactions of the individuals, the entities or the shows."
24          Did I read that correctly?
25  A  Yes.
                    United States District Court

1 Q    All right.  Thank you.

2      **(Government's Exhibit 194 was marked for purposes of**

3 **identification.)**

4           MR. KREPP:  At this time, your Honor, I move for the

5 admission Government's Exhibit 194.

6           THE COURT:  Mr. Anulewicz?

7           MR. ANULEWICZ:  No objection, your Honor.

8           THE COURT:  Mr. Friedberg?

9           MR. FRIEDBERG:  No objection.

10           THE COURT:  Mr. Griffin?

11           MR. GRIFFIN:  No objection.

12           THE COURT:  194 is admitted.

13           MR. KREPP:  Your Honor, by agreement by the parties,

14 we've redacted certain information that we told the Court

15 about ahead of time from these documents.

16           THE COURT:  So noted.

17 BY MR. KREPP:

18 Q    All right.  So there's a letter here.  I'll just read

19 this.  Again, just to be perfectly clear, you in no way

20 prepared this document; right?

21 A    That is correct.

22 Q    Okay.  All right.  "June 7th, 2019.  Dear Tommy, enclosed

23 please find additional documents provided in response to the

24 grand jury subpoena to 7C's Productions dated February 1,

25 2018.  This production includes five pages consisting of a

1  document entitled Board of Directors and shareholders

2  Resolution adopting amendment to Articles of Incorporation for

3  7C's Productions, Inc. and two pages consisting of two e-mails

4  between Julie Chrisley and Benjamin Stranahan.  Also included

5  is a business record certification executed by Julie Chrisley.

6  Please accept these on behalf of the grand jury.  Should you

7  have any questions concerning the enclosed, please feel free

8  to contact me."

9          Did I read that correctly?

10 A   Yes.

11          MR. KREPP:  If we can go to the next page, please.

12 BY MR. KREPP:

13 Q   All right.  Does it say here, "I", and it's filled out

14 "Julie Chrisley, hereby certify that I have personal knowledge

15 of the business filing record system of the business known as

16 7C's Productions, Inc. located at the following address" --

17 and there's an address listed there -- "I have reviewed the

18 attached business records described briefly as follows:

19 Two -- 7C's corporate resolution and two e-mails and certify

20 these business records were taken from the ordinary course of

21 the entity" -- I'm sorry -- "and certify that these business

22 records were taken from the ordinary business records of the

23 entity named herein."

24          Did I read it correctly so far?

25 A   Yes.

United States District Court

1  Q   And then we'll skip down to the bottom.  "In accordance

2  with Title 18 United States Code Section 1746, I declare,

3  certify, verify and state under the penalty of perjury that

4  the foregoing is true and correct.  Executed on June 6th,

5  2019, by Julie Chrisley owner/manager."

6          Did I read that correctly?

7  A   Yes.

8  Q   Now, if we can go to the next page in this document.  Does

9  this appear to be a variation or some crumpled-up version of

10 the document we previously looked at?

11 A   Yes, previously.

12 Q   All right.  And it still says Elizabeth Faye Chrisley at

13 the bottom right here; correct?

14 A   Yes.

15 Q   Let's go to the next page.  What do we notice that's

16 different about that document that was submitted to the

17 federal grand jury as opposed to the one we already looked at

18 that was submitted to the bank?

19 A   "Elizabeth Faye Chrisley 100 percent" has been crossed out

20 and "Julie Marie Chrisley 100 percent" has been handwritten

21 in.  And then they both signed it, dated March 8th, 2017.

22 Q   Go to next page, please.  All right.  And does there

23 appear to be, again, signatures for Elizabeth and Julie

24 Chrisley there as well?

25 A   Yes.

                    United States District Court

1  Q    Prior to the Government showing you these documents, had

2  you ever seen this version of this corporate operating

3  agreement?

4  A    No, I have not.

5  Q    All right.  Now, let's go to Page 6 of this exhibit.

6  We're going to zoom in on the bottom, the e-mail from Benjamin

7  Stranahan to jchrisley.  We'll have to zoom in --

8          MR. KREPP:  I'm sorry.  The middle.  Sorry, Ms. Dyer.

9  Perfect.

10  BY MR. KREPP:

11  Q    Okay.  So it's an e-mail from Benjamin Stranahan.  And

12  tell me if I read this correctly.  "Julie, I wanted to touch

13  base with you on a couple of things.  I was speaking with the

14  banking center manager at Green Hills to make sure there

15  aren't any issues for you and your mother-in-law going forward

16  for access on the accounts now that it's switched over.  We

17  want to be proactive and help you avoid any issues.  And we've

18  identified some potential blocks and wanted to discuss ahead

19  of time to ensure that you both receive the highest level of

20  service.  Let me know a good time to chat.  Kind regards."

21          Did I read that correctly?

22  A    Yes.

23  Q    All right.  Now if we keep moving forward.

24          MR. KREPP:  I'm sorry.  We're done with that exhibit,

25  Ms. Dyer.  Thank you.

                    United States District Court

1    I believe I left this off my list, your Honor, but I
2  will be moving in Government's 198.  And I'll show it to
3  counsel.
4    I'm going to move for the admission of Government's
5  Exhibit 198.
6    **(Government's Exhibit 198 was marked for purposes of**
7  **identification.)**
8    THE COURT:  Mr. Anulewicz?
9    MR. ANULEWICZ:  No objection.
10   THE COURT:  Mr. Friedberg?
11   MR. FRIEDBERG:  No objection.
12   THE COURT:  Mr. Griffin?
13   MR. GRIFFIN:  No objection.
14   THE COURT:  198 is admitted.
15   **(Government's Exhibit 198 was admitted into evidence.)**
16   MR. KREPP:  If you could please publish.
17   MS. DYER:  It is not in the system.
18   MR. KREPP:  Okay.  We'll move over to the ELMO.
19  BY MR. KREPP:
20  Q    All right.  So -- all right.  Tell me if I read this
21  correctly.  We've met.  You know this is me, right, Thomas J.
22  Krepp is my name?
23  A    Yes.
24   MR. KREPP:  Again, your Honor, by agreement between
25  the parties, we've agreed to redact certain attorney
              United States District Court

1 information here.

2        THE COURT:  Yes.

3 BY MR. KREPP:

4 Q   "We are able to find the 7C's supplemental production.

5 Apologies for the confusion.  We want to make sure we

6 understand the production.  Was the corporate resolution

7 attached to Ms. Chrisley's e-mail to Bank of America?  In

8 other words, when Ms. Chrisley wrote, please find attached the

9 documents requested, was she sending the corporate resolution

10 that 7C's produced pursuant to the grand jury subpoena?  If

11 not, can the company produce whatever was sent to the bank.

12 Thanks, Tommy."

13        Did I read that correctly?

14 A   Yes.

15    **(Government's Exhibit 195 was marked for purposes of**

16 **identification.)**

17        MR. KREPP:  I'm going to move for the admission of

18 Government's Exhibit 195.

19        THE COURT:  Have you already laid the foundation or

20 you're about to?  Is that what you're saying?

21        MR. KREPP:  I was going to move for the admission and

22 see if they --

23        THE COURT:  Oh, I got you.

24        MR. KREPP:  I think we're on the same page now about

25 this.

1      MR. ANULEWICZ:  Your Honor --

2      THE COURT:  Well, he hasn't moved it in yet.

3      MR. ANULEWICZ:  -- I don't know --

4      THE COURT:  I have no idea what it is because no

5  questions have been asked.  He was assuming that you-all would

6  agree.  But since that doesn't seem to be the case, I'm

7  assuming Mr. Krepp is now going to try to establish

8  foundation.

9  BY MR. KREPP:

10 Q   Before we showed you this document, you had no -- this is

11 not a Bank of America document; correct?

12 A   This is not.

13 Q   This is an e-mail exchange; right?

14 A   Yes.

15 Q   Does it appear to be in response to the prior e-mail we

16 just read?

17 A   Yes.

18      MR. KREPP:  All right.  Your Honor, I'm going to move

19 for the admission of Government's 195.  And I can show it to

20 the Court.

21      THE COURT:  I don't know who is on this one, even

22 though I understand it's in response to the previous one,

23 but --

24      MR. ANULEWICZ:  Your Honor, it is -- I mean, I just

25 don't think that this is the right witness.  I've been trying

                United States District Court

1  not to object in order to move things along; but basically
2  he's just putting up exhibits that this witness has never
3  seen.  She's not on any of the e-mail chains.  She can't speak
4  to any of the e-mails.
5              THE COURT:  What's your objection?
6              MR. ANULEWICZ:  Foundation, hearsay.  And I'm not
7  going to object to authenticity.
8              THE COURT:  Because again -- and it may be me.  I may
9  need to go review those rules of evidence.  But based on what
10 you just described, that does include an authenticity
11 objection, what you just said.  She doesn't know about it.
12 That all goes to authenticating a document.  And my
13 understanding is that there is a stipulation as to that.  So
14 the one objection I heard that perhaps has not been covered by
15 the stipulation is hearsay.
16             So Mr. Krepp, what say you with respect to this?  And
17 again, I don't know who's on this particular one.  And I'm not
18 going to assume, even though it's in response to 195, that
19 it's the same people.  So I'm not sure.
20             MR. KREPP:  Yes, your Honor.  This is what's -- it's
21 not being offered for the truth of the matter asserted.  And
22 for the Court's reference, this is specifically referenced in
23 the superseding indictment verbatim.
24             THE COURT:  So for what purpose is it being offered?
25 To put someone on notice?  I mean, what is the purpose if it's

1 not for the truth of the matter contained therein?

2        MR. KREPP:  This is part of the obstructive act

3 alleged in Count 12 of the indictment.

4        THE COURT:  Well, specifying a purpose doesn't

5 necessarily -- a purpose related to the indictment doesn't

6 really get around hearsay related rules I don't think.

7        MR. KREPP:  And I think -- this information came, I

8 will proffer to the Court -- and I don't believe there's going

9 to be an objection on this.  This information came from the

10 defendant Julie Chrisley.

11        THE COURT:  So you're going with statement again?  If

12 you-all would approach.  Let me just see it.  Let me just see

13 the document.  Again, if you-all will talk after today's

14 session to iron out the stipulation and what it's expected to

15 cover.

16        **(The following discussion was held at the bench**

17 **between the court and counsel.)**

18        THE COURT:  Let me hear from you first.  It is being

19 offered for what?

20        MR. KREPP:  Your Honor, again, this is what's alleged

21 in the indictment is the obstructive act that -- and I'm using

22 his name right now outside the presence of the jury to be

23 clear.  This is an e-mail Mr. Morris sent us in response to

24 the grand jury subpoena.  We have that stipulation that the

25 information came from the defendant Julie Chrisley.  So to the

                    United States District Court

1  extent there's any hearsay -- and I realize I may be muddled

2  in the way I'm expressing it. -- it's a statement of a party

3  opponent, to the extent it is a statement.  But we're not

4  offering it for the truth of the matter asserted because we're

5  alleging that this is a lie, we're alleging that this is part

6  of the obstructive conduct toward the grand jury.

7       MR. MORRIS:  May I speak only as to the stipulation

8  issue since this is not my witness?

9       THE COURT:  Sure.

10       MR. MORRIS:  This is an authentic document, but the

11  witness on the witness stand has no knowledge of it

12  whatsoever.  You can take somebody off the street and read it

13  to them.

14       THE COURT:  But that is what authenticity covers.

15  Authenticity is someone who can identify it who has knowledge

16  of it and can authenticate it.  If y'all have stipulated to

17  that, then that portion is covered.  There would be additional

18  hearsay objection possibly.  But even if she doesn't have

19  knowledge of it, if you-all have said it's authenticated, we

20  don't need her to say she has personal knowledge of it, is my

21  understanding.

22       MR. MORRIS:  My only problem with that, Judge, is I

23  don't see that as authentication.  I agree it's authentic, but

24  to ask a witness who has absolutely no knowledge about a

25  particular document is improper because the witness doesn't

 1   know.

 2           THE COURT:  On what basis?  The main --

 3           MR. MORRIS:  She has no foundation.

 4           THE COURT:  But if it's been authenticated -- her

 5   foundation would be just to say it is what it purports to be.

 6   If you stipulated to that portion, though, that has been

 7   covered, so she -- they don't need that anymore.  That is the

 8   purpose of that type of stipulation, so that they don't have

 9   to bring someone else who does have personal knowledge to get

10   on the witness stand and say I do have personal knowledge.

11   You have given them an out on that through the stipulation.

12           MR. MORRIS:  I have stipulated that the document is

13   authentic, and so it can come into evidence.

14           THE COURT:  But how?  I mean, from your argument,

15   they would still need to acquire someone who has personal

16   knowledge.  And that undermines the whole stipulation.

17           MR. MORRIS:  My problem is this is not the right

18   witness.  If I get up on cross-examination and say I'm going

19   to play this tape of Mark Braddock --

20           THE COURT:  I understand.  You don't have to give me

21   an example.  But you agreed that they did not have to bring in

22   a particular witness.  You agreed that they could get it

23   through any witness, assuming there's no other objection.  You

24   allowed them to authenticate it so that it could come in

25   through any witness.  I understand what you're saying.  It

                    United States District Court

1   doesn't seem to make sense that another witness could do it.
2   But that's what that type of stipulation says, is they don't
3   have to call a particular witness for it.

4           MR. MORRIS:  My understanding is, they don't have to
5   call a custodian to say this came from the records.  We agree
6   it's authentic and it came from the records.  But that doesn't
7   mean any witness can answer questions about a document they've
8   never seen.

9           THE COURT:  Then maybe I don't understand the entire
10  stipulation.  I mean, that's the -- the type of authenticity
11  stipulation I'm describing is the one I'm most familiar with.
12  So did you-all commit this stipulation to writing or did you
13  just simply say authenticity or what?

