IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| UNITED STATES OF AMERICA, | ] | |
| --- | --- | --- |
| | ] | |
| v. | ] | File No. 1:19-CR-00297-ELR-JSA |
| | ] | |
| TODD CHRISLEY a/k/a | ] | |
| MICHAEL TODD CHRISLEY, | ] | |
| JULIE CHRISLEY, and | ] | |
| PETER TARANTINO, | ] | |
| | ] | |
| Defendants. | ] | |

## PETER TARANTINO'S SENTENCING MEMORANDUM

Peter Tarantino, who recently turned 60 years old, will be sentenced following his conviction for felony tax offenses. He did not financially benefit from the crimes that he was convicted of committing. Though he was convicted of conspiring with his co-defendants to misrepresent their taxable income and their assets with which they could pay past due taxes (and on their behalf, filed erroneous tax returns), he was paid his normal hourly rate ($180 - $200/hour) for providing CPA services.

Having been convicted, he deserves to be punished. This memorandum urges the Court to sentence him to a minimal period of incarceration reflecting his background, the nature of the crimes he committed, and his minimal role in the offense.

1

1. **<u>Tarantino, who is now 60 years, has no record. He poses no risk of recidivism</u>**

Studies have shown that when an offender's first offense occurs when he is in his 60's, the chance of recidivism as exceedingly low.[1] While age, in and of itself, is not a factor that the guidelines encourage to be explicitly calculated in computing the sentencing range, it does factor into recidivism, and recidivism is one of many factors that can and should inform the Court's decision about a reasonable sentence. *See* USSG § 5H1.1.

---

[1] The key findings of a United States Sentencing Commission's study of federal offenders' recidivism by age at release are that:

> • Older offenders were substantially less likely than younger offenders to recidivate following release. Over an eight-year follow-up period, 13.4 percent of offenders age 65 or older at the time of release were rearrested compared to 67.6 percent of offenders younger than age 21 at the time of release. The pattern was consistent across age groupings, and recidivism measured by rearrest, reconviction, and reincarceration declined as age increased.
>
> • For federal offenders under age 30 at the time of release, over one-fourth (26.6%) who recidivated had assault as their most common new charge. By comparison, for offenders 60 years old or older at the time of release, almost one quarter (23.7%) who recidivated had a
>
> Age exerted a strong influence on recidivism across all sentence length categories. Older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of sentence imposed. In addition, for younger offenders there was some association between the length of the original federal sentence and the rearrest rates, as younger offenders with sentences of up to six months generally had lower rearrest rates than younger offenders with longer sentences. However, among all offenders sentenced to one year or more of imprisonment, there was no clear association between the length of sentence and the rearrest rate.
>
> • Age and criminal history exerted a strong influence on recidivism. For offenders in Criminal History Category I, the rearrest rate ranged from 53.0 percent for offenders younger than age 30 at the time of release to 11.3 percent for offenders age 60 or older. For offenders in Criminal History Category VI, the rearrest rate ranged from 89.7 percent for offenders younger than age 30 at the time of release to 37.7 percent for offenders age 60 or older.
>
> • Education level influenced recidivism across almost all categories. For example, among offenders under age 30 at the time of release, college graduates had a substantially lower rearrest rate (27.0%) than offenders who did not complete high school (74.4%). Similarly, among offenders age 60 or older at the time of release, college graduates had a somewhat lower rearrest rate (11.6%) than offenders who did not complete high school (17.2%).

Tarantino has no criminal record. Moreover, as a CPA who has assisted individuals for decades, Tarantino has never been accused of any impropriety in connection with the preparation of any income tax return.

As noted above, Tarantino did not financially benefit from the crime. He was not paid extra, did not take a commission, and did not "split the loot" with the Chrisleys. He was not paid extra to hide information from the IRS; he was not paid a premium to falsify a tax return. Over the course of four years, he submitted bills at his normal hourly rate and was paid according to his bills. No presents; no gifts under the table.

Yet, he has paid a price, not just in attorney's fees, but in the loss of his business and his CPA license, his reputation and standing in the community, as well as any fine that the Court will impose.

2. **Tarantino's background, as revealed in the PSR, includes an abusive childhood which he overcame through perseverance**

As the PSR reveals, Tarantino's childhood was tumultuous. Tarantino describes his childhood:

> At the age of 7 my parents' marriage began to unravel. My father is an alcoholic and was physically and verbally abusive to my mother.
>
> After having endured the abuse for many years my mother, fearing for her safety and the wellbeing of my brother and I, filed for divorce and an order of protection. This only further enraged my father.
>
> Over the next several years their divorce and child custody hearings worked their way through the courts.