14          MR. KREPP:  It was done in writing.  I think if I can
15  just clarify.  I understand what Mr. Morris is saying.  Okay.
16  To be clear, this document is coming into -- I think we're all
17  on the same page, this document, once I move into it evidence
18  right now it's admissible.  I mean, what they're problem is
19  and what is going --

20          THE COURT:  That you're asking her questions.

21          MR. KREPP:  Exactly.

22          THE COURT:  Yes.

23          MR. KREPP:  I understand that.  But the reason we're
24  asking this particular witness this -- about this document is
25  there's a representation in here about going into Bank of
                    United States District Court

1  America the very next day.  So I need to establish through
2  this witness that that never happened.  Because she is going
3  to testify that she was at Bank of America the next day and
4  that what is represented by Mr. Morris from the defendant,
5  Julie Chrisley, is a lie.  So again, I can't establish that --
6          THE COURT:  So first of all, I don't know that you
7  need a witness -- I'm sorry.  I'll let you respond in just one
8  second.
9          I don't know that you need this document just to ask
10  her did Ms. Chrisley come into Bank of America on such and
11  such a day.  I don't know that you need that.
12          Second, assuming you don't need that from this
13  witness, is there some other witness that you were intending
14  to get it in through or --
15          MR. MORRIS:  It's in.
16          THE COURT:  It's no argument that it's in.
17          So the objection is not to its admissibility, it is
18  to any questions of this witness?
19          MR. MORRIS:  Correct.
20          THE COURT:  Yes, Mr. Friedberg.
21          MR. FRIEDBERG:  He can ask the question does she know
22  whether or not Julie came back the next day.
23          THE COURT:  He doesn't have to compare it to the
24  contents of the document.
25          MR. FRIEDBERG:  Correct.
                    United States District Court

1          THE COURT:  Ms. Peters.

2          MS. PETERS:  I just want to note, since there is a

3   lot of discussion about, well, who would be the appropriate

4   witness, I just want to point out this is an e-mail from Bruce

5   Morris to Tommy.  They're the only people on the e-mail.

6          THE COURT:  Well, that's why I just asked him is

7   there some other witness --

8          MR. KREPP:  That's why we agree Mr. Morris would have

9   been recused --

10         MR. ANULEWICZ:  I think it was a stipulation as they

11  can enter the exhibit into evidence.  If they want to read it

12  into evidence, we can do that.

13         THE COURT:  Okay.  It sounds to me like you-all did

14  not complete the understanding of the stipulation; because

15  certainly there would be no purpose of stipulating to it if

16  they couldn't ask any particular witness about it.  I don't

17  know how else it would be presented to the jury.  So it seems

18  like there's a breakdown of understanding of once it's in --

19  how does it get conveyed to the jury?

20         MR. ANULEWICZ:  This exhibit is in evidence.  Is

21  this -- she says it's --

22     **(The following proceedings continued in open court.)**

23         THE COURT:  All right.  Ladies and gentlemen,

24  we're -- I was going to give you-all a ten-minute break at

25  3:15 for an afternoon break anyway.  It's 3:14.  So why don't

                    United States District Court

1  you go out until about 3:25.  My apologies.  Thank you so
2  much.
3          **(The jury exited the courtroom at 3:14 p.m., after**
4  **which the following proceedings were had.)**
5          THE COURT:  You-all can go back since they're going
6  to be gone.
7          Attorneys, why don't you go ahead and take a quick as
8  you can stretch break.  As soon as you get back, we'll go
9  ahead and complete our discussion and bring the jurors back
10  in.  Thank you.
11          And, ma'am, if you need to step off the stand for a
12  quick break, that's fine as well.
13          I'll step off.  Everyone else may either be seated or
14  otherwise at ease.  And we'll reconvene in just a few moments
15  once the attorneys have had an opportunity to stretch and use
16  the restroom.
17      **(A recess was taken at 3:15 p.m..)**
18          THE COURT:  You-all may be seated.  Thank you so
19  much.
20                  **(brief pause).**
21          THE COURT:  Okay.  We're back on the record.
22          I guess I need some clarity.  I apologize if it's my
23  misunderstanding.  Initially I understood that there was a
24  stipulation as to authenticity of certain documents.  Then
25  there were some objections.  And from what I recall, the
                  United States District Court

1  objections were initially to the documents even coming in.

2  Now I'm being told, yes, we did stipulate to authenticity and,

3  no, we're not objecting to the documents coming in, we are

4  just objecting to this particular witness being questioned

5  about the documents, which seems different from the argument

6  that was initially made.  But again, I may have misunderstood.

7       What I don't understand now is, if the authenticity

8  stipulation is in place, what witness would these documents

9  come in through?  It's not a -- it's not the type of

10  stipulation -- well, I didn't think it was -- where anybody

11  was going to just stand up and read it to the jury.  So I'm

12  not sure.  I'm just unclear on what the full stipulation is

13  and if everyone agrees that you're under this stipulation.

14       Mr. Krepp, let me hear from you first.

15       MR. KREPP:  Yes.  I think the parties are in

16  agreement -- and, please, anybody, correct me if I'm wrong. --

17  on the authenticity issue.  So I think we're all on the same

18  page about that, that if I move into admission Government's

19  Exhibit -- I apologize.  I'm forgetting what number I'm up to,

20  but 196 I think or 194.

21       THE COURT:  I think -- was 195 ever admitted or are

22  we still arguing --

23       MR. ANULEWICZ:  That's what we're arguing.

24       MR. KREPP:  So if I move for the admission of

25  Government's 195, I believe everyone would agree that the

United States District Court

1  document itself could come in under the stipulation because
2  we've agreed to authenticity.  The question I think we're
3  wrestling with is, is it appropriate to publish it to a
4  particular witness?  So it's a publishing -- I think --
5  correct me if I'm wrong.  I think -- they're nodding their
6  heads -- it's publishing an exhibit versus admitting an
7  exhibit.

8          THE COURT:  So why else would it be admitted?  Just
9  for the record?  I mean, if it's not going to be published
10 now, is it going to be sent back with the jury, which wouldn't
11 seem to make sense?  And so what would be the whole -- what
12 would be the purpose for admitting a document if it's not
13 going to be published?

14         MR. KREPP:  I agree.  That's why I'm trying to
15 publish it right now.  And my plan is -- with these witnesses,
16 your Honor, is to ask them direct questions, did -- it's going
17 to be a few series.  For this witness it will be, there's a
18 representation in Mr. Morris's e-mail -- I'm sorry.  It will
19 be the 7C's Productions attorney e-mail, that Elizabeth Faye
20 Chrisley came into the bank on March 8th, 2017.  Were you
21 working in the bank that day?  Did this event occur, as what
22 was represented to the grand jury?

23         I don't know who else would be an appropriate witness
24 to ask because this witness has personal knowledge of what
25 occurred on March 8th, 2017.

1          THE COURT:  All right.  First of all, as I pointed

2     out, even if she has knowledge of it, I don't know that you

3     need the e-mail to corroborate that knowledge.  That may even

4     be cumulative.  So I don't know that you need the e-mail.  But

5     what is the exact stipulation?  Was it committed to writing?

6     What was the agreement between the parties with respect to

7     these e-mails?

8          MR. KREPP:  Purely authenticity.  Purely

9     authenticity.

10         THE COURT:  All right.  Well, then I guess that to me

11    falls short of what the stipulation needed to cover, as we're

12    seeing now, because nobody is disputing authenticity, as you

13    just pointed out.  But now -- but you did not discuss how it

14    would be conveyed to the jury, whether it would be read to

15    them, whether it would be shown to them, whether it would go

16    back with them.  So Part 2 of once we get it in, what happens

17    with it, doesn't appear to have been covered by the

18    stipulation.  And I guess that's where we are now.  Would that

19    be correct?

20         MR. KREPP:  What we said in our e-mail exchange was

21    that other evidentiary objections, such as relevancy and

22    hearsay, fair game, everyone could make those objections.  And

23    that was our understanding.  And certainly, if that's a

24    hearsay objection or a 403 objection, they are certainly able

25    to do so.

                       United States District Court

1       But it's our understanding, looking at the Federal

2   Rules of Evidence, that once a document is properly admitted,

3   assuming the Government can cross the threshold of relevancy

4   and hearsay, then -- I'm not trying to be hyperbolic, but why

5   can't we publish it?

6           THE COURT:  I agree.

7           MR. KREPP:  There's nothing that prohibits us.  We

8   don't need a stipulation to publish.

9           THE COURT:  I agree.

10          MR. KREPP:  It's going to go back with them.

11          THE COURT:  And I don't think anybody can dispute the

12  relevancy.  Whether or not it's cumulative, I mean, it's

13  relevant to what we're talking about.  So that is why I've

14  honed in on the hearsay objection the few times it's been

15  made.  And then the Government's response is it's a statement

16  by a party.

17          So defense, someone from the defense, I mean, all I

18  was hearing up here was, this isn't the right witness to use

19  it -- to ask about it.  That's not a valid objection.

20          MR. MORRIS:  I believe, Judge, under Rule 602, the

21  need for personal knowledge, this witness has no personal

22  knowledge of this document.

23          THE COURT:  She doesn't need to.  Y'all agreed on

24  authenticity.  The basis -- the reason for personal knowledge

25  is to let us know it is what it purports to be.  By your

United States District Court

1  stipulation, you said they don't need to establish that.  You
2  would normally call a person with personal knowledge to say I
3  have knowledge that this is whatever it is so that everyone
4  knows that.  But you-all stipulated to that part.  So, no, she
5  doesn't have personal knowledge, but she doesn't need it based
6  on the stipulation, from my understanding.

7       MR. MORRIS:  I'm not objecting to its admissibility.
8  I'm only objecting to this witness being questioned about
9  something she has no personal knowledge of.

10      THE COURT:  She doesn't -- I mean, once a document is
11 in -- that's just -- if any document is in, I mean, somebody
12 can ask a witness about something.  They don't have to know
13 that -- they don't have to have made the document.  They don't
14 have to have been present.

15      So I guess what is your objection?  What is your
16 objection?  Is it hearsay?  Is it -- because if you're just
17 saying she doesn't know, that goes to foundational
18 authenticity, which has been stipulated to.  I understand what
19 you're saying, that she doesn't, but that's why they got you
20 to agree to it so they didn't have to call someone who does
21 have that personal knowledge.

22      MR. MORRIS:  No.  I respectfully disagree.

23      THE COURT:  Okay.

24      MR. MORRIS:  That's not what the stipulation meant.
25 The stipulation meant one thing and one thing only.  It's

authentic and it can come into evidence.

Now, if the Court believes that once it's in evidence anybody can be asked anything about anything in evidence, then my objection under 602 is probably wrong and I would object under 401.  This is just not the right witness to be asked questions about something she has no knowledge of.

THE COURT:  What's your objection under 401?

MR. MORRIS:  It's not in any -- it's not -- this witness can't give testimony about this document that is relevant to any issue in the case because she doesn't know anything about this document.

THE COURT:  Okay.  I've got it.  Overruled.  I mean, that just makes no sense to me whatsoever.  I'm sorry that it's -- I mean, it seems like you entered into a stipulation that you're trying to backpedal from a little bit.  My apologies if I'm misunderstanding that.  But the objections -- I agree with the Government here.  The objections that you can still make beyond the stipulation to authenticity would be hearsay, relevancy.  I'm not hearing any of that.  I'm just hearing we don't think she should be the one to be asked about it.  Those aren't valid objections under the rules of evidence.  That's not a valid objection.

I mean, once it's in, they can show it to anybody, I mean, and ask them about things.  Whether or not that seems logical to you is a different analysis or a different story.

1  But I don't see why he can't ask her about something that is

2  in evidence.  This says this.  Did it really happened?  They

3  can ask her that.  It's in evidence.

4         MR. MORRIS:  I understand the Court's ruling.  If I

5  may have a continuing objection under 602.

6         THE COURT:  Okay.

7         MR. MORRIS:  Recordkeeping, just a little

8  recordkeeping thing, Judge.  I neglected at the beginning of

9  the trial -- and I hope your Honor will forgive that.  May we

10 have a continuing objection to the evidence that we sought to

11 suppress and the Court denied our motion, so that I don't have

12 to every time they try to put something in --

13        THE COURT:  I know which evidence you're talking

14 about.  But for the record, I think you need to be a little

15 more clear, because there were a couple of motions along those

16 lines.

17        MR. MORRIS:  The electronic e-mails that is Part 1,

18 which I believe the Court denied, and then anything that came

19 from the illegal search and seizure that was sustained by the

20 Court upon the report and recommendation of Magistrate Judge

21 Anand, that is, the search of the Georgia Department of

22 revenue records.

23        THE COURT:  I would feel slightly uncomfortable with

24 the latter portion, because I'm not sure that I will recognize

25 whether or not it came from that search, if that makes sense.

1  I mean, I understand the ruling, but I don't know what came

2  from the DOR search to say -- just to assume that your

3  objection continues with respect to it.

4      Does that make sense?

5      MR. MORRIS:  Yes.  If they try, I'll do it.  But may

6  I have a continuing objection to the motion that you denied to

7  suppress all of the electronic e-mail information that we

8  believe was the fruit of that illegal search?

9      THE COURT:  Okay.  Sure.  Yes.

10     MR. MORRIS:  Thank you.

11     THE COURT:  All right.  Bring them back in.

12     Anything else before they come back in?  I'm sorry.

13     MR. KREPP:  We do have that stipulation, the actual

14 stipulation we talked about earlier today.  I'm not going to

15 move it in to publish it to the jury.  My plan was to read it

16 to the jury.  And then I'll talk to the defense counsel

17 afterwards about if it goes back to the jury.  We'll figure

18 that out at another time.

19     THE COURT:  All right.

20     MR. KREPP:  Is that okay?

21     MR. MORRIS:  No objection.

22     THE COURT:  All right.  Thank you.

23     **(The jury entered the courtroom at 3:32 p.m., after**

24 **which the following proceedings were had.)**

25     THE COURT:  All right.  The jury has reentered and is

                     United States District Court

1  seated.

2          Everyone else may be seated.

3          And you may resume your examination.

4          MR. KREPP:  Okay.  Thank you.

5          I believe where we left off was Government's 198.

6  And we had just read this into the record.  And I had moved in

7  for the admission of Government's Exhibit 195.

8          THE COURT:  It's admitted.

9          MR. KREPP:  Thank you.

10     **(Government's Exhibit 195 was admitted into evidence.)**

11          MR. KREPP:  All right.  So again, by stipulation, the

12  parties have agreed to certain redactions here.  But let's

13  just zoom in on the middle e-mail.

14  BY MR. KREPP:

15  Q    "Tommy, the resolution accompanying my letter of June 7th,

16  2019, supplementing 7C's Productions, Inc's response to the

17  grand jury subpoena is the second or replacement resolution

18  given to the Bank of America in March 2017.  By way of further

19  explanation, a resolution was given to the bank on March 7 via

20  the e-mail contained in my June 7, 2019 letter.  On March 8th,

21  2017, Elizabeth Chrisley made changes to the resolution and

22  brought it to the bank by hand.  That second resolution was

23  first produced to you in my June 7, 2019, letter.  It was not

24  attached to the original e-mail from Julie to the bank.  The

25  bank should have the first resolution as well as the second."

1    I just want to take this piece by piece.  And first,
2 so we're on the same page, I'm going to read a stipulation
3 into the record.

4    MR. KREPP:  Ladies and gentlemen, you'll be
5 instructed on this later on.  But the United States and the
6 defendants Todd Chrisley and Julie Chrisley by and through
7 each of their attorneys hereby stipulate and agree to the
8 following facts:  On June 7th, an attorney acting on behalf of
9 7C's Productions sent an e-mail to the United States in
10 response to a grand jury subpoena.  The defendant Julie
11 Chrisley provided the information contained within this e-mail
12 to the 7C's Productions attorney.