My father convinced my brother that the divorce was my mother's fault. He turned my brother against my mother. This was the beginning of a six-year period where my brother refused to have any contact with my mother.

My brother went to live with my father at my grandparents' home some 90 miles away in upstate NY.

My father did everything he could to avoid paying child support and alimony / maintenance. Needing to support me my mother returned to work as a legal secretary. I became a "latch-key child."

When I was 10 or 11 years old my father kidnapped me. He took me to my grandparents' home in Upstate NY. He made me call my mother and tell her I never wanted to see her again and if she made us go to court I would tell that to the judge. To say this was traumatic is an understatement.

After a few days passed my grandmother realized what was going on and she told my father to take me back to my mother or she would call the police.

My brother and I were always close even though we are 5 years apart in age and I missed him. I did see him when my father had visitation but I wanted more.

At the time I was about 11 years old I asked my mother if I could go live with my father because I missed my brother. I can't imagine how difficult it was for my mother to make this "Sophie's Choice" but she agreed because she felt it was important that my brother and I maintain our close relationship.

During this time my father remarried and we eventually moved to Long Island to the home owned by my now stepmother, Dolores.

I had regular visitation with my mother on weekends and alternate school vacations.

At the age of 12 I got a part time job at the grocery store a block away from our home on Long Island. I swept up, restocked shelves, and occasionally helped the delivery driver who delivered groceries to various homes in the small community.

One of the customers we delivered to was an orthopedic surgeon, Dr. Kapland. He noticed there was something wrong with my gait. He contacted my father to tell him his concern and offered to examine me at his office.

My father agreed. Dr. Kapland said I had a slipped femoral epiphysis. The problem, if not corrected would result in a significant difference in the length of my legs. I had surgery to correct the problem which involved putting pins in my femur. First on my right leg the following year on my left leg and then a final surgery to remove the pins.

Because of the surgeries I spent three consecutive summers in a wheelchair.

3. **Tarantino is recovering from hip surgery and will have a second operation in February on the other hip.**

On November 9th, Tarantino had hip replacement surgery. He will need the assistance of a walker for several weeks thereafter while receiving rehabilitative physical therapy. A second hip replacement will be necessary in approximately three-to-four months. *See* Letter from Anuj Gupta (Nov. 10, 2022) (Attached as Exhibit 1). Again, he will need a walker for several weeks while receiving rehabilitative physical therapy after this second procedure. The defense will be requesting a delayed surrender date to accommodate these medical issues, but also urges the Court to consider Tarantino's health condition and limited mobility (thus restricting his ability to participate in any prison recreation and limiting his work opportunities), in fashioning an appropriate in-custody sentence. *See* USSG 5H1.4.

4. **Tarantino has been charitable in ways that do not result in any recognition.**

Not only does Tarantino donate his time to charitable organizations; he also helps with his tenants and others who are in difficult situations. We are attaching as

exhibits to this memorandum several letters that document his community involvement, as well as his individual acts of compassion and charity.

He served on the board and has provided financial assistance to the following associations:

    a. Homestretch (homeless assistance)

    b. Hope Foundation (hospice care education and assistance)

    c. Alpharetta Public Safety Foundation (financial support to First Responders)

    d. Hopewell Youth Association (recreational baseball program).

His role in these charities are described in the attached letters of support.

**5. Letters of Support from Family, Friends, Clients, Tenants and Others**

Attached to this Memorandum are letters of support from members of Tarantino's family, friends, clients, tenants and various other people who have known Tarantino for decades and who have experienced his generosity, his compassion, and his exemplary behavior. (Exhibit 2). The letters portray Tarantino as a man who has regularly put the welfare of others ahead of his own financial interests: he has provided free accounting advice to both institutional charities and to individuals who have sought his help. He allows tenants to delay paying rent in hard times. For example:

> He is the very cornerstone of our family. For over ten years, while my mother split her time between our family and caring for her sick parents, my father

somehow managed to bridge the gap in caring for myself and my brother. He is also an emotional rock for our family, particularly through the deaths of his mother and my mother's parents. Also, he is the sole provider for a family of five.