13    And I'll note for the record, I believe that --

14    MR. GRIFFIN:  Mr. Tarantino does not have an
15 objection to that stipulation.

16    THE COURT:  All right.

17 BY MR. KREPP:

18 Q   Okay.  All right.  So let's look at the document, now that
19 we're all here.

20    All right.  So let me ask you this:  Were you working
21 on March 8th, 2017, at the Green Hills location?

22 A   Yes, I was.

23 Q   Can you tell me whether or not, as what's represented here
24 to the grand jury took place, did Elizabeth Chrisley bring
25 that handwritten version we saw to your branch on March 8th,

1   2017?

2   A   No, she did not.

3   Q   All right.  Are you familiar with bank -- generally with

4   bank policies and what types of documents are accepted?

5   A   Absolutely.

6   Q   All right.  And have you had an opportunity to look at

7   that handwritten document prior to coming to court today?

8   A   Yes.

9   Q   All right.  In your experience, is that the type of

10   document -- well, let me ask you this:  In your 11 years of

11   experience as a banking manager, have you ever seen a bank

12   accept a resolution with handwritten changes like this?

13   A   No.

14   Q   Not once?

15   A   Not once.

16   Q   All right.  So in this e-mail, again, to the grand jury,

17   it states that Elizabeth Chrisley made changes to the

18   resolution and brought it to the bank by hand.

19          Per Bank of America policies, who needs to be present

20   when -- presumably the account was transferred, let's say, to

21   Julie Chrisley, who would need to be present for that to

22   occur?

23   A   Faye, the current owner, and then also Julie.

24   Q   All right.  Now, have you reviewed Bank of America's

25   internal records regarding this account prior to coming to

1  court today?

2  A   Yes.

3  Q   All right.  And are you familiar with something -- is

4  there a particular system that shows you account information?

5  A   Yes.  Interact.

6  Q   Interact.  All right.

7      **(Government's Exhibit 100 was marked for purposes of**

8  **identification.)**

9  BY MR. KREPP:

10 Q   And I don't believe it's in the binder in front of you,

11 but it's Government's Exhibit 100.  Did you prepare certain

12 documents, pages of screen shots from the Interact system?

13 A   I did.

14 Q   And generally speaking, what do those documents purport to

15 show?

16 A   It just shows what accounts are open, what debit cards are

17 open, who's the owner of the accounts, general information

18 like that.

19      MR. KREPP:  Your Honor, I'm going to move for the

20 admission of Government's Exhibit 100.

21      THE COURT:  Any objection, Mr. Anulewicz?

22      MR. ANULEWICZ:  Just subject to our ongoing

23 objection, your Honor.

24      THE COURT:  This is -- all right.

25      Mr. Friedberg?

United States District Court

1      MR. FRIEDBERG:  Same announcement, your Honor.

2      THE COURT:  And Mr. Griffin?

3      MR. GRIFFIN:  No objection.

4      THE COURT:  All right.  It is admitted.

5      **(Government's Exhibit 100 was admitted into evidence.)**

6      MR. KREPP:  If we could please publish.

7   BY MR. KREPP:

8   Q    So is this a screen shot from the Interact system?

9   A    It is.

10  Q    And just to be clear, do you have personal knowledge of

11  the document we're looking at here?

12  A    Yes.  I'm the one that created it.

13  Q    Great.

14       All right.  So let's first start by just walking the

15  jurors through what we're looking at.  What is this Page 1

16  showing us?

17       THE COURT:  Well, then I need to clarify the record.

18       Mr. Anulewicz, what is your objection?  She says she

19  does have personal knowledge.

20       MR. ANULEWICZ:  He hadn't established that early on.

21  If she does, I withdraw the objection.

22       THE COURT:  Okay.  Mr. Friedberg?

23       MR. FRIEDBERG:  Likewise, your Honor.

24       THE COURT:  You may continue.

25       MR. KREPP:  Thank you, your Honor.
                    United States District Court

1      THE WITNESS:  This is what we call the profile

2   screen.  So you can see the business account is under 7C's

3   Productions, Incorporated, their address.  You can see that it

4   was established in Georgia in 2013, what kind of a business

5   that it is.  They've been a customer, over on the right-hand

6   side, since July 2014.  Total balances, loan balances, if

7   they're enrolled in our preferred rewards program and what

8   their average balances are and then contact information.

9   BY MR. KREPP:

10  Q    What e-mail address is listed there as the e-mail?

11  A    It's jchrisley1@gmail.com.

12  Q    When did you pull this information?

13  A    May 2nd.

14  Q    Of 2022?

15  A    Yes, sir.

16  Q    In your review of the records, has that been consistent,

17  the jchrisley1@gmail?

18  A    Yes.

19       MR. KREPP:  Just one moment, your Honor.

20       THE COURT:  Sure.

21                    **(brief pause)**

22  BY MR. KREPP:

23  Q    Okay.  Let's go to Page 9 here of this exhibit.  What is

24  this showing us right here?

25  A    This is the screen showing the debit card ending in 7016.

1  It's for the business, but the cardholder is for Elizabeth

2  Chrisley.

3  Q  All right.  If we go to Page 8, the one right beforehand,

4  now whose name is listed here?

5  A  Julie Chrisley.

6  Q  Is that the same thing as an account owner -- as the

7  account holder -- I'm sorry.  Is that the same thing as the

8  person who has signature authority over the 7C's corporate

9  account?

10 A  This is the debit card that's been assigned to Julie.

11 Q  I want to make sure we understand the difference between

12 those two concepts.

13 A  Right.  So you can have a business and then choose to

14 issue debit cards to somebody else besides the signer on the

15 account so they can help you run business.  This is one

16 established to Julie.

17 Q  All right.  And again, what is the difference between

18 having a debit card as an employee, let's say, and being on

19 the signature card for an account?

20 A  It limits what she can do for the business.

21 Q  And who does Bank of America consider to be the owner of

22 the 7C's corporate account?

23 A  Elizabeth Faye Chrisley.

24 Q  All right.  Now, can you tell me from your review of Bank

25 of America's records, was Julie Chrisley ever added back as a

United States District Court

1  signer to the account after March 7th, 2017?

2  A   No.

3  Q   Do you recall whether or not Julie Chrisley ever asked you

4  to add her back to the account after March 7th, 2017?

5  A   She did not.

6  Q   When Julie Chrisley came into the bank on March 7th, 2017,

7  do you recall any conversation she had about her account being

8  compromised or hacked?

9  A   No.

10  Q   Is that the kind of thing you'd remember?

11  A   Absolutely?

12        MR. KREPP:  That's all I have, your Honor.

13        THE COURT:  Cross-examination, Mr. Anulewicz -- or

14  Mr. Friedberg.

15        MR. FRIEDBERG:  Thank you, your Honor.

16        THE COURT:  Thank you.

17                    **Cross-Examination**

18  BY MR. FRIEDBERG:

19  Q   Good afternoon, Ms. Stone.  How are you?

20  A   I'm good.  Thank you.

21  Q   You agree with me, do you not, that in order to conduct

22  transactions on an account, you have to have authority on that

23  account; correct?  You have to be connected to that account?

24  A   There are different ways of doing that, but yes.

25  Q   Okay.  So let me ask you this:  Are you aware that Bank of

                 United States District Court

1  America subsequent to March the 8th, 2017, continued to deal

2  exclusively with Julie Chrisley?

3  A    No.

4  Q    You're not aware of that.  All right.

5        So it would have been wrong for Ben Stranahan to make

6  certain that a scanner or recapture machine was sent to Julie

7  Chrisley for that account, wouldn't it?

8  A    You would have to ask Ben that question.  I don't know.

9  Q    Okay.  But under banking law, what is your opinion of it,

10  if you know?

11        MR. KREPP:  Objection, your Honor.  Under banking

12  law?

13        THE COURT:  Yes.  I'll sustain as to the form of that

14  question.

15        MR. FRIEDBERG:  I'm sorry.

16  BY MR. FRIEDBERG:

17  Q    Under your policies and procedures at Bank of America,

18  would it have been appropriate for you to discuss the

19  recapture machine with Julie Chrisley at a later date other

20  than March 8th, 2017, with anyone else?

21  A    I can talk about that machine and how it can benefit your

22  business and you not be an owner of a business.  So, yes, I

23  can have those conversations with anybody that's not an owner.

24  Q    Okay.  Well, let me put it this way, if I may.

25  A    Sure.

United States District Court

1  Q   Bear with me just for a second.

2      You worked in the Nashville branch that we're talking

3  about, Green Hills; correct?

4  A   I did.

5  Q   And you worked there for less than a year, from, as I

6  understood it, August of 2016 through May 15th, 2017; would

7  that be correct?

8  A   That's correct.

9  Q   And you indicated that part of your job was to know your

10  customers; correct?

11  A   That's correct.

12  Q   And you would see Julie Chrisley a couple of times a week;

13  correct?

14  A   Correct.

15  Q   Do you have any recollection, assuming that you do, of

16  either Julie or Faye coming back into the bank subsequent to

17  March 7th until you left on March 15th of 2017 performing any

18  transactions in the bank or needing anything from the bank?

19  Do you have any personal --

20  A   Either one of them?

21      I remember Faye coming back in because Julie was out

22  of town.

23  Q   And when Faye was out of town --

24  A   No.  Julie was out of town.

25  Q   So do you happen to know where they were out of town?

                    United States District Court

1    A    In California.

2    Q    Do you know the reason they were out of town?

3    A    They were filming something out in California, that's all

4    I know.

5    Q    If Faye was a signatory on that account, she would have

6    had the right to come in and perform transactions; correct?

7    A    This was after March 7th; correct?

8    Q    That is correct.

9    A    Faye did.

10   Q    Okay.  So as long as she's a signatory, she can still do

11   it?

12   A    Faye, yes.

13   Q    Okay.  So I believe you indicated that you didn't know

14   why -- or do you know why Julie Chrisley wanted to add Faye as

15   a signatory on this account?

16   A    She didn't -- she was removed and then made it all into

17   Faye's name.  And why was that, I do not know.  That was a

18   conversation that I asked Ben to have privately.

19   Q    But you do not, as you say, participate yourself in the

20   change of the account, that would probably be someone in a

21   position similar to Mr. Ben Stranahan; correct?

22   A    Correct.

23   Q    Okay.  So are you personally aware of any discussions or

24   conversations between Ben and Julie Chrisley and/or Faye

25   Chrisley?

1  A    No.

2  Q    Okay.  Again, these were just with Mr. Stranahan, to the

3  best of your knowledge?

4  A    Correct.

5  Q    All right.  Now, is it not true that Julie had come in

6  prior to March 7th to add Faye as a signatory?

7  A    Prior to March 7th, no.

8  Q    Okay.  Do you remember back on March 6th, 2019, having a

9  telephone interview with some law enforcement officers

10 regarding this matter?

11         Perhaps I could be a little bit more specific.  You

12 would have had a telephone interview with Ms. Peters, as well

13 as Larry Arrow, Special Agent Larry Arrow.  Do you remember

14 that?

15 A    I do remember having a phone call.

16 Q    At that time you stated a number of things, did you not?

17 A    I was asked several questions.

18 Q    Okay.  Do you remember that any conversation that you may

19 have had that Julie Chrisley -- you wanted Julie Chrisley and

20 Faye Chrisley to speak with Ben Stranahan about making the

21 signature authority change?  Do you remember anything like

22 that?

23         MR. KREPP:  Objection, your Honor.  Hearsay.

24         THE COURT:  Just whether she had a conversation?

25         MR. KREPP:  Well, he's asking about a conversation
                 United States District Court

1  she had with Special Agent Arrow and AUSA Peters.

2          MR. FRIEDBERG:  Did you have a conversation --

3          THE COURT:  I'll overrule.  My understanding is he's

4  asking if they had this conversation.  Overruled.

5          MR. FRIEDBERG:  Thank you.

6  BY MR. FRIEDBERG:

7  Q   Do you have any recollection of Mr. Stranahan not being

8  available when they first came in and asked to have the

9  signatory -- have Faye added as a signatory?

10 A   Say that question for me one more time.  I'm sorry.

11 Q   Do you have any recollection as to Julie Chrisley and Faye

12 Chrisley coming in and needing to speak apparently with

13 Mr. Stranahan and that Mr. Stranahan was not available and

14 they had to come back?

15 A   That is correct.

16 Q   Do you have any idea when that was?

17 A   It was the day before we did the transaction.

18 Q   Okay.  So that would be what date?

19 A   That would have been March 6th.

20 Q   March 6th.  Okay.

21          And all they wanted at that time was purely to change

22 Faye as a signatory in your mind; correct?

23 A   They wanted to change ownership.

24 Q   Ownership?

25          I asked you about signatory.

                    United States District Court

1  A    I signer of a business account, it makes them a signer for

2  the business, removing one and adding the other.

3  Q    But it was for the purpose of adding Faye or not adding

4  Faye?

5  A    Adding Faye and removing Julie, both at the same time.

6  Q    So if they're going to add Faye, would that not mean that

7  Julie is a signatory?

8  A    No.  It was going to be based on the articles of

9  incorporation that we asked them to bring to us or meeting

10 minutes from the corporation saying that there was a change of

11 ownership.  They had to have some sort of document to make the

12 changes.

13 Q    You have no recollection of having a conversation with

14 them purely as to signatory and telling them that Ben

15 Stranahan would be the only one that could help them and they

16 would have to come back?

17 A    They did not have the documents.  And then I wanted them

18 to meet with my small business banker specifically because he

19 was the best one to take care of that transaction for them.

20 Q    So this was likely, was it not, a few days or the week

21 before the actual change was made on March 7th, 2017?

22 A    It was the day before.  It was not the week before.  It

23 was the day before.

24 Q    All right.

25 A    Because they had to get the documents and also meet with

United States District Court

1  Ben.

2         MR. FRIEDBERG:  Okay.  Could I have just a moment,

3  your Honor?

4         THE COURT:  Certainly.

5         MR. FRIEDBERG:  Thank you.

6                         **(brief pause)**

7         MR. FRIEDBERG:  At this point I think that

8  Mr. Anulewicz would like to ask some questions, your Honor.

9  But I'd like to reserve the right to come back if I could, if

10 the Court would allow me.

11        THE COURT:  Yes.  After the Government would have

12 redirect.  Yes.

13        MR. FRIEDBERG:  Thank you.

14                     **Cross-Examination**

15 BY MR. ANULEWICZ:

16 Q   Good afternoon, Ms. Stone.  How are you?

17 A   I'm good.  Thank you.

18 Q   My name is Chris Anulewicz, and I represent Mr. and

19 Mrs. Chrisley.

20        I want to clarify a couple of things.  We've talked a

21 lot about owners of an account.  The owner of the account at

22 Bank of America is 7C's; is that correct?

23 A   That's correct.

24 Q   So we've cleared that up.

25        When we look at the documents that were admitted by
                    United States District Court

1  Mr. Krepp, it notes on the Bank of America records, including

2  the ones that you prepared, that the owner of the account is

3  7C's; is that correct?

4  A   It's the business 7C's, yes.

5  Q   It's the business account; that's correct.

6  A   Yes.

7  Q   And all of the statements that are sent out for that

8  account goes to 7C's; is that correct?

9  A   Yes.

10 Q   And so when the -- when Mrs. Chrisley and Faye Chrisley

11 came into the bank, they did not change the ownership of that

12 account, did they, of the account?

13 A   They changed who would be processing or was approved to do

14 transactions for that business, what individual.

15 Q   But in terms of all of the bank records, in terms of

16 everything else, the owner of the account remained 7C's;

17 correct?

18 A   Correct.

19 Q   That never changed and has not changed to this day;

20 correct?

21 A   7C's; that's correct.

22 Q   And you will agree with me, will you not, that when you

23 went over the document with Mr. Krepp that jchrisley1 was an

24 e-mail account authorized by the bank to deal with that

25 account; isn't that correct?

United States District Court

1  A    So that would have been set up with the individual that

2  became the owner.  And they give us the phone number and the

3  e-mail that we should communicate with them for.

4  Q    Okay.  And that was Mrs. Chrisley's account; right?  It's

5  the same e-mail before and after; right?

6  A    Could be.  I'm not sure whose e-mail that is.

7  Q    Didn't you go through your bank records when you were

8  discussing with Mr. Krepp to figure out that's the exact same

9  e-mail that he showed you on the screen communicating with

10  Julie Chrisley?

11  A    It showed on the profile.

12  Q    It is the same thing.

13       And Julie Chrisley was noted as having a right to

14  have a debit card of that account; isn't that correct.

15  A    They could have done that.  Yes.

16  Q    And Mrs. Chrisley has a right to utilize that account;

17  isn't that correct?  And you looked at it I think you said

18  May the 6th.  So 11 days ago, Mrs. Chrisley had a right to

19  utilize that account with a debit card; is that correct?

20  A    May 2nd I looked at it.  She did have a debit card.

21  Q    So fifteen days ago.

22       And that has been the case for the past five years;

23  correct?

24  A    I can see my picture of the account back in 2019 when we

25  had the conversation and then May of this year.  It was the

United States District Court

1   same.

2   Q   So it's been consistent.  Every single time that you have

3   looked at the account, Julie Chrisley has had the authority to

4   use that account; correct?

5   A   As a debit card.  That's different than doing anything

6   else besides using a debit card.

7   Q   Well, the bank -- I know you left very shortly after

8   March 2017.  But the bank employees continued to e-mail,

9   discuss account and 7C's activity with Mrs. Chrisley, did they

10  not?

11  A   It's to the phone number and the e-mails that the signer

12  on the account gave us to use to do the communication.

13  Q   And they continued to do that communication, did they not?

14  A   Whatever Faye requested we put on there, that's what we

15  did.

16  Q   Whatever the bank continued to do from May the 17th to

17  now, for the past five years, they have dealt with Julie

18  Chrisley; correct?

19  A   Based on that information, that's just communication,

20  that's not ownership.

21  Q   Based upon the documents that you went over with Mr. Krepp

22  and the logs that you've looked at for the last five years;

23  correct?

24  A   The information is on there.

25  Q   Mr. Krepp asked you about a check that was written from

                 United States District Court

the 7C's account.  Do you remember that?

A    The cashier's check?

Q    The cashier's check.

A    Yes.

Q    There is no prohibition for that check being written, is there?

A    No.

Q    Okay.  And with regard to the adding of Faye as a signatory to the accounts, I want to make sure that I understand.

A    Okay.

Q    You did not have any discussions with Faye Chrisley or Julie Chrisley about the reasons for changing the account that was with Ben Stranahan; right?

A    Correct.

Q    Okay.  And as a matter of fact, you -- they walked into the bank on March the 7th, you refer them to Mr. Stranahan, they went behind closed doors, and you have no idea what was said?

A    Correct.

Q    Okay.  And you -- Mr. Stranahan, I think you told Mr. Friedberg he was not available the first day and Faye and Julie came back to the bank; is that right?

A    Correct.

Q    Okay.  And when Mrs. Chrisley came in and asked -- Julie

United States District Court

1  Chrisley came in and asked that Faye be added as a signatory,

2  you didn't express to anybody, well, that's weird, did you?

3  You didn't have an opinion on that; right?

4  A   No.  I just asked that we have documents to show the

5  change.

6  Q   Okay.  So there had to be documents to show the change.

7          Now, I think that you -- do you recall telling the

8  Government that it was Mr. Stranahan that drafted the document

9  that made the change?

10 A   He didn't draft the articles.  He -- once he made the

11 change in Interact, the signature card was printed out, but he

12 didn't do the articles.

13 Q   Okay.  But you told them that if they were going to add

14 Faye as a signatory to the account that they needed to bring

15 in articles of incorporation showing a change to allow her to

16 be affiliated some way with 7C's; right?

17 A   Correct.

18 Q   They in fact did bring that to the bank; right?

19 A   Correct.

20 Q   Now, it's true, is it not, that the bank did not retain a

21 copy of either of the documents that was dropped off on May

22 the 7th?

23 A   The articles you mean?

24 Q   Yeah.  It was not in the records of the bank; correct?

25 A   We don't keep those.  We use that information to document

United States District Court

1  things in Interact, that system.

2  Q    I understand.  But you did not keep an actual copy; right?

3  A    No.  We --

4  Q    I'm sorry.

5  A    No.  We use those and then at the end of the day Ben will

6  show them to us to make sure that it's in Interact properly.

7  And then we upload what we need to the signature card and

8  business resolution.  And then once we know it's in there, we

9  shred them.

10 Q    I think that you -- do you remember telling the Government

11 back in 2019 that you never saw a copy of the actual articles

12 of incorporation that were changed?

13 A    I don't remember.

14 Q    Okay.  And you also never saw a copy where they handwrote

15 the change to who the owner was of the company; is that

16 correct?

17 A    That one I would have remembered.  And, no, I never saw

18 that.

19 Q    You never did see it and you don't recall seeing the first

20 one either; right?

21 A    Correct.

22 Q    So you didn't see either of them; right?

23 A    Correct.

24 Q    Bank kept records of neither of them; correct?

25 A    We don't do that.  That's correct.

United States District Court

1  Q   Now, you say that you don't recall Julie Chrisley coming

2  in the next day with the handwritten change; is that right?

3  A   Correct.

4  Q   You were at the -- you were at your post for eight hours

5  straight, is that what you're saying here?

6  A   I do take a lunch.  I do go to the restroom.

7  Q   You took a lunch break, you took a restroom break.  And

8  I'm sure that there are other customer issues that you deal

9  with during the course of the day.  Is that correct?

10 A   That's correct.

11 Q   Did you go back and look at video to confirm that

12 Mrs. Chrisley didn't come in there that day during one of the

13 breaks and times you were absent from your post?

14 A   No, sir, but I only have four or five staff.  And if that

15 would have happened, they would have brought that article to

16 me to show me.

17 Q   Maybe they ought to have.  But they were dealing with

18 Mr. Stranahan; correct?  With regard to this, you directed

19 them to Mr. Stranahan to deal with this; correct?

20 A   Correct.  But if he wasn't there, they would have brought

21 it to me.

22 Q   Well, what if you weren't there and Mr. Stranahan wasn't

23 there, what if they just left it at the bank?  Maybe somebody

24 would have brought it to Mr. Stranahan.

25 A   They would have brought it to me.

1  Q    And what if they didn't?

2  A    Then they would have given it to Mr. Stranahan.  It would

3  have gone somewhere.

4  Q    It would have gone somewhere.

5       But in terms of -- but you don't know whether it went

6  somewhere.  I think you just testified to the fact that the

7  bank didn't retain the record.  They didn't retain the record

8  that Mrs. Chrisley brought the next day.

9  A    Well, even if that document was dropped off, it wouldn't

10 have changed the ownership of the account because --

11 Q    Because the ownership of the account --

12      MR. KREPP:  I'm sorry.  The witness should be able to

13 finish answering.

14      MR. ANULEWICZ:  Absolutely.  I apologize.

15      THE COURT:  I agree.

16      THE WITNESS:  If that article would have been dropped

17 off, it would not have changed ownership because Faye and

18 Mrs. Chrisley both would have been present at the same time,

19 sat down with an individual, changed it in Interact, which

20 then the new signature card and business resolution would have

21 been produced and then they would have had to sign, which none

22 of that was done.

23 Q    You're making a lot of assumptions here.

24      You told me just a minute ago that the owner of the

25 account has not changed in the last five years, the owner of

1  the account is 7C's Productions; correct?

2  A   Correct.

3  Q   You told me that Julie Chrisley has a debit card and has

4  been allowed to use that account for the last five years; is

5  that right?

6  A   You can have a debit card and not be a signer on the

7  account.

8  Q   And you understand that -- I mean, Faye Chrisley is the

9  current signer on the account; correct?

10  A   Correct.

11  Q   And to be a signer of the account, you can be president of

12  the corporation.  She's still the president of the

13  corporation, isn't she?  Or do you know?

14  A   That's what our records show.

15  Q   Your records don't show anything.  It just shows that

16  she's -- does it show -- when you say the owner?

17  A   President.

18  Q   President.  She's the president.

19         And to this day, do you know that Faye Chrisley is

20  the president of 7C's?

21  A   And our documents still show it as of May 2nd.

22  Q   And in the second document that Mr. Krepp showed you, it

23  shows that Faye Chrisley is still the president of 7C's;

24  right?

25  A   Correct.

United States District Court

1    MR. ANULEWICZ:  Give me just one second.

2    THE COURT:  Sure.

3                    **(brief pause)**

4  BY MR. ANULEWICZ:

5  Q    Am I correct -- maybe you misspoke.  But are you saying

6  that you cannot be a signer on the account unless you are the

7  owner of the corporation that is on the account?

8  A    In a corporation, the articles would document who are the

9  president, vice president, whatever it might list; just like

10 the one he showed showed just 100 percent Elizabeth Faye

11 Chrisley.  There was no one else to sign.

12 Q    But you don't have to be the owner of the account to sign

13 it or do you -- I'm sorry, of the company that owns the

14 account, do you?

15 A    You would have to be on the articles showing that you have

16 some sort of ownership of the business.

17 Q    An ownership, president or something else?  You could be

18 the president of the company and not the owner and have a

19 signatory; right?

20 A    You could be the president.

21 Q    You could be an authorized agent of the company and be a

22 signatory; is that right?

23 A    What do you mean by authorized agent?

24 Q    If you're somebody that the corporation authorizes to sign

25 checks, you can do that?

                    United States District Court

1  A    You would have to be --

2  Q    Now, you said initially that when Mr. and Mrs. Chrisley

3  came in -- I'm sorry, when Mrs. Chrisley and Faye Chrisley

4  came in that -- to add Faye as a signer, was it you that told

5  them that they needed to get a corporate resolution adding

6  Faye Chrisley as the owner of the account?

7  A    I recall looking up what we needed.

8  Q    What did you tell them?

9  A    And I told them that we had to have meeting minutes or an

10 updated article of incorporation showing the change of

11 ownership.

12 Q    In order to make Faye Chrisley a signer?

13 A    Yes.

14 Q    And then that's what they brought back; is that correct?

15 A    Yes.

16 Q    In terms of -- I think you answered Mr. Friedberg's

17 question, that you understood that Mrs. Chrisley, Julie

18 Chrisley, was going to California shortly thereafter and was

19 there for about six months; is that right?

20 A    She was going to be there for an extended period of time.

21 Q    Do you know what, if any, projects they had ongoing in

22 Nashville that would have required somebody to be present and

23 sign checks on behalf of the corporation while they were in

24 California?

25 A    I know that they -- the business continued, so they still

United States District Court

1  needed to use that business account.

2  Q   While they were away?

3  A   Uh-huh.

4  Q   And you said you saw Faye Chrisley.  Faye Chrisley was in

5  Nashville while they were away; right?

6  A   Correct.

7          MR. ANULEWICZ:  Thank you.  No further questions.

8          THE WITNESS:  Thank you.

9          MR. ANULEWICZ:  I'm sorry.  One second.

10                       (brief pause)

11         MR. ANULEWICZ:  No further questions, your Honor.

12         THE COURT:  Mr. Griffin, any questions of you?

13         MR. GRIFFIN:  No, your Honor.

14         THE COURT:  All right.  Thank you.

15         Government, any redirect?

16         MR. KREPP:  Yes, just very briefly, your Honor.

17         THE COURT:  Okay.

18         MR. KREPP:  Thank you.

19                  Redirect Examination

20  BY MR. KREPP:

21  Q   Hey, again, Ms. Stone.

22         All right.  So I just wanted to be clear on the

23  chronology here.  Mr. Friedberg asked you about Julie and Faye

24  coming in.  So if I heard you correctly on cross-examination,

25  the first time they came in was actually March 6th, 2017?

1    A    That is correct.

2    Q    All right. And did you personally interact with Julie

3 that day?

4    A    Yes. I was standing at my station there in the lobby and

5 I greeted her.

6    Q    What was her demeanor like that day?

7    A    It was very stern. She's a super nice individual, easy to

8 talk to. And it was all business that day.

9    Q    All business that day?

10    A    Yes.

11    Q    Did it seem to be different than other days you've seen

12 her?

13    A    It did.

14    Q    And you were asked about sort of subsequent events.

15       So what did you tell her -- What happened on March 6?

16 Just walk us through the conversation on March 6?

17    A    So she came in, said we needed to make an ownership

18 change. She wanted to know when and how quickly that could

19 get done. We then went and looked up what we needed. And

20 then I related to her that we needed meeting minutes or an

21 update in the articles and that I wanted her to meet with Ben

22 Stranahan, who took care of my business accounts that were

23 related to preferred rewards, so our larger business accounts.

24 That was his specialty.

25    Q    And then so based upon your recollection, did Ms. Julie

Chrisley come back the next day?

A    She let me know that she could get that updated document,
that wasn't a problem.  And I can't remember if we made an
appointment, but we got in touch with Ben somehow and they
came back the next day.

Q    Both Julie and Elizabeth Faye Chrisley?

A    They both had to be present to be able to do that.  Yes.

Q    Now, you were asked a number of questions about ownership
of accounts, so let's be clear.  The account owner is 7C's;
right?

A    Correct.

Q    But if we look -- if we pull up Government's 103B, I'm
showing you the initial signature card.  We're using a lot of
terminology here.  But what is Julie Chrisley's title right
there?

A    That says owner.

Q    Owner of 7C's; right?

A    Of 7C's Productions, Inc.

Q    Now, you were asked a number of questions on cross about
never saw it or never remember seeing it.  I just want to be
crystal clear on a few things.  Okay.

        The handwritten documents that we saw, the version
with the crossed-out and it had Julie Chrisley's name on it,
is it that you don't remember seeing it or that you never saw
that document?

1  A   That's so unusual.  If that was brought to my bank, I

2  would have seen it.  My team would have brought it to me.

3  It's -- anything that happens inside those four walls is my

4  responsibility.  They would have brought that to me and said,

5  what do we do with this, because it's very unusual.

6  Q   All right.  And are there any records whatsoever that you

7  have reviewed from Bank of America indicating that at any

8  point after March 7, 2017, there was an attempt to change the

9  account back to Julie Chrisley's name?

10  A   No.

11  Q   And do you have any recollection whatsoever of anybody

12  from -- Julie Chrisley coming in on March 7th or March 6th or

13  at any point claiming that the account was compromised?

14  A   No.

15  Q   Do you have any recollection whatsoever of Julie Chrisley

16  coming in -- because you worked there for two months in the

17  Green Hills location afterwards; right?

18  A   Uh-huh.

19  Q   Any recollection whatsoever of Julie Chrisley coming in

20  and saying there had been a mistake and that she actually

21  needed to be added back to the account?

22  A   No.

23          MR. KREPP:  Thank you.  That's all I have.

24          THE COURT:  Any recross, Mr. Anulewicz?

25          MR. ANULEWICZ:  Yes, please, just briefly.

                 United States District Court

Recross-Examination

BY MR. ANULEWICZ:

Q   Just again, to make sure that I understood, you did not see either the first resolution or the second one; correct?

A   The business resolution from the Bank of America?

Q   Right.

A   I asked for the business resolutions because Ben did not get them signed.

Q   And I'm talking about the ones that Julie Chrisley brought in.

A   You're talking about the articles?

Q   Articles, yes.  Thank you.

     You didn't see either of the articles; correct?
That's what you --

A   I do not recall seeing them.

Q   You do not recall.

     Do you remember telling anybody, FBI, anybody, about three years ago that you didn't see either of them?

A   At this point in time, I do not recall.

Q   Okay.  Do you remember a subpoena was sent to Bank of America to produce copies of either the corporate resolutions in this case?  Do you remember whether that was done, whether they produced copies, or they just didn't have them?

A   No.  We had them.  The business resolutions?

Q   No.  The corporate resolutions.

United States District Court

1  A    We don't keep those.

2  Q    You don't keep those.

3        And those are the ones that you were questioned

4  about, the ones that Mrs. Chrisley and Faye Chrisley signed?

5  A    The business resolution is a bank document.  We keep

6  those.  That's a business resolution.

7  Q    You keep the business resolution but not the corporate

8  resolution?

9  A    We don't keep the articles of incorporation; correct.

10 Q    Okay.  You said too -- and you don't remember seeing

11 either of them.  What you just told to Mr. Krepp is you can't

12 remember seeing the first one but certainly the second one

13 would have been brought to you?

14 A    Yes, because it's so unusual.

15 Q    What about the first one, wouldn't that have been brought

16 to you?

17 A    That would have been given to Ben.

18 Q    So Ben gets the first one, but you would get the second

19 one?

20 A    Ben is not in my office every day.  He was --

21       MR. KREPP:  Your Honor --

22 BY MR. ANULEWICZ:

23 Q    Please go ahead, finish your answer.

24 A    His main office was my location, but he traveled from bank

25 to bank.  And so he was probably only in there maybe once a

United States District Court

1  week.

2  Q    I understand.

3  A    And so if it would have been brought in the next day, Ben

4  would not have been there and it would have been brought to me

5  for sure.

6  Q    Do you know whether it would have -- I thought I heard you

7  say earlier it would have gone to you or Ben.

8  A    That's what somebody said, could it have gone to Ben?

9  Sure, it could have gone to Ben.  But I know Ben was not there

10  the next day.

11  Q    But you don't know whether or not anybody at the bank ever

12  got a copy and just didn't give it to you, of a second

13  resolution?

14  A    Highly unlikely.

15  Q    Highly unlikely, but you do not know; is that correct?

16  With certainty, you don't know if somebody got it, put it on

17  somebody's chair, you didn't see it?

18  A    I trust my team.  If it was in my bank, it would have come

19  to me.  I have full confidence in them --

20  Q    Do you know that it was not?

21         MR. KREPP:  Objection, your Honor.  It's asked and

22  answered at this point.

23         THE COURT:  I'll let him ask it one more time.

24         MR. ANULEWICZ:  Thank you.

25         THE WITNESS:  I feel confident that if it walked in

United States District Court

1  my door it would have been brought to me.

2  BY MR. ANULEWICZ:

3  Q   Do you know what a remote capture machine is?

4  A   Yes.

5  Q   Would it be appropriate for a remote capture machine to be

6  sent to somebody who is not on the bank account?

7  A   We send those to, like, the office managers and things

8  like that, so that could happen.

9  Q   Do you know whether or not Mrs. Chrisley had any

10 conversations with Ben Stranahan about the account being

11 compromised?

12 A   I do not know that.

13         MR. ANULEWICZ:  Okay.  Thank you.  No further

14 questions.

15         THE COURT:  All right.  Anyone else on the defense

16 team?  Who else -- Mr. Friedberg?

17         MR. FRIEDBERG:  Nothing further, your Honor.

18         MR. GRIFFIN:  No, your Honor.

19         THE COURT:  And any redirect?

20         All right.  Thank you, ma'am.  You are free to go.

21 Thank you so much.

22         Government, you may call your next witness.

23         MR. KREPP:  Thank you, your Honor.  We're calling

24 Betty Carter.

25         THE COURT:  Good afternoon, ma'am.  Come on up and

                    United States District Court

1   I'll swear you in.  If you would like, you may place your

2   purse on the extra chair over there, wherever the officer is

3   not sitting.

4           If you will -- good afternoon to you.

5           THE WITNESS:  Good afternoon.  How are you?

6           THE COURT:  Fine.  If you'd raise your right hand.

7                           **BETTY CARTER,**

8   **A WITNESS** HEREIN, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED

9   AND TESTIFIED AS FOLLOWS:

10          THE COURT:  If you will take the witness stand,

11  please.  Once you're seated, if you would state your name and

12  then also spell your name for the record.

13          THE WITNESS:  Sure.  Betty Carter.  B-E-T-T-Y.

14  C-A-R-T-E-R.

15                      **Direct Examination**

16  BY MR. KREPP:

17  Q   Good afternoon, Ms. Carter.

18  A   Hi.

19  Q   Can you please tell us how you're employed?

20  A   Yes.  I'm a revenue officer with the Internal Revenue

21  Service.

22  Q   How long have you been a revenue officer?

23  A   About 38 years.

24  Q   Thirty-eight years?

25  A   Yes.

                     United States District Court

1  Q   Can you briefly go through your duties and
2  responsibilities as a revenue officer?
3  A   Yes.  We collect delinquent taxes and delinquent tax
4  returns.
5  Q   So are you part of the IRS criminal investigation
6  division?
7  A   I am not.
8  Q   So you've obviously met Special Agent Kinsler back here;
9  right?
10         So how does your job differ from a special agent like
11 Special Agent Kinsler's?
12 A   We're on the civil side, he's on the criminal side.
13 Q   So you don't carry a gun; is that right?
14 A   No.
15 Q   I'm not asking in your personal life, but just in your
16 line of work.
17 A   Correct.  Yes.
18 Q   Okay.  All right.  Now, is there a particular unit you're
19 assigned to?
20 A   In a specialty unit, yes.
21 Q   And what's the name of that specialty unit?
22 A   Abusive tax and avoidance transactions, ATAT for short.
23 Q   How long have you been in that specific unit?
24 A   Maybe ten years, something like that.
25 Q   And are there -- generally speaking, what does that unit

1  specialize in?

2  A   We -- some of the cases that we work are refund schemes,

3  promoters, high income filers, high income earners, high

4  income non-filers, and public figures.

5  Q   Is there a reason that public figures and high income

6  owners are lumped in there?

7  A   They're just more complex cases.  And we're more

8  specialized, more experienced.

9  Q   Is there more scrutiny within the IRS if somebody's

10 higher -- if they're publicly known?

11 A   We do what's called a sensitive case report on public

12 figures.

13 Q   All right.  Is that common practice when it comes to

14 public figures?

15 A   Yes.

16 Q   All right.  Now, again, generally speaking, how many cases

17 are you assigned at any given time?

18 A   Probably carry an inventory of 35 to 45, something like

19 that.

20 Q   All right.  Are these, generally speaking, again, just

21 taxpayers who are in arrears, who owe money to the IRS; is

22 that right?

23 A   Correct.

24 Q   So if a -- let's talk about the tax collection process.

25 A   Okay.

United States District Court

1  Q    So let's assume just right now -- the filing date is
2  generally April 15 any year; right?
3  A    Correct.
4  Q    If a taxpayer doesn't pay on April 15th, can you go seize
5  their bank accounts on April 16th?
6  A    No.
7  Q    Is there a process in place before you're allowed to go to
8  that level?
9  A    Oh, yes.
10 Q    Can you walk us through the process, the tax collection
11 process, and what steps you have to follow before you're able
12 to go and, let's say, seize a bank account from somebody?
13 A    Sure.  Generally once a return is filed, the tax has to be
14 assessed at the service center; an initial notice will go out
15 to the taxpayer; then there could be a long series of time and
16 notices that go out.  We also have an automated collection
17 system.  Sometimes cases will go there for collection.  If
18 after the tax is still not paid or the returns still aren't
19 filed, they will come out to a collection group.
20 Q    Okay.  And walk us through what happens when it comes out
21 to a collection group.
22 A    Once it gets to a collection group, the cases come in a
23 variety of ways.  They can come in what's called a queue.
24 Various inventory systems are then assigned to us.  Once we
25 get them, we basically do an initial analysis to determine

1  what has taken place at that -- so far, if a lien has been

2  filed, what notices have gone out or have not gone out.

3  Q    All right.  So you mentioned the word "lien".  And we're

4  going to get to that in a second.

5         But generally speaking, are notices sent out to

6  taxpayers before enforcement mechanisms are put in place?

7  A    Absolutely, yes.

8  Q    Let's talk about the enforcement mechanisms you have;

9  okay?

10  A    Okay.

11  Q    Are there taxpayers who despite getting the notices still

12  refuse to pay their taxpayers -- I'm sorry, still won't pay

13  their taxes?

14  A    Yes.

15  Q    All right.  So are there certain enforcement mechanisms

16  you have at your disposal to collect taxes from those

17  taxpayers?

18  A    Yes.

19  Q    You mentioned lien.  What is a lien?

20  A    A lien is a notice that's filed at the courthouse in the

21  county that let's creditors or the public know that there's a

22  tax liability owed to the IRS.

23  Q    All right.  Are you familiar with something known as a

24  levy?

25  A    Yes.

United States District Court

1  Q    What is a levy?

2  A    A levy is like a garnishment on wages or bank accounts,

3  something like that.

4  Q    So just again, if you have a taxpayer who is not paying

5  their money potentially after notice after notice, you,

6  Officer Carter, could go levy a bank account at a certain

7  point?

8  A    At some certain point, yes.

9  Q    At a certain point?

10  A    Yes.

11  Q    Are you familiar with the term "power of attorney"?

12  A    Yes, I am.

13  Q    What is a power of attorney?

14  A    A power of attorney would be someone that the taxpayer has

15  chosen to represent them and step in pretty much their place.

16  They act on the behalf of the taxpayer.

17          MR. KREPP:  Okay.  Just one moment, your Honor.

18          THE COURT:  Sure.

19                         **(brief pause)**

20  BY MR. KREPP:

21  Q    Okay.  So generally, power of attorney, who generally are

22  you dealing with when you're dealing with power of attorney?

23  A    Generally it could be an attorney, a lawyer or a CPA.  It

24  can also be an unenrolled preparer or a family member.  But

25  generally it's a lawyer or a CPA.

1  Q   And it's Certified Public Accountant; is that right?

2  A   Yes.  I'm sorry.

3  Q   No.  It's okay.

4      So as a revenue officer, did you have any involvement

5  with attempting to collect taxes that were owed by Todd and

6  Julie Chrisley?

7  A   Yes, I did.

8  Q   All right.  So my questions are going to be specifically

9  about that; all right?

10 A   Okay.

11 Q   So prior to coming to court today, did you have an

12 opportunity to review any IRS systems related to collections

13 activity against the Chrisleys?

14 A   Yes.

15 Q   What systems did you review?

16 A   We have case history where we keep our case inventory,

17 also our integrated data system that will show returns that

18 are filed, taxes that are due, payments that are made,

19 basically the activity on the money side of the account.

20 Q   Okay.  Understood.

21     All right.  And did you have an opportunity to review

22 all of those systems?

23 A   Yes.

24 Q   Did that help refresh your memory as to events that

25 occurred while you were assigned to the Chrisley case?

1  A   Yes.

2  Q   Were you able to determine from your review whether

3  notices were sent out historically before you were assigned to

4  the case?

5  A   Yes.

6  Q   All right.  Now, we're not going to get too into weeds in

7  some tax terminology, just again at a high level here.

8        Is it fair to say that a common way for a married

9  couple to file their returns would be married filed jointly?

10  A   Yes, it is.

11  Q   So let's say, again just hypothetically, a married filed

12  jointly return is assigned to you at a certain point, meaning

13  that the person -- the couple owes money to the IRS and hasn't

14  paid.  All right.

15        What tools do you have at your disposal if money is

16  found in the husband's name?  I'm sorry.  That was inartfully

17  stated.

18        Let's say you found out there's a bank account

19  holding money that's only held by the husband as opposed to

20  the wife?

21  A   If it's a joint liability and all notices have been sent,

22  then we can levy that account and we would collect from that

23  account because it's in the husband's name and he does have

24  the liability.

25  Q   And same question.  If it's, let's say, a property --

let's say it's a property owned by the wife somewhere.  Okay.
What tools would you have at your disposal to go against that
property if it was a married filed jointly return?

A   If it's married filing jointly, we would of course have
our lien in place.  And then we could enforce our lien by
seizing the property or we could even go to a suit with that.

Q   All right.  Is there a different mechanism in place if
it's returns that are filed married filed separately?  So in
other words, different collections procedures that are in
place?

A   Yes.  I think what you're talking about is if it's --
let's just say he owed -- Mr. Taxpayer owed the money but the
property was in the wife's name.  Then if we could show that
the taxpayer -- Mr. Taxpayer was benefiting from the property,
maybe paying the rent or somehow supporting the property, then
we can go with the nominee or alter ego.

Q   Okay.  So we'll talk about that in a moment.  It's nominee
or alter ego?

A   Right.

Q   But generally speaking, if it's not going to that next
level, are you able to go after the wife's property?

A   No.

Q   So is there a different enforcement mechanism in place,
depending on whether taxpayers elect to file married filed
jointly as opposed to married filed separately?

1   A   Yes.

2   Q   Let's talk about that nominee lien process. Can you

3   explain to me what you mean by that?

4   A   In that situation where the property is owned by -- or is

5   in Mrs. Taxpayer's name but Mr. Taxpayer has the liability and

6   we can show that Mr. Taxpayer does have an interest in the

7   property, he is paying the rent, he's paying the property

8   taxes, he's living in the property, he's benefiting from the

9   property, then what we do is we go through our counsel and

10   request that we get a nominee lien in that situation filed

11   that would give us a security interest in the property.

12   Q   Okay. All right. Now, let's talk about -- back to the

13   Chrisleys.

14         Do you recall the year that you were assigned to the

15   Chrisley case?

16   A   Yes. 2017.

17   Q   Were you the first collections officer -- I'm sorry,

18   revenue officer that was assigned to the case?

19   A   Yes.

20   Q   All right. Did you ask to be assigned to the Chrisley

21   case?

22   A   No.

23   Q   How was it assigned to you?

24   A   Just random case assignment inventory based on, I'm sure,

25   the dollar amount owed and the fact that it was a public

1  figure.

2  Q   But again, you didn't specifically go out and, just to be

3  clear, pick a name out of a hat?

4  A   No.

5  Q   All right.  Were you familiar with the Chrisleys before

6  you were assigned to the case?

7  A   No.

8  Q   Had you ever watched their television show?

9  A   No.

10  Q   Now, have you ever testified before?

11  A   Yes.

12  Q   You have.  All right.  What types of cases have you

13  testified in?

14  A   A bankruptcy case, a suppression hearing last year.

15  There's are some other case related.

16  Q   All right.  So now, you said you took some steps to orient

17  yourself to this before coming to court today; correct?

18  A   Uh-huh.

19  Q   And you looked through an IRS file; is that correct?

20  A   Case history; correct.

21  Q   Case history?

22  A   Yes.

23  Q   Have you maintained that case history as the -- are you

24  the latest collections officer who was assigned to the case?

25  A   The latest collection person I believe so, yes.

1  Q   Did the -- the collection file, did it appear to be -- is

2  it kept in the ordinary course of IRS's -- let me rephrase

3  that.  I apologize.

4          The collection file you reviewed, is it kept and

5  maintained in the ordinary course of IRS's business?

6  A   Yes.

7  Q   All right.  So from your review of the IRS collection

8  file, were certain notices mailed out to the Chrisleys before

9  your involvement in the case?

10  A   Yes.

11  Q   All right.  And I want to take this in different time

12  chunks.  Okay?

13  A   Okay.

14  Q   Tell me whether or not you know that Mr. Chrisley declared

15  bankruptcy at a certain point.

16  A   I did know that, yes.

17  Q   What impact -- when somebody declares bankruptcy, what

18  impact does that have on IRS collection procedures?

19  A   For the person that files bankruptcy, there's a stay of

20  collection.  We can't take any collection actions during the

21  time that they're in bankruptcy.

22  Q   Is that standard?

23  A   Yes.

24  Q   So it's not just for the Chrisleys?

25  A   No.

United States District Court

1  Q    During the period that Mr. Chrisley was in bankruptcy,

2  what was happening with IRS collections?

3  A    Well, since Mrs. Chrisley did not file bankruptcy,

4  collection action can continue with her.  She still would be

5  responsible for the taxes.  But for him, it's coded in a

6  bankruptcy status and no collection action can take place.

7  Q    So let's talk about things that happened before the

8  bankruptcy and after.  All right.  Again, the file that you

9  reviewed, it's maintained in the ordinary course of business.

10 You have the binder in front of you.  I'm going to read these

11 off.

12       MR. KREPP:  And your Honor, if the court -- I gave

13 this to the courtroom deputy.  I have an extra copy if this

14 would help.

15       THE COURT:  Either way.  Honestly, I didn't find it

16 to be that helpful last time.  I'm just keeping record up here

17 on the list that you've given me like this, the grid.  Thank

18 you.

19       MR. KREPP:  Sure.

20    (Government's Exhibits 60, 64, 68, 69, 74, 83, 85 and 91

21 were marked for purposes of identification.)

22 BY MR. KREPP:

23 Q    So we'll be referring to Government's Exhibits 60, 64, 68,

24 69, 74, 83, 85, and 91.

25                      (brief pause)

                 United States District Court

BY MR. KREPP:

Q   Okay.  So have you had an opportunity to look at those documents I just read out?

A   Yes.

Q   All right.  What can you tell me about those documents?

A   These are all general publications that we sent out just about on any collection letter or notice that would go out.

Q   All right.  And from your review of the case file from the -- that's maintained in the ordinary course of business, what can you tell me about the specific Government's exhibit numbers that I listed out here?  Can you tell me -- again, we're talking about the Chrisleys here.

A   Right.  So Exhibit 60, Exhibit 64, and Exhibit 66 are pubs that I personally sent out.

Q   And from your review of the -- again, we're talking about the historical file?

A   Right.

Q   So let's focus on 60, 64 -- and it should be in order in your binder. -- 68 -- 69 should be in there.  If you don't have it, let me know.  It may be paper clipped to the back of 68.

A   You said 69; right?

Q   Yes.

A   Thank you.

Q   Then following from 69, we're on to 74, 83, 85, and 91.

United States District Court

588

1  A    Okay.

2  Q    Okay.  Now, before coming to court today, did you have an

3  opportunity to review -- again, going back to that collections

4  file that's maintained in the ordinary course of business, did

5  you have an opportunity to review that?

6  A    Yes.

7  Q    What can you tell me about the exhibit numbers that I just

8  read out?

9  A    All of those were sent in that case history.

10  Q    Sent to who?

11  A    To the Chrisleys.

12  Q    All right.  And were they sent before the bankruptcy

13  action?

14  A    Yes.

15        MR. KREPP:  All right.  Your Honor, I'm going to move

16  for the admission of Government's Exhibits six -- I'm sorry.

17  I'll complete the foundation.

18  BY MR. KREPP:

19  Q    These are -- to be clear, these are -- the versions I just

20  sent you, are these just templates of the letters that would

21  have been mailed out?

22  A    The letters, yes.

23  Q    So they don't have "Dear Michael Todd Chrisley" written on

24  there?

25  A    No.

United States District CourtUnited States District Court

1  Q   These are available?  You can pull these off the IRS

2  website right now; is that right?

3  A   Yes.

4       MR. KREPP:  Your Honor, I move for the admission of

5  Government's Exhibits 60, 64, 68, 69, 74, 83, 85 and 91.

6       THE COURT:  Mr. Morris?

7       MR. MORRIS:  No objection, your Honor.

8       THE COURT:  Mr. Friedberg?

9       MR. FRIEDBERG:  No objection, your Honor.

10      THE COURT:  And Mr. Griffin?

11      MR. GRIFFIN:  No objection.

12      THE COURT:  They're all admitted, 60, 64, 68, 69, 74,

13  83, 85 and 91.

14      **(Government's Exhibits 60, 64, 68, 69, 74, 83, 85, and 91**

15  **were admitted into evidence.)**

16  BY MR. KREPP:

17  Q   All right.  So we're going to take these a few at a time.

18      MR. KREPP:  If we could please pull up Number 60.

19  BY MR. KREPP:

20  Q   All right.  So is this an IRS publication Number 1?

21  A   Yes, it is.

22  Q   All right.  And there's different versions of this; is

23  that fair to say, that IRS changes these every so often?

24  A   True.  Yes.

25  Q   All right.  So is this the version that would have been

                    United States District Court

1  mailed out pre-bankruptcy to the Chrisleys?

2  A    Yes.

3  Q    So just -- we're not going to read through the entire

4  document.  But what is Publication Number 1 telling the

5  taxpayer?

6  A    It gives him his rights as a taxpayer.

7  Q    Have you confirmed this was mailed out?

8  A    Yes.

9  Q    All right.  Now, let's go to the next exhibit, which is

10  Number 64.  All right.  Now, this is a 12-page document.  And

11  again, I'll ask you the same question.  Can you tell me

12  whether or not this was mailed out to the Chrisleys?

13  A    Yes, it was.

14  Q    And pre-bankruptcy?

15  A    Yes.

16  Q    And is this -- what is this Government's exhibit showing?

17  We're not going to read all 12 pages, but just tell the jury,

18  if you can summarize, what this document is.

19  A    It goes over collection process.  It talks about our right

20  to file a lien, how we can levy.  It also talks about appeal

21  rights.  So it's just a general synopsis of the collection

22  process.

23  Q    All right.  And now let's go to 68, please.

24        All right.  What is this document walking the

25  taxpayer through?

1  A   This is how to apply for a certificate of discharge from

2 the federal tax lien.

3  Q   What does that mean?

4  A   A discharge of a lien is when you own property and you

5 want to sell it and there's not enough equity in the property

6 to pay off the lien. So to get the buyer a clear title, you

7 can apply to discharge our lien from the taxes, even though

8 it's not going to pay off the full taxes.

9  Q   Okay. All right. So when somebody is trying to sell

10 property, all right, subject to a tax lien, have you had that

11 come up in some of your cases?

12  A   Oh, yes.

13  Q   Is that a frequent occurrence?

14  A   Oh, yes.

15  Q   Generally speaking, what does the buyer require when

16 there's a tax lien filed by the IRS?

17  A   Well, they want clear title or they want lien release

18 satisfied.

19  Q   Why is that important to the buyer?

20  A   Because they won't have clear title. The lien will follow

21 the property.

22  Q   So Bob has a tax debt and he's trying to sell the property

23 to Sam. Right. If the property has an IRS tax lien that you,

24 Officer Carter, put in place, Sam would in essence be

25 inheriting that lien?

1   A    That's correct.

2   Q    Normally people don't want that; right?

3   A    No.

4          MR. KREPP:  All right.  So now if we can pull up

5   Number 69.

6   BY MR. KREPP:

7   Q    So again, is this just another instruction on how to -- a

8   certificate of release of federal tax lien?

9   A    Yes.

10  Q    All these documents I've been showing you, can you tell me

11  whether or not they were mailed out to the Chrisleys before

12  Mr. Chrisley filed for bankruptcy?

13  A    They were, yes.

14  Q    Let's go to Government's 74.  All right.  Again, another

15  lengthy document.  Is this document entitled Collection of

16  Appeal Rights?

17  A    Uh-huh.

18  Q    And what is this document explaining to the taxpayer?

19  A    It explains the many different appeals that you have in

20  the collection process.

21  Q    Okay.  And are there certain appeal rights that taxpayers

22  have?

23  A    Yes.

24  Q    Again, was this sent out to the taxpayer?

25  A    Yes.

1  Q   So now -- we won't go through the rest of them.  But all

2  the exhibit numbers that I read out, were they mailed to the

3  Chrisleys and/or their power of attorney before Mr. Chrisley

4  filed for bankruptcy?

5  A   Yes.

6  Q   Now, was collections, as you said, was it stayed at a

7  certain point against Mr. Chrisley?

8  A   Yes.

9  Q   From your review of the IRS record, just approximately

10  when did collections activity against Mr. Chrisley resume?

11  A   I believe he was out of bankruptcy the first part of 2016.

12  It would have been shortly after that.

13  Q   So sometime in 2016?

14  A   Yes.

15     **(Government's Exhibits 46 through 48 were marked for**

16  **purposes of identification.)**

17  BY MR. KREPP:

18  Q   All right.  So from your review of the IRS case file --

19  and I'll direct you to the next set of exhibits, which are 46,

20  47 and 48.  If you don't have them, let me know.

21  A   I've got them.

22  Q   Okay.  Do you recognize -- let me know when you're done

23  looking at them if you recognize those documents.

24  A   Yes.

25  Q   What are 46, 47 and 48?

1    A    These are all tax liens that were filed.

2    Q    Against who?  And we can take them one at a time.  Start

3    with 46.

4    A    46 is against Michael T. Chrisley.

5    Q    Okay.  47?

6    A    Michael and Julie Chrisley.

7    Q    And then 48?

8    A    Michael Chrisley, Michael T. Chrisley.

9              MR. KREPP:  Move for the admission of Government's

10   Exhibits 46, 47 and 48.

11             THE COURT:  Mr. Morris?

12             MR. MORRIS:  No objection.

13             THE COURT:  Mr. Friedberg?

14             MR. FRIEDBERG:  No objection.

15             THE COURT:  Mr. Griffin?

16             MR. GRIFFIN:  No objection.

17             THE COURT:  Those three are admitted.

18      **(Government's Exhibits 46 through 48 were admitted into**

19   **evidence.)**

20             MR. KREPP:  If we can please publish 46.

21   BY MR. KREPP:

22   Q    Okay.  So now, this is the one -- this is Government's 46.

23   And if you look at the screen in front of you, just so we're

24   all reading from the same document, this is one that was filed

25   against Mr. Chrisley; is that correct?

                    United States District Court

1   A   Yes.

2   Q   What's the unpaid balance for the 2009 tax year?

3   A   $507,315.97.

4   Q   All right.  And for the 2010 tax year?

5   A   $1,654.26.

6   Q   And 2011?

7   A   $52,227.57.

8   Q   And to be clear, you didn't file this particular lien?

9   A   I did not.

10  Q   But have you confirmed this was actually a lien that was

11  filed from your review of the records regularly kept?

12  A   Yes.

13  Q   All right.  Now, if we look at the top right-hand corner,

14  there's a recording date of the lien; is that correct?

15  A   Yes.

16  Q   What's the recording date?

17  A   August 1st of 2016.

18  Q   All right.  So did Mr. Chrisley still owe this money --

19  let's focus on the 2009 tax year.  Did he still owe that money

20  as of August 1st, 2016?

21  A   Yes, he did.

22  Q   What notices would have been sent out to Mr. Chrisley

23  about this tax lien that was filed?

24  A   All of the notices that we talked about would have been

25  sent out.

1  Q   There's -- so for court purposes, there's some redactions
2  here on the screen and in front of you.  But there's a
3  residence.  Is that property that the lien was attached
4  against in Alpharetta, Georgia?
5  A   It would have been -- this lien would not be property
6  specific.  It would be any property that he owned in Fulton
7  County.
8  Q   So it's a county wide, anything owned?
9  A   Yes.
10 Q   But it's designating his taxpayer address as being in
11 Alpharetta, Georgia?
12 A   Correct.
13 Q   Now let's go to 47.  So there's one for Michael and Julie
14 Chrisley; correct?
15 A   Yes.
16 Q   And it's for 2012?
17 A   Correct.
18 Q   Saying they owed slightly over $29,000?
19 A   Yes.
20 Q   And if we look in the upper right-hand corner again,
21 August 1st, 2016; correct?
22 A   Yes.
23 Q   All right.  So was this money that was owed as of that
24 date?
25 A   Yes.

United States District Court

1  Q   All right.  And again, do we see -- is it for all property

2  in Fulton County because it lists Alpharetta, Georgia?

3  A   Yes.

4  Q   All right.  Finally, let's go to 48.  All right.  So is

5  this -- this is, again, against just Mr. Chrisley; is that

6  correct?

7  A   Correct.

8  Q   This is for Seneca, South Carolina?

9  A   Correct.

10 Q   So what's the difference between this document that we're

11 seeing here -- because the numbers are the same; correct,

12 2009, 2010, 2011?  So what's the difference between this

13 document and the prior one that we saw, Government's 46?

14 A   This particular lien would attach for any property that he

15 owns in the county, Oconee County.

16 Q   Gotcha.

17      **(Government's Exhibit 521 was marked for purposes of**

18 **identification.)**

19 BY MR. KREPP:

20 Q   All right.  If we move forward in your packet there,

21 Government's Exhibit 521, do you recognize this document?

22 A   I'm trying to get to it.

23 Q   Sure.  You can have my copy.

24 A   Thank you.

25 Q   Do you recognize that document?
                    United States District Court

1    A    Yes.

2    Q    What is that document?

3    A    It's a notice of federal tax lien.

4    Q    Is it a similar version to the one we just saw?

5    A    Correct.

6          MR. KREPP:  All right.  Move for the admission of

7    Government's Exhibit 521.

8          THE COURT:  Any objection, Mr. Morris?

9          MR. MORRIS:  What was it?  I'm sorry.

10         MR. KREPP:  521.

11         MR. MORRIS:  No objection.

12         THE COURT:  Mr. Friedberg?

13         MR. FRIEDBERG:  No objection.

14         THE COURT:  Mr. Griffin?

15         MR. GRIFFIN:  No objection.

16         THE COURT:  521 is in.

17    **(Government's Exhibit 521 was admitted into evidence.)**

18    BY MR. KREPP:

19    Q    Okay.  Now, so again, this is just another version in

20    these.

21         MR. KREPP:  Is 521 available?  Can you pull that up,

22    please.  Thanks a lot, Ms. Dyer.

23    BY MR. KREPP:

24    Q    So again, is this another -- just how it would actually

25    be -- look if you were going to the county courthouse?

                    United States District Court

1  A    Yes.  This is actually a copy from the county.

2  Q    Gotcha.

3       And that's not your name on the bottom, obviously?

4  A    Right.

5  Q    You weren't the revenue officer at the time?

6  A    No.

7  Q    So now, were any notices sent -- did you review the case

8  file to see if any notices were sent to the Chrisleys or their

9  power of attorney in 2016 after bankruptcy, so after the

10 discharge of bankruptcy, but before you were assigned to the

11 case?

12 A    Yes.

13      **(Government's Exhibits 63, 66, 76, 88, 89, 90 and 92**

14 **what's marked for purposes of identification.)**

15 BY MR. KREPP:

16 Q    So let's look at Government's 63, 66, 76, 88, 89, 90, and

17 92.

18      MR. KREPP:  And Mr. Griffin, I'll come back to you.

19                **(brief pause)**

20 BY MR. KREPP:

21 Q    Okay.  So what can you tell me about the exhibit numbers I

22 just read out?

23 A    These are publications, probably later versions of

24 publications of -- that we've already talked about.

25 Q    With respect to this case, what can you tell me from your

                United States District Court

1  review of the collections file?

2  A    These were all sent.

3  Q    Were they sent to the Chrisleys or their power of

4  attorney?

5  A    Yes.

6        MR. KREPP:  Your Honor, I'm moving for the admission

7  of Government's Exhibits 63, 66, 76, 88, 89, 90, and 92.

8        THE COURT:  Mr. Morris?

9        MR. MORRIS:  No objection.

10       THE COURT:  Mr. Friedberg?

11       MR. FRIEDBERG:  No objection, your Honor.

12       THE COURT:  Mr. Griffin?

13       MR. GRIFFIN:  No objection.

14       THE COURT:  All of those are admitted.

15    **(Government's Exhibits 63, 66, 76, 88, 89, 90 and 92 were**

16 **admitted into evidence.)**

17 BY MR. KREPP:

18 Q    So let's just pull up 63.  And I promise we're not going

19 to go through all of these, Ms. Carter.  Looks like the IRS

20 updated this publication Number 1; is that right?  So it's a

21 different version that was mailed out to the Chrisleys?

22 A    (Nods head.)

23 Q    All right.  Let's skip ahead to Government's Exhibit 88.

24 So again, this is just a form letter; correct?

25 A    Yes.

                    United States District Court

1 Q   But would the taxpayer's name be listed on there when it

2 gets mailed out?

3 A   Yes.

4 Q   Have you been able to confirm from your review of the

5 collections history if this form was specifically sent out to

6 the Chrisleys?

7 A   Yes, it was.

8 Q   I'm going to read this.  And let me know if I read this

9 correctly.

10        "Dear", blank, "We are attempting to collect unpaid

11 taxes from you.  You should already be aware of this from our

12 previous contacts with you.  Generally our practice is to deal

13 directly with the taxpayer or taxpayer's duly authorized

14 representative.  However, we sometimes talk with other

15 persons, for example, when we need information that a taxpayer

16 has been unable to provide or to verify information we have

17 received.  We are writing to tell you that we may contact

18 other persons.  If we do contact other persons, we would

19 generally need to tell them limited information, such as your

20 name.  The law prohibits us from disclosing any more

21 information than is necessary to obtain or verify the

22 information we are seeking.  Our need to contact other persons

23 may continue as long as there is activity on this matter.  If

24 you have any questions regarding this letter or wish to

25 request a list of contacts, please do not hesitate to contact

1  us at the telephone number listed above."

2        Did I read that correctly.

3  A    Yes.

4  Q    So is this essentially telling the taxpayer that the IRS

5  is trying to collect tax debts?

6  A    Right.  Yes.

7  Q    All right.  And then if we go to Government's Exhibit 89,

8  the date at the top is May 11th, but that's just when the form

9  was printed out; is that right?

10  A    Yes.

11  Q    May 11th, 2022.

12        Is this the version that would have been Sent out to

13  the Chrisleys?

14  A    Yes.

15  Q    I'll just read the first paragraph.

16        "Dear" blank, "Although we previously sent you a

17  notice of our intention to collect your unpaid tax through

18  enforce collection, our record show that you still have not

19  paid the amount you owe.  Enforce collection may include

20  placing a levy on your bank account, wages, receivables,

21  commissions, et cetera.  It could also involve seizing and

22  selling your property, such as real estate, vehicles or

23  business assets.  To prevent collection action, please pay the

24  amount you owe by" -- and then would there be a date filled in

25  there?

1  A    Yes.

2  Q    Again, was this mailed out to the Chrisleys?

3  A    Yes, it was.

4  Q    All right.  So now let's talk about your involvement in

5  the case.

6         Approximately when in 2017 were you assigned to the

7  Chrisley case?

8  A    Mid February of '17 is when I got it.

9  Q    And what were your initial steps when you were assigned to

10 the case?

11 A    Usually I will make an initial analysis and just go

12 through the case history.  I'll pull all the copies of the

13 liens.  I'll look to see what tax returns have been filed or

14 have not been filed, check internal income information, that

15 type of thing.

16 Q    What did your initial analysis reveal?

17 A    That he owed these years that we've talked about, 2009,

18 married filing separate, the other two, married filing joint;

19 that he had filed bankruptcy; that all the liens had been

20 filed in many different counties.  Also looked at the prior

21 case history and saw there was a lot of involvement with other

22 revenue officers.

23 Q    Okay.  All right.  What about recent tax filings for prior

24 tax years?  So you're in early 2017 now; right?

25         Did you review whether or not they were current on

                 United States District Court

1  paying any recent taxes?

2  A    Yes.

3  Q    What did your analysis reveal?

4  A    They were not current.

5  Q    Can you be a little more specific?

6  A    I think the last return filed when I reviewed the case was

7  2012.

8  Q    So no personal income tax returns for Michael Chrisley for

9  '13, '14, '15?

10  A    And '16 was almost due.

11  Q    Almost due.  But as of that point, though -- it wasn't

12  quite due.  But at that point --

13  A    Right.

14  Q    -- '14 and '15 haven't been filed; right?

15  A    Or Mrs. Chrisley.

16  Q    Or for Julie Chrisley?

17  A    Right.

18  Q    During your analysis, did you come across the a company

19  named 7C's Productions?

20  A    Yes.

21  Q    Did your analysis review whether or not any corporate

22  returns had been filed for that entity?

23  A    I believe the last corporate return filed was 2015.

24  Q    So we'll talk about that a little bit later on.

25           THE COURT:  Mr. Krepp, give me an idea of whether or
                      United States District Court

 1  not you have a lot more for this witness.

 2          MR. KREPP:  Sure.  It's going to be a lengthy

 3  witness, your Honor.

 4          THE COURT:  Okay.  I'm inclined to stop for the day

 5  just to get the jurors out a little bit before 5.

 6          MR. KREPP:  Sure.

 7          THE COURT:  Ladies and gentlemen -- and I'm sorry,

 8  you're going to have to come back tomorrow.

 9          Ladies and gentlemen, I'm going to go ahead and

10  dismiss this witness.  And so if you want to hold her off just

11  for a few minutes until we finish.

12          I'm going to dismiss you today just because we've

13  been going for a while today with the openings.  But tomorrow

14  I need you here by 9:15.  We're not going to do 9:45 anymore.

15  9:15 so that we can go ahead and get started no later than

16  9:30.  Please be on time.

17          Thank you so much.  Have a great evening.

18          Ladies and gentlemen, before you go, you got a feel

19  for this first day.  As you see, trial is not like you may

20  think from watching television shows.  It's not all fireworks

21  and excitement.  So I encourage you to get your rest, to be

22  prepared to stay awake, to be prepared to just sit and listen.

23  There are a lot of documents in this case.  And so we need

24  your concentration.  We need you to stay awake and alert.  So

25  just keep all of that in mind.

                    United States District Court

1    Thank you so much and have a safe evening.

2    **(The jury exited the courtroom at 4:50 p.m., after**

3 **which the following proceedings were had.)**

4    THE COURT:  Ms. Farrens, you have a doctor's

5 appointment Thursday at 10?

6    JUROR FARRENS:  Yes, ma'am.

7    THE COURT:  I meant to tell everyone that what we'll

8 probably do that day is not start until noon.  Because do you

9 think you would be here by then based on how your other

10 appointments have gone?

11    JUROR FARRENS:  I will call them and see if I can get

12 it pushed up a little earlier.

13    THE COURT:  That would be great.  But we're going to

14 work around it.  Thank you so much.

15    JUROR FARRENS:  Thank you.

16    THE COURT:  I need to remember to tell the rest of

17 them that tomorrow.

18    You may step down, ma'am.

19    Everybody in the courtroom may be at ease, may be

20 seated or whatever.

21    Lawyers, let me have you here for one second because

22 I want to talk to you just a little further about the stuff

23 that caused -- I will say that caused a lot of confusion

24 earlier, the stipulation.  And for any confusion that I might

25 have caused, I apologize.

1           I want to talk briefly about the stipulation
2   regarding authenticity.  A couple of times when we were going
3   back and forth, I asked for any objections from the defense
4   beyond authenticity, since my understanding was that
5   authenticity had been agreed to.  At one point I heard
6   hearsay.  Another point I heard no personal knowledge.  It
7   wasn't until the last time we talked up here that I heard
8   Federal Rule of Evidence 602 cited, which does go -- which it
9   does involve personal knowledge.

10          But I guess when we first heard the witness doesn't
11  have personal knowledge, I kind of took it to mean in the
12  creation of the document.  So there are two areas of personal
13  knowledge I would say.  One is personal knowledge in how the
14  document came to be, and second, personal knowledge as far as
15  the actual contents or subject matter.

16          And I get I vacillated in my understanding.  I
17  sustained an objection that was made with respect to a witness
18  Ms. Peters had.  I don't even remember who or what.  But I
19  think it was an e-mail chain where I thought the only
20  objection -- I thought the objection was to whether the
21  witness had personal knowledge of the subject matter.  Later
22  when Mr. Krepp had a witness, my understanding was that that
23  witness did have personal knowledge of the subject matter
24  because it went to whether or not Mrs. Chrisley had gone into
25  a bank on a particular day.  I hope all of that is not

1 confusing.

2       But this is what I'm going to say:  I'm not privy to

3 what is in each e-mail.  I did ask for a synopsis on a couple

4 of them; but remember, I don't know the contents.

5       So going forward, this is my assumption:  When the

6 objection is no personal knowledge by the witness on the

7 stand, we're not talking about the creation of the document

8 because you-all have agreed to authenticity, we are

9 referencing the subject matter.

10       First of all, from the defense, is that a correct

11 assumption?  Mr. Morris.

12       MR. MORRIS:  On every document that we have seen and

13 agreed to the authenticity, that is correct.

14       THE COURT:  That is.

15       Okay.  Anything different from you, Mr. Friedberg?

16       MR. FRIEDBERG:  No, your Honor.

17       THE COURT:  Mr. Griffin?

18       MR. GRIFFIN:  I understand.

19       THE COURT:  All right.  So Mr. Krepp, if that is --

20 if I'm correct, they're not objecting at all to authenticity

21 as far as the creation and having someone come in who can

22 actually testify this was the document created under these

23 circumstances, they are objecting to having a witness testify

24 about the actual subject matter with -- or the contents,

25 whatever is being explained within the document.

1        What say you with respect to whether or not a witness

2   who does not have that personal knowledge should be able to

3   answer questions about it?

4        MR. KREPP:  One moment, your Honor.

5        THE COURT:  Sure.

6                      **(brief pause)**

7        MR. MORRIS:  He needs to talk to his lawyer.

8        THE COURT:  That's a smart thing to do.

9                      **(brief pause)**

10        MR. KREPP:  Your Honor, just a couple of points.  I

11   think it's an overarching principle.  The Government's view is

12   that -- I think we disagree with the defense on this, that

13   once a document is admitted, it properly can be published to

14   the jury through any witness and we can ask questions about

15   it.

16        But putting that aside, let me just talk about what

17   we intended to do today.

18        THE COURT:  Before you go there, let me ask you to

19   reconcile what you just said with Rule 602, which says, a

20   witness may testify to a matter only if evidence is introduced

21   sufficient to support a finding that the witness has personal

22   knowledge of the matter.  Evidence to prove personal knowledge

23   may consist of the witness's own testimony.  And the last

24   sentence says, this doesn't apply to a witness's expert

25   testimony.  But that's Rule 602.

1        So how do you reconcile that statement that seems to

2   suggest that notwithstanding authenticity in terms of the

3   circumstances of how the document was created, a witness still

4   needs personal knowledge to testify about it?

5        MR. KREPP:  Sure.  I think that the -- we are not

6   trying to get the witness, in any of our questions, to confirm

7   the actual events that are in the e-mail itself, so -- let me

8   take a step back.  We're not having the witness testify as to

9   those specific events, so I don't think 602 is the right

10  framework for this.  It would be different if I said -- if I

11  had the witness on the stand and was trying to get a witness

12  who had no personal knowledge of it whatsoever and was just

13  using it just to sort of PowerPoint it for the jury.

14       Here our questions are:  Did the events on here occur

15  or did they not occur?  So again, with the way we're trying to

16  reconcile these exhibits is, a lot of our witnesses -- for

17  instance, Ms. Carter, we plan on showing her bank records and

18  plan on showing her records she wasn't privy to during the

19  collections -- she's not in the courtroom is she? -- during

20  the collections enforcement activity.  And part of the

21  Government's burden is to prove that the defendants were

22  attempting to impede that collection enforcement activity.  So

23  showing her records that were hidden from her --

24       THE COURT:  Well, bank records, would those not be

25  excepted by the business record exception?  I guess we're

United States District Court

1  talking about e-mails.

2      MR. KREPP:  Even e-mails, your Honor, e-mails between

3  Mr. Tarantino and the Chrisleys, we plan on showing internal

4  e-mails that we got from either the e-mail search warrant or

5  from the grand jury subpoena.

6      Authenticity issue, that ship has sailed.  We're done

7  on that.

8      So now the question is:  Did officer Carter know that

9  Mr. Tarantino was having these types of conversations with the

10  Chrisleys.  I think the answer to that is highly probative as

11  to whether or not the Government can demonstrate willfulness,

12  whether or not the Government can meet its materiality

13  standard.

14      THE COURT:  So it sounds like you are making a

15  general knowledge argument that just knowledge generally of

16  whatever scheme, for lack of a better description,

17  characterization that you're alleging that the Chrisleys were

18  involved in, not necessarily -- I mean, is that fair to --

19      MR. KREPP:  I think the way I would equate it, your

20  Honor, is imagine a Ponzi scheme victim and the victim being

21  shown e-mails between the two perpetrators jokingly saying I

22  can't believe we're pulling this off.  We have to prove

23  materiality in a wire fraud case.  And I'd like to be able to

24  ask the victim, would you have wanted to know that these guys

25  were laughing about taking your money.  So that witness would

1  not have personal knowledge as to that e-mail.

2         THE COURT:  And I don't think you could get that

3  e-mail through them.

4         MR. KREPP:  Well, I think if authenticity was

5  stipulated to, that's where --

6         THE COURT:  I don't -- maybe that's not a good

7  example.  I don't think you could get that through them,

8  notwithstanding authenticity.

9         Let me hear from the defense.  Mr. Morris.

10         MR. MORRIS:  With the greatest respect, I think

11  Mr. Krepp is confusing authenticity with relevance and

12  admissibility.  It can be objectionable for any number of

13  reasons -- it contains hearsay, the witness has no personal

14  knowledge of it, lots of reasons.  I'm not doubting that it's

15  an e-mail, but it may contain a whole bunch of hearsay in

16  there that this witness can't be asked about.  Just because

17  it's an authentic document, that doesn't mean a witness can

18  testify about it.

19         THE COURT:  Well, I think all of us are in agreement

20  with respect to hearsay.  I guess I was honing in on the

21  personal knowledge one, because that seems to be where we're

22  getting hung up.  Mr. Krepp is arguing, it sounds like,

23  basically just general knowledge of the things that were going

24  on with this whole thing with respect to whatever the

25  Chrisleys allegedly were involved in, they have knowledge in

1   that sense.  I don't know that we're talking about hearsay

2   right now.  We're talking specifically, I think, about the

3   objection as to personal knowledge under Federal Rule of

4   Evidence 602.

5           MR. MORRIS:  I agree.  That's when I raised the 602.

6   I just said there are other objections I might also have.  I

7   agree on 602, absolutely.  The witness knows nothing about it.

8           THE COURT:  Knows nothing about what, though?  I

9   guess it depends on how specific we're talking about when

10  we're describing the subject matter of the e-mails.

11          MR. MORRIS:  The document.

12          THE COURT:  Well, that -- see, the existence of the

13  document, to me that still falls under authenticity.  So

14  that -- just whether it exists our how it was created.  I

15  think 602 goes to the subject matter of the e-mail not just

16  the existence of or the creation of the document.

17          MR. MORRIS:  I would agree.  That's -- assume there

18  are three things, the creation of it, the existence of it, and

19  what it means.  I agree, all three have to be met.  And to ask

20  a witness who knows nothing about it seems to me inappropriate

21  because the witness doesn't know anything.  Again, I gave a

22  bad example of asking my wife about a tax return that she's

23  never seen before and has no idea.

24          THE COURT:  I'm sorry.  Mr. Morris, we're saying --

25  but you're saying she doesn't know because she's never seen

1   that document?  Is that what you're saying in your example?

2          MR. MORRIS:  She may have never seen the document and

3   she may not know anything about the subject matter.

4          THE COURT:  But those are two distinct things, and

5   one of which you stipulated to.  So we're not talking about

6   that one anymore.

7          MR. MORRIS:  I understand the Court.  But to ask a

8   person are you aware of the substance of this document and

9   have them say no, it's just not probative and it's not

10  appropriate.  They don't know anything about it.

11         THE COURT:  Okay.  Mr. Griffin, you were going to say

12  something.

13         MR. GRIFFIN:  My concern, because it will affect us

14  eventually, is that we can use one witness and just get in all

15  the Government's documents.  We did stipulate to authenticity.

16  But the way I'm hearing this argument is, like, no, this

17  witness knows nothing about this e-mail, but let me show you

18  and wouldn't you have liked to have known that.  And nobody is

19  testifying as to what has happened here.

20         If it's a summary witness, it's different.  Right.

21  You can get a lot in through a summary witness.

22         But I fear that Ms. Carter is going to be talking

23  about things she knew nothing about when she was investigating

24  and working on this case.  I think that's what I'm hearing.

25         THE COURT:  And see, that's my fear.  In one of the
                    United States District Court

1 instances, one of the last ones we talked about, my
2 understanding, my limited understanding based on my limited
3 knowledge of what was in the e-mail, was that the witness knew
4 just enough to say whether or not someone had come into the
5 bank on a particular day.

6 But I guess I'm trying to rule here based on really
7 not having full knowledge of what's in these e-mails and
8 whether or not the witnesses are aware of them. And I don't
9 want to just allow everything in just because there's this
10 stipulation out there. I need to do more of an analysis of
11 whether the witness has personal knowledge of the specifics of
12 what's being discussed in the e-mail. And that's what's --
13 what I don't know enough about these e-mails to know.

14 MR. GRIFFIN: And what I thought was happening with
15 Ms. Stone was it was just this one little thing that the
16 Government was trying to connect. Right. And now, I'm
17 hearing, well, there's going to be a lot of things that are
18 going to come in.

19 THE COURT: I'm sorry to cut you off. I guess that's
20 my concern here, Mr. Krepp. To me it sounds like you are just
21 saying that because of the authenticity stipulation any of
22 these documents -- any witness can be asked about any of them
23 and they don't have to know anything about the specifics of
24 what happened because they just generally know what the
25 Chrisleys allegedly were involved in. And I think that is

1   far-reaching.

2          MS. PETERS:  I mean, your Honor, we would agree.  I

3   don't think it would be appropriate for us to put, you know,

4   any e-mail necessarily in this case in front of any witness.

5   There's got to be some sort of connection.

6          We understand Rule 602 and the Court's concerns about

7   it.  I think -- it seems easy to get sort of over-technical

8   about Rule 602.

9          In this case I think what Mr. Krepp was trying to do

10  was ask questions of Ms. Stone that were within her personal

11  knowledge, which is, does she know whether or not something

12  happened.  And she did have personal knowledge about whether

13  or not an event happened.

14         The charge in this case that's relevant to what her

15  testimony was was the obstruction of justice.  And it seems

16  like, you know, it's appropriate for Mr. Krepp to be able to

17  set the stage.  I mean, the parties have a stipulation about

18  what Mrs. Chrisley claimed happened the day after.  And so it

19  seems like the jury should be able to hear that and know the

20  context of the evidence.

21         You know, I don't even think Mr. Krepp was asking

22  Ms. Stone to give any testimony about some of the e-mails that

23  are at issue.  But they've been admitted.  The authenticity is

24  stipulated to.  They've been admitted as evidence.  I think

25  the jury has the right to see the evidence, hear the evidence

                    United States District Court

1    and see the e-mail.  And if Ms. Stone is not being asked to

2    give testimony about that and it's just being presented as

3    background for the jurors and it's already been admitted, that

4    doesn't seem improper.

5         THE COURT:  Well, how is that doing what you

6    described if you just simply have a witness on the stand and

7    you basically just read it and say is that what it says, would

8    you agree that's what it says?  I mean, if she's not being

9    asked anything, like you say, what connects her to that

10   e-mail?  I mean, it's in.  Is she just simply being used as

11   the vessel to convey it to the jury?  I mean, why are we even

12   talking about that e-mail to that witness if all we're doing

13   is basically just reading -- having the witness read along and

14   saying, did I read that correctly?

15        MS. PETERS:  Sure.  And, you know, I think it is -- I

16   mean, I guess we could ask the same question of an e-mail that

17   she is on, which we still read along to the jury.  And it's

18   trying to give the jury context about what's in there so that

19   they know what's in there.

20        THE COURT:  But if she's on the e-mail, you presume

21   that she does know the subject matter.  It's a different story

22   if she's not on there and it hasn't been established that she

23   has knowledge, unless, again, you're falling back on this

24   argument that the witness generally knows.

25        I don't know.  It may be super technical.  I guess I

                    United States District Court

1  am just pointing out that I feel like I am at a disadvantage

2  because I don't know what is in these e-mails.

3          A lot of times the only foundation that has been laid

4  is, here's an e-mail and we move it into evidence because

5  we've stipulated as to authenticity, then there becomes this

6  argument about whether the witness actually has knowledge of

7  the subject matter.  The Court certainly doesn't have that

8  knowledge, so I don't know how I can assess properly whether

9  the witness does.

10          Mr. Krepp seems to be taking the position that any

11  witness can be asked, it doesn't matter, which seems too vast

12  to me.

13          So I guess, in the absence of you-all more clearly

14  defining what this stipulation actually means, I don't know

15  how I am supposed to rule on each of these e-mails and I

16  foresee an objection being made to each one or a continuing

17  objection existing.  And so I just -- I don't know.  I don't

18  know what clarity can come from this.

19          All right.  Again, I guess part of that is what I

20  said earlier, is there seemed to be no agreement as to once

21  the e-mails were in under authenticity how they would actually

22  be presented, through a particular witness, that it doesn't

23  matter which witness, that the Government could just read the

24  documents, whatever.

25          MR. KREPP:  Just to clarify, our plan is not to just

United States District Court

1  have witnesses regurgitating e-mails or me regurgitating

2  e-mails to witnesses.

3       My questions to Ms. Stone were about -- everything

4  about Bank of America.  So I wasn't showing her e-mails about

5  Mark Braddock and just asking her to read e-mails about Mark

6  Braddock.

7       THE COURT:  Okay.  That may be the case.  I thought I

8  heard you say she doesn't have to have personal knowledge,

9  they stipulated.  So I thought you were basically conceding

10  she didn't have personal knowledge but saying it didn't

11  matter.

12       MR. KREPP:  So I think as a general evidentiary

13  principle I may feel that way, but that's not what we're going

14  to do in this case.  There's something we do want to

15  accomplish, though, and that is, show the information that the

16  defendants were hiding from the IRS.  So that's the point of

17  these questions.

18       As for my questions for Officer Carter tomorrow,

19  there are a number of e-mails where she's not on them.  And

20  that's the whole point, is she's trying to enforce collection

21  actions against the Chrisleys.  I'd like to show her, for

22  instance, the new Bank of America account and all of that and

23  say, was this information ever conveyed to you, would you have

24  wanted to know that as a collections officer.

25       THE COURT:  Well, I don't think a person has to be on
                    United States District Court

1  an e-mail chain to have knowledge of something.  That's
2  established.  Then it goes beyond that.  So does the person,
3  regardless of whether or not they're on the e-mail chain, have
4  knowledge of this?  And that's what I'm not in a position to
5  know because no foundation is being laid before.  These
6  documents are just being moved into evidence pursuant to the
7  stipulation and then I'm being asked to determine whether or
8  not this witness has knowledge and should be asked about it.
9  And I don't know how I'm supposed to do that.  That's the only
10  thing I'd point out.  I don't know how either side expects me
11  to do that.

12          I don't know whether someone is backpedaling on a
13  stipulation or whether a stipulation wasn't clearly hammered
14  out.  I'm not sure.

15          I'll leave it there.  We'll just keep muddling
16  through the best way that we can.  I don't know.  I don't know
17  if you-all have had any further discussion on these e-mails.
18  I don't know whether you have shared with the defense the
19  particular e-mails you plan to get in with this witness and
20  they have told you whether or not they have objections despite
21  the stipulation as to authenticity and you-all have discussed
22  that or not.  But again, I just encourage that type of
23  discussion, because right now it's difficult to understand
24  where -- each side's clear position.

25          All right.  Anything else before we depart for the
                 United States District Court

1  evening?  Government?

2         MS. PETERS:  If we could have one moment, your Honor.

3         THE COURT:  Sure.  Take your time.

4                      **(brief pause)**

5         MS. PETERS:  Your Honor, just one matter.  One of our

6  witnesses, just a fact witness, who is not a government

7  employee, is very unlucky and got a jury summons for Fulton

8  County next week.

9         THE COURT:  Oh, wow.

10        MS. PETERS:  She just notified us about it.  So we

11  just wanted to bring it to the Court's attention.  We're not

12  sure if there's anything the Court could do or that we could

13  do, but we just wanted to make the Court aware.  And we'll do

14  our best to work around it.

15        THE COURT:  All right.  Yeah, nothing I can do at

16  this point.  So you can just keep me informed.  A lot of times

17  they tell folks they don't have to report.  And so it may be a

18  nonissue.  If it still is an issue, you can remind me of it.

19        MS. PETERS:  Thank you.

20        THE COURT:  I think Thursday -- I did talk to, as

21  you-all just saw, the jury that does have the appointment at

22  10.  And as you-all suggested, we would just start at noon

23  that day.  She said she would try and get her appointment

24  moved up earlier.  That also, I think, will address the

25  concern by the jurors expressed in voir dire about having time

                  United States District Court

1  to vote for those who didn't do early voting.  So I will just
2  tell them we're starting at noon.  That covers both the
3  juror's medical appointment and an opportunity to vote.  And
4  we'll start at noon.
5          I don't think there's anything else.
6          Anything else from the Government?
7          MS. PETERS:  No, your Honor.
8          THE COURT:  Anything else from the defense?
9  Mr. Morris?
10         MR. MORRIS:  Thank you.  No, your Honor.
11         THE COURT:  Mr. Friedberg?
12         MR. FRIEDBERG:  No, your Honor.
13         THE COURT:  Mr. Griffin?
14         MR. GRIFFIN:  No, your Honor.  Have a good night.
15         THE COURT:  You too.  I hope I haven't made things
16  even more muddy.  I'm up here struggling with this one because
17  I want to get this right for you-all, for the Court and
18  everything.  But I'll think on it some more this evening.
19         Thanks and have a great evening.
20         **(The proceedings were adjourned for the day at 5:13**
21  **p.m., to be reconvened as ordered by the court.)**
22
23
24
25
              United States District Court

1

2

3

4                          Reporter's Certification

5    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

6    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7
                                    /S/GERALDINE S. GLOVER, RPR
8                                   OFFICIAL COURT REPORTER
                                    UNITED STATES DISTRICT COURT
9                                   NORTHERN DISTRICT OF GEORGIA

10   DATE:    JUNE 22, 2022

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          United States District Court