The time from my father's indictment to the writing of this letter spans over three full years. In that time, I graduated college twice, my brother graduated high school and is almost finished with college. We have had two other deaths in our family. My father's father has almost passed away twice. My mother's aunt moved in with us and is under my mother's care. Both my brother and I have been hospitalized several times for various issues, me for my kidneys and
gallbladder, and my brother for his heart. And yet, through all of this, and despite the monstrous black cloud that has followed my dad around for all this time, my father has been there, with his head held high, ready to do anything and everything in his power to guide us through whatever crisis has befallen us at that point in time. Without him, I truly do not know how our family would continue to function.

My father was a board-member and accountant for Homestretch, a charity that provides stable housing for families with children, for almost a decade. He sat on the Board of Directors for the Alpharetta Public Safety Foundation. He was also a board member for Hopewell Youth Association where my brother and I played recreational baseball. He has done thousands of hours of pro-bono tax work for friends, family, and charitable organizations. He was also a yearly participant in our church's Secret Santa for the parish. Frequently, he will use credit card points to increase our family donations to North Fulton Community Charities.

Letter from Alexander Tarantino.

During a particularly difficult time in my life, I was going through an ugly divorce it was Peter who would invite me and my children to come out to dinner with his family every Saturday after church. Peter would do my taxes and not charge me because he knew financially, I was struggling. When my mother was gravely ill and we had to scramble to find somewhere for her and my father to live, it was Peter who came to the rescue for us. I don't remember a time when Peter has not offered help to my family even when we didn't ask.

Letter from Sheridan Alonso.

Peter and my family are extremely close, when my wife was seriously ill in hospital the Tarantino's were the first people to reach out and offer help, Peter facilitated an apartment for my wife and I to stay in once she was discharged from hospital.

Letter from John Britchford-Steel.

I met Peter when I accepted the position of Executive Director with HomeStrech, Inc., a nonprofit that provides housing and services for homeless families in North Fulton County. During my nearly 10 years at HomeStretch, I came to know Peter as a committed member of the Board of Directors, a passionate volunteer and a generous person who cares for others and serves his community.

Letter from Rose Burton.

Peter willingly devoted his time, effort and free business services to Hopewell Youth Baseball and several other community events. Peter covered everything from registration, uniforms, coaching, mentoring, concession stands to Board of Directors. Peter has made helping others and volunteering contagious in our community. Usually anytime something comes up where help is needed Peter is the first call.

Letter from Phillip Hettinger.

Peter respects us as tenants while always displaying great compassion and understanding when I face financial difficulties which results in late rental payments. He is never disgruntled, and his kind words of encouragement during such trying financial times helps me tremendously. These remarkable attributes, along with his compassion and patience aids in alleviating the pressures of my symptoms from anxiety.

Letter from Crystal Matthews.

## **CONCLUSION**

The United States Sentencing Commission has identified the list of factors that courts often cite as reasons for a downward variance. If one were to check the boxes, Tarantino would score high on over a dozen of the reasons that have been identified as supporting a downward variance: (1) Medical Care; (2) aberrant behavior; (3) community ties; (4) conduct while on release; (5) physical condition; (6) non-violent offense; (7) role in the offense; (8) previous employment record; (9) youthful experiences; (10) age; (11) family ties and responsibilities; (12) lack of criminal history; (13) no need to protect public from further crimes; (14) criminal history issues. U.S.S.C. Sourcebook, 2021, Table 44.

It is worth noting, moreover, that well over 50% of sentences imposed in federal court for tax offenses result in a variance (USSC Source Book, 2021, Table 31).

For the foregoing reasons, Tarantino urges the Court to impose a sentence of 18 months. This sentence will accomplish the legitimate mission of sentencing and accounts for all the §3553(a) factors and will be consistent with the sentencing decisions of federal judges throughout the country, thus avoiding inappropriate disparity.

Respectfully submitted,

By: */s/Donald F. Samuel*
Donald F. Samuel
Ga. Bar No. 624475
Garland, Samuel & Loeb
dfs@gsllaw.com

John J. Van Why
Ga. Bar No. 814951
Griffin Durham Tanner & Clarkson, LLC
jvanwhy@griffindurham.com

Daniel P. Griffin
Ga. Bar No. 310760
Griffin Durham Tanner & Clarkson, LLC
dgriffin@griffindurham.com

*Attorneys for Defendant Peter Tarantino*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of November, 2022, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel of record.

                                            */s/John J. Van Why*
                                            John J. Van Why
                                            Ga. Bar No. 814